1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF ALABAMA

3                  SOUTHERN DIVISION

4

5    MAX LEROY REED, JR. and

6    ELIZABETH REED, individually and

7    on behalf of all similarly

8    situated individuals,

9            Plaintiffs,

10

11   vs.     Civil Action No. 11-0412-WS-C

12

13   CHASE HOME FINANCE, L.L.C.,

14           Defendant.

15

16        DEPOSITION OF:  ALBERT SMITH, JR.

17              January 26, 2012

18

19          S T I P U L A T I O N

20          IT IS STIPULATED AND AGREED by and

21   between the parties through their respective

22   counsel that the deposition of ALBERT SMITH, JR.

23   may be taken before Howard R. Burns, Court

Page 2

1  Reporter and Notary Public, at the Law Offices of
2  Johnson, Barton, Proctor & Rose, L.L.P., 569
3  Brookwood Village, Suite 901, Birmingham,
4  Alabama, 35209, at 10:05 a.m., January 26, 2012.
5       IT IS FURTHER STIPULATED AND AGREED
6  that the signature to and the reading of the
7  deposition by the witness is waived, the
8  deposition to have the same force and effect as
9  if full compliance had been had with all laws and
10  rules of Court relating to the taking of
11  depositions.
12       IT IS FURTHER STIPULATED AND AGREED
13  that it shall not be necessary for any objections
14  to be made by counsel to any questions, except as
15  to form or leading questions, and that counsel
16  for the parties may make objections and assign
17  grounds at the time of trial, or at the time said
18  deposition is offered in evidence, or prior
19  thereto.
20       IT IS FURTHER STIPULATED AND AGREED
21  that notice of filing of the deposition by the
22  Commissioner is waived.
23

Page 4

1
   DEFENDANT'S EXHIBITS:         PAGE NUMBER:
2
   11   Sections, note holder, etc.    182
3
   12   Section 401 documents          184
4
   13   Section I, 408 MERS, etc.      185
5
   14   Section VIII documents         187
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 3

1
2          I N D E X
3  EXAMINATION BY:          PAGE NUMBER:
4  Mr. Riemer          6; 191; 211
5  Ms. Downs           154; 209
6
7  PLAINTIFF'S EXHIBITS        PAGE NUMBER:
8  1    Notice              21
9  2    Binder  (retained)  39
10  3   Binder  (retained)  40
11  4   McCullough letter 9-3-10    86
12
   DEFENDANT'S EXHIBITS        PAGE NUMBER:
13
   1    Promissory note     155
14
   2    MERS Milestones     160
15
   3    Servicing record    163
16
   4    Screens in Servicing System    165
17
   5    Servicing System - Internal Records  167
18
   6    Foreclosure Notes   170
19
   7    Mortgage            172
20
   8    Notice of acquired servicing rights  178
21
   9    Section I documents   180
22
   10   Section I documents   181
23

Page 5

1
2          A P P E A R A N C E S
3
4       The Law Offices of Underwood & Riemer,
5  P.C., by Mr. Earl P. Underwood, Jr. and
6  Mr. Kenneth J. Riemer, 21 South Section Street,
7  Fairhope, Alabama, 36532, appearing on behalf of
8  the Plaintiffs.
9
10      The Law Offices of Johnson, Barton,
11  Proctor & Rose, L.L.P., by Ms. Helen Kathryn
12  Downs, 569 Brookwood Village, Suite 901,
13  Birmingham, Alabama, 35209, appearing on behalf
14  of the Defendant.
15
16
17
18
19
20
21
22
23

Page 6

1        I, Howard R. Burns, Court Reporter and
2    Notary Public, acting as Commissioner, certify
3    that on this date as provided by the Federal
4    Rules of Civil Procedure, and the foregoing
5    stipulation of counsel, there came before me
6    at the Law Offices of Johnson, Barton, Proctor &
7    Rose, L.L.P., 569 Brookwood Village, Suite 901,
8    Birmingham, Alabama, 35209, at 10:05 a.m.,
9    January 26, 2012, ALBERT SMITH, JR., witness in
10   the above cause, for oral examination, whereupon
11   the following proceedings were had:
12
13           ALBERT SMITH, JR.,
14   being first duly sworn, was examined and
15   testified as follows:
16       THE COURT REPORTER:  Do we have the usual
17   stipulations?
18       MS. DOWNS:  Those are fine with us.
19       MR. RIEMER:  Yes.
20   EXAMINATION BY MR. RIEMER:
21   Q.   Could you state your full name for the
22   record, please?
23   A.   Albert Smith, Jr.

Page 7

1    Q.   Mr. Smith, my name is Ken Riemer.  We met a
2    few minutes ago.  I heard you introduce yourself
3    as Al.  Do you go by Al or Albert?
4    A.   Yes.  Al is fine.
5    Q.   As you know, I represent Mr. and Mrs. Reed
6    in this case and with me is my law partner, Earl
7    Underwood.  He also represents the Reeds.
8        Could you tell -- Well, tell me first, you
9    have given deposition testimony before, right?
10   A.   Yes.
11   Q.   Okay.  Let me just go over my iteration of
12   the ground rules and make sure we are on the same
13   page.  I'm sure you have heard this, something
14   like this before.
15       I'm going to ask you a series of questions
16   and I'll do my best to ask questions that you can
17   understand that are clear.  But I promise you
18   I'll ask a question and probably more than one
19   that will be -- will not be clear to you.  So if
20   that is the case, you let me know and I'll reask
21   the question or we will have the question read
22   back.
23       But if you don't ask for clarification on

Page 8

1    the question and answer the question, the record
2    is going to assume that you understood the
3    question and answered.
4        Do you understand that?
5    A.   Yes.
6    Q.   You know, I'm sure, that we are
7    communicating verbally here so that the court
8    reporter can take our words down and so that nods
9    of the heads and other nonverbal communication
10   doesn't work.  I'll be just as guilty as you are
11   as this goes.
12       But you understand that, right?
13   A.   Yes.
14   Q.   Okay.  One more thing, this is not an
15   endurance test.  Any time you would like to take
16   a break, and lawyers will take breaks, too, just
17   let us know and we will accommodate that.
18       There's only one rule on breaks and that is
19   that we can't take a break while there's a
20   question pending.  Just make sure the question --
21   last question asked is answered and then we will
22   take a break.  Okay?
23   A.   Okay.

Page 9

1    Q.   Could you tell me, identify for me your
2    employer?
3    A.   J.P. Morgan Chase Bank NA.
4    Q.   What is your position?
5    A.   Home lending research officer.
6    Q.   How long have you been a home lending
7    research officer.
8    A.   Will be two years in May.
9    Q.   How long have you been with J.P. Morgan
10   Chase?
11   A.   Since the early part of 2008.
12   Q.   Okay.  So three years or coming up on four
13   years?
14   A.   Yes, yes.
15   Q.   Okay.  We will probably most of the time
16   refer to J.P. Morgan Chase as Chase, although we
17   are going to have to make a distinction between
18   that and Chase Home Finance.  But just for now,
19   when I say Chase, we'll refer to J.P. Morgan
20   Chase.
21       Is that okay?
22   A.   Yes.
23   Q.   All right.  Before -- Well, tell me a

1 little bit about your educational background,
2 Mr. Smith.
3 A.  I completed high school.  I attended Alfred
4 State University in Alfred, New York.  I didn't
5 complete a degree there.
6 Q.  What did you study there?
7 A.  Accounting.
8 Q.  Okay.
9 A.  And I also am currently online with DeVry
10 University.  I've got about a year to finish up a
11 Bachelor's degree.
12 Q.  Okay.  With your -- Other than the
13 accounting study work that you did with Alfred,
14 is that -- Do I have that right?
15 A.  Yes.
16 Q.  -- and your current curriculum with DeVry,
17 is there any other post-high school education?
18 A.  I've taken courses in Atlanta through
19 Dekalb College.
20 Q.  Have these been accounting courses?
21 A.  Some, yes.
22 Q.  Are you working towards your CPA or are you
23 just --

1 A.  Currently I'm just working to get a
2 business management degree.
3 Q.  Okay.
4 A.  I changed my mind.
5 Q.  Okay.  That's your prerogative.  Okay.
6 So when -- So you started Chase the early part of
7 2008.
8     What did you do before then?
9 A.  Well, initially I was employed with EMC
10 Mortgage in September of 2007.
11 Q.  That's a mortgage servicing company or was?
12 A.  Right.  Correct.
13 Q.  Okay.
14 A.  Which was acquired by Chase in 2008.
15 Q.  Tell me again when you started working for
16 EMC.
17 A.  September of 2007.
18 Q.  Okay.  So your employment with Chase began
19 as a result of the merger of EMC into Chase?
20 A.  Correct.
21 Q.  So what did you do for EMC?
22 A.  For EMC, I was a foreclosure title --
23 foreclosure and title analyst.

1 Q.  Now, did that entail working with the
2 foreclosure lawyers in the foreclosure process?
3 A.  Yes.
4 Q.  Making sure the title -- all the title
5 documents they needed for foreclosure were lined
6 up correctly; is that fair?
7 A.  In some instances, yes.
8 Q.  Okay.  How would you describe your job
9 duties as a title analyst, foreclosure title
10 analyst at EMC?
11 A.  Well, for -- In my particular role, I
12 worked with foreclosures that were contested.
13 And so I would often respond to interrogatories
14 related to litigation, complete any research
15 necessary.
16     If there were title issues hindering
17 foreclosure, I would follow up on title claims
18 that were filed or make sure that they have been
19 filed and determine the best way to clear the
20 title for those loans.
21 Q.  Okay.  Did your job duties also include
22 giving deposition testimony in litigated matters?
23 A.  When -- When required for that particular

1 case, yes.
2 Q.  That happened for EMC?
3 A.  Yes.
4 Q.  About how many depositions did you give
5 while you were working for EMC?
6 A.  I really don't remember.  I'm not sure.
7 Q.  Would it be more than ten?
8 A.  I don't -- I'm not really sure.  I don't
9 think so, but I don't recall.
10 Q.  All right.  That gives me an idea.
11     Was that your position at EMC the two years
12 you worked there before the acquisition or let's
13 say the period of time you worked there before
14 the acquisition by Chase?
15 A.  No.
16 Q.  What other position did you have?
17 A.  Well, I held a position as a fulfillment
18 assistant manager.
19 Q.  What does that mean?
20 A.  We processed or I managed a team that
21 processed the setup of loan modifications that
22 were approved.
23 Q.  Okay.  So that was part of the loss

Page 14

1  mitigation function?
2  A.   Well, the back end process, the part where
3  we -- We actually just made the system changes to
4  reflect the documents that were sent and executed
5  and returned.
6  Q.   Okay.  So at the tail end of the
7  modification process when there's a permanent
8  mod, there would be some title work, things to be
9  recorded and things like that; is that what you
10  are talking about?
11  A.   Yes.
12  Q.   Are those the only two positions you had
13  while you were at EMC?
14  A.   Yes.
15  Q.   All right.  So when you became employed by
16  Chase after the merger, what was -- the research
17  officer position you hold now, was that the
18  position you held then?
19  A.   Well, no.
20  Q.   Okay.
21  A.   What happened was as far as the fulfillment
22  assistant manager position, initially I was part
23  of EMC for that role and after the acquisition I

Page 15

1  remained under the EMC umbrella, working with EMC
2  loans.  And then in 2009 I transitioned to the
3  Chase loan portfolio.
4  Q.   Okay.  Is it -- Did your duties change?
5  A.   No.
6  Q.   Okay.  So basically the same functions that
7  you described for us as a fulfillment assistant
8  manager at EMC, you are doing as research officer
9  at Chase; is that fair?
10  A.   No.
11  Q.   Okay.  Tell me how I'm off then.
12  A.   Well, no.  In May of 2010 actually I became
13  -- I changed positions and became a research
14  officer.
15  Q.   All right.  So that was the case until May
16  of 2010 and this current job is different from
17  what you were doing before at EMC?
18  A.   Yes.
19  Q.   Okay.  How -- Tell me how your job changed
20  and what you do now.
21  A.   How my job changed from when?
22  Q.   On May 2010 when you went, when you got --
23  Well, let me make sure I understand this right

Page 16

1  before we move on.  Okay.
2     So at EMC you were a foreclosure title
3  analyst, then you were, I guess, promoted to
4  fulfillment assistant manager; is that --
5  A.   Yes.  I applied for the position, yes.
6  Q.   And then the acquisition into Chase
7  happened in 2009, correct?
8  A.   No.
9  Q.   Okay.
10  A.   The acquisition to Chase occurred in early
11  2008.  So I became an employee of Chase through
12  that acquisition at that time --
13  Q.   Okay.
14  A.   -- though I continued to work on the --
15  with the EMC platform for a period of time.
16  Q.   Okay.  Then that changed to a Chase
17  platform in 2009?
18  A.   Correct.
19  Q.   Okay.  But your job didn't change?
20  A.   No.
21  Q.   Until May 2010?
22  A.   Correct.
23  Q.   Okay.  Then what happened in May 2010?

Page 17

1  A.   In May 2010 is when I started the position
2  as home lending research officer.
3  Q.   Okay.  All right.  Then tell me what your
4  job entails as home lending research officer.
5  A.   As home lending research officer, I review
6  loans that have some type of pending litigation;
7  complete research related to that litigation;
8  when required, make appearances by way of
9  hearings, mediations, depositions, depending on
10  the case.
11  Q.   What about trials?  As part of your job
12  duty -- part of your job duties include
13  testifying at trial, if the case goes to trial?
14  A.   Yes.
15  Q.   Have you done that?
16  A.   Yes, I have.
17  Q.   Okay.  How many times have you testified in
18  trial?
19  A.   I don't know how many times off the top of
20  my head.
21  Q.   Would it be -- Would it be more than ten?
22  A.   Possibly, yes.
23  Q.   Possibly more?

Page 18

1 A. Yes.
2 Q. Less than twenty, something like that?
3 A. I would say less than twenty.
4 Q. Okay. Now, the trials that you have
5 testified to in litigated matters, do these
6 include judicial actions in foreclosure, in
7 judicial foreclosure states?
8 A. Sometimes.
9 Q. Do these cases also include cases where
10 there are affirmative claims brought by a
11 borrower against Chase?
12 A. Yes.
13 Q. Do all the cases you are involved in
14 involve an affirmative claim by a borrower
15 against Chase?
16 A. Not necessarily.
17 Q. Now, when you were involved with EMC as a
18 fulfillment assistant manager -- Well, strike
19 that.
20     Your job as the foreclosure title analyst,
21 did it -- were you limited to certain
22 jurisdictions? Because I know EMC was
23 nationwide, a lot of different -- was involved in

Page 19

1 mortgages in a lot of different states.
2     Was your job limited to certain states?
3 A. No.
4 Q. Okay. So you dealt in states that had both
5 a nonjudicial system and states that had a
6 judicial foreclosure system?
7 A. Yes.
8 Q. Okay. Is that true with regard to your
9 work with Chase? In other words, you work in
10 cases in jurisdictions that are both nonjudicial
11 foreclosure and judicial foreclosure?
12 A. Yes.
13 Q. Is it fair to say that the cases that you
14 get involved in, you are not involved in the case
15 until after a dispute has arisen and there is
16 litigation?
17 A. Correct.
18 Q. All right. So you don't -- your job
19 doesn't entail actually participating in the
20 servicing of a mortgage as it occurs?
21 A. No.
22 Q. I guess that hasn't happened for you since
23 you were a foreclosure title analyst, analyst?

Page 20

1 A. I'm sorry.
2 Q. Well, if I understand you right, when you
3 did -- when you worked as a foreclosure title
4 analyst, you did participate in particular files
5 as the foreclosure was going forward? Do I
6 understand that right?
7 A. Yes.
8 Q. Okay. But since that position, your work
9 is only on cases after a dispute has arisen and
10 there has been litigation?
11 A. Well, also my role as the fulfillment
12 assistant manager, I worked with the loan
13 servicing in regards to the setup of the loan
14 modifications.
15 Q. Okay. What you were talking about before
16 at the end --
17 A. Yes.
18 Q. -- at the end of the modification process?
19 A. Yes.
20 Q. In terms of your position with Chase, have
21 you undergone any kind of training, other than
22 on-the-job training, attended training seminars
23 or other types of structured training activity?

Page 21

1 A. Yes.
2 Q. Tell me about those.
3 A. I've had training in regards to certain
4 types of loans, home equity, home equity loans, I
5 received some training in reference to that, the
6 filing proof of claim process. Also periodically
7 take online courses as well.
8 Q. Courses that are offered through Chase?
9 A. Correct.
10 Q. Did your training include training on legal
11 requirements regarding foreclosures in the
12 various states?
13 A. No.
14 Q. Okay. Go ahead and mark this.
15     (Plaintiff's Exhibit Number 1
16     marked for identification and
17     same is attached hereto.)
18 Q. Mr. Smith, I'm going to hand you what I've
19 marked as Exhibit One, Plaintiff's Exhibit One
20 and that is a copy of the notice for today's
21 deposition.
22     Have you seen that before?
23 A. Yes.

Page 22

1  Q.   Okay.  Is it your understanding today that
2  you are giving testimony on behalf of Chase as
3  its designated representative?
4  A.   Yes.
5  Q.   On the second page of that exhibit is a
6  list of topics.
7      Is it your understanding that you are here
8  to give testimony on behalf of Chase for the
9  topics listed on Exhibit A of the notice?
10     MS. DOWNS:  Let me just interject for the
11 record that Chase has filed a response
12 delineating which topics this witness will speak
13 to, that I trust y'all have.
14     MR. RIEMER:  Yes, we do.  I mean, in the
15 rush to get all this together -- Why don't we
16 establish that?
17     MS. DOWNS:  Okay.
18     MR. RIEMER:  Why don't we go off the record
19 for a second?
20     (Off-the-record discussion.)
21 BY MR. RIEMER:
22 Q.   From our off-the-record discussion,
23 Mr. Smith, it's my understanding that you are

Page 23

1  here to testify about all matters here, but with
2  some caveats, that you are not prepared to
3  testify in any depth about the claims that are
4  involved in the Reeds state court case against
5  Chase.
6      Is that your understanding?
7  A.   Correct.
8  Q.   Okay.  And there will be a second witness
9  that will be able -- The other caveat is that
10 while you are familiar, you have familiarity with
11 Fannie Mae Guidelines, there will be another
12 witness that will testify in more depth in
13 response to this notice as to the relationship
14 between Chase and Fannie Mae and the application
15 of those Guidelines?
16     MS. DOWNS:  Let me clarify, Ken.  That is
17 something that Al Smith is prepared to testify
18 to.
19     MR. RIEMER:  Yes, I'm going to ask him
20 questions.  But he won't be the only witness on
21 that?
22     MS. DOWNS:  That's what I want to clarify.
23 That topic is -- Al is being put up for that

Page 24

1  topic.
2      MR. RIEMER:  Okay.
3      MS. DOWNS:  If I wasn't clear during our
4  off-the-record discussion, our second witness
5  relates to more of Chase's systems for -- and
6  records as servicer for Fannie Mae.
7      MR. RIEMER:  Okay.
8      MS. DOWNS:  But the guide -- Mr. Smith is
9  preferred for the Servicing Guide today.
10 BY MR. RIEMER:
11 Q.   Okay.  That's your understanding?
12 A.   Yes.
13 Q.   All right.  Before we go on, let me ask you
14 this though:  With regard to the state court
15 case, you are aware that the Reeds have filed a
16 case against -- a lawsuit against Chase that's
17 pending in state court?
18 A.   Yes.
19 Q.   Tell me what you know about that case.
20 A.   I don't know a lot about the case.  I'm --
21 Q.   You know just that it's out there?  You
22 don't know what the allegations entail?
23 A.   I don't know what the specifics are.

Page 25

1  Q.   Okay.  Tell me what you did -- You know
2  this, but I will say it for the record just to
3  make sure, you know, where we are coming from.
4      I'm not asking you to reveal anything you
5  have discussed with your lawyers or they have
6  discussed with you, but I do want to know or get
7  an idea what you did to prepare for this
8  deposition.
9  A.   Okay.  I reviewed documents within our
10 servicing file, a copy of the note, mortgage.  I
11 reviewed -- I've glanced at the loan history, the
12 payment history of the loan.  I've also spoken
13 with Investor Reporting within Chase as it
14 relates to transactions with Fannie Mae.
15 Q.   Okay.  Go ahead.  I didn't mean to stop
16 you.
17 A.   And, of course, reviewed the complaint and
18 other documents related to this case.
19 Q.   Now, Chase's attorneys have produced a set
20 of documents to us.
21     And when you talk about the note, mortgage
22 and the documents related to the case, are you
23 talking about the documents that have been

Page 26

1 produced?
2 A.  Yes.
3 Q.  Okay.  Now, did you review any policy
4 documents, policy type documents?
5 A.  Well, I reviewed the -- I've glanced at the
6 Fannie Mae Servicing Guide.  I also searched
7 internally for any policies that we had related
8 to Fannie Mae.  And I did speak with our
9 foreclosure manager in regards to specific
10 processes and procedures for Fannie Mae loans in
11 the State of Alabama.
12 Q.  Okay.  Well, your understanding -- You
13 understand, do you not, that this lawsuit here,
14 the federal case, the lawsuit you are here about,
15 centers around the requirement embodied in
16 Section 1641(g) of truth in lending, right?
17 A.  Yes.
18 Q.  Okay.  Before you were asked to give
19 testimony in this case, had you ever heard of
20 that particular provision?
21 A.  No.
22 Q.  You never dealt with it?
23 A.  Not that I recall.

Page 27

1 Q.  Didn't know what it says?
2 A.  No.
3 Q.  Okay.  When -- You said you, in preparing
4 for this deposition, you spoke with Investor
5 Reporting.
6    Is that a department within Chase?
7 A.  Yes.
8 Q.  What do they do?
9 A.  They are responsible for tracking payments
10 or disbursements to particular investors or
11 owners of a loan.
12 Q.  Payments, you mean payments that are made
13 when a loan goes -- changes hands or payments
14 that are collected on the regular course of
15 servicing a loan?
16 A.  Well, payments that actually are disbursed
17 to the loan owners on a monthly basis.
18 Q.  Okay.  So Chase -- Chase Home Finance, the
19 servicing arm of Chase, is servicing a mortgage
20 for an investor, correct?
21 A.  Correct.
22 Q.  Monthly mortgage payments come in, Chase
23 retains a portion of those and then a portion --

Page 28

1 a portion goes to the investor?  Is that what you
2 are talking about?
3 A.  Yes.
4 Q.  All right.  This department, Investor
5 Reporting, is in charge of that aspect of the
6 servicing; is that what you are saying?
7 A.  Correct.
8 Q.  All right.  Did you speak with a lawyer
9 inside that department?
10 A.  No.
11 Q.  Okay.  Who was it that you spoke to?
12 A.  Her name is Erin Culley.
13 Q.  C-u-l-l-y?
14 A.  Yes.  No.  C-u-l-l-e-y.
15 Q.  What did you ask her and what did you talk
16 about with her?
17 A.  What I discussed with her was obtaining
18 information related to the monthly disbursement
19 to Fannie Mae as it relates to the particular --
20 the Reeds' loan and any documentation related to
21 that.
22 Q.  Okay.  What did she say?  What did she tell
23 you?

Page 29

1 A.  Well, she gave me information related to
2 the monthly disbursement and what she told me,
3 what she explained -- and I'm not an accounting
4 or Investor Reporting guru.
5 Q.  Okay.
6 A.  But what she explained was that the -- on a
7 monthly basis Chase disburses funds to Fannie Mae
8 as it relates to a loan in this case, that was
9 done for a certain period of time around the
10 first day of each month.
11 Q.  Okay.
12 A.  And then Fannie Mae allows for a provision
13 when the loan is delinquent, that instead of
14 disbursing on a monthly basis, that you were able
15 to disburse as payments actually are received.
16 Q.  Well, skipping ahead to some things we will
17 be talking about.
18    You are aware of an assignment that was
19 recorded in this case?
20 A.  Yes.
21 Q.  Okay.  Did you discuss with Ms. Culley
22 whether the payment arrangement changed at all
23 after the execution of that assignment?

Page 30

1 A.  No.  I didn't ask that specific question.
2 Q.  Well, okay.  So your discussion with her
3 centered on the arrangement with regard to the
4 money that is retained by Chase and the money
5 that is conveyed to the investor?
6 A.  Yes.
7 Q.  Okay.  Anything else?
8 A.  No.
9 Q.  Okay.  Now, you said you talked to a
10 foreclosure manager?  Did I write that down
11 right?
12 A.  Yes.
13 Q.  Okay.  Was that person a lawyer?
14 A.  No.
15 Q.  What department was that person in?
16 A.  He manages foreclosure for the State of
17 Alabama.
18 Q.  Okay.  What is his name?
19 A.  His first name is Brad.  I don't remember
20 his last name off the top of my head.
21 Q.  What department is he in?
22 A.  Foreclosure.
23 Q.  That makes sense.  So that department is --

Page 31

1 that department has folks that are assigned to
2 particular states, I take it?
3 A.  Yes.
4 Q.  All right.  Do you know his position?
5 Is foreclosure manager his position?
6 A.  Yes.
7 Q.  Is he the -- As far as the group that
8 handles Alabama, is he head of -- is he the
9 supervisor of that group?
10 A.  Yes.
11 Q.  Okay.  What did you talk to Brad about?
12 A.  Well, I specifically -- I wanted to know if
13 there were specific procedures for processing the
14 Fannie Mae foreclosures outside of the Servicing
15 Guidelines that we adhere to.  And he verified
16 that that is what they use, is the Fannie Mae
17 Servicing Guidelines and then any additional
18 legal information that they need to rely on, they
19 rely on our outside foreclosure counsel.
20 Q.  Okay.  So let me make sure.  I'm not trying
21 to put words in your mouth.  Just I want to see
22 if I can -- if I have this down.
23     He confirmed for you that for loans that

Page 32

1 are serviced where Fannie Mae is the investor,
2 the Fannie Mae Guidelines are the Servicing
3 Guidelines?
4 A.  Yes.
5 Q.  Okay.  That is the case other than -- Well,
6 did he give you the impression that if Fannie Mae
7 Guidelines don't answer a particular question,
8 then they rely on whatever the local lawyers
9 advise them as to a particular issue?
10 A.  Yes.
11 Q.  So with regard to servicing Fannie Mae
12 loans, there is no separate servicing agreement
13 or set of guidelines that govern?  The Fannie Mae
14 Guidelines are the Servicing Guidelines?
15 A.  Yes.
16 Q.  Did you speak with Brad about the legal
17 effect of the assignment that was recorded with
18 respect to the Reeds' loan?
19     MS. DOWNS:  Object to the form.  That
20 really asks about a legal question, but you can
21 answer if you all talked about it.
22 A.  No, I didn't ask him that.
23 Q.  You are probably familiar with this.  There

Page 33

1 will be objections.  You just let her get her
2 objections out.  Unless she instructs you not to
3 answer, which would be rare, you do your best to
4 answer subject to her objections.
5     You understand that, right?
6 A.  Yes.
7 Q.  Let me ask you this:  Mr. Smith, before you
8 were made aware of this case and being -- before
9 you were asked to give testimony here, in your
10 work in the mortgage servicing industry have you
11 ever heard use of the term "administrative
12 convenience"?  Does that term mean anything to
13 you?
14 A.  I can't say off the top of my head that I
15 have or haven't.
16 Q.  Not a term that come -- that came up in
17 your experience in the servicing business?
18     MS. DOWNS:  Object to the form.
19 A.  I don't recall one way or the other.
20 Q.  Have you -- Again, not with your lawyers,
21 but with respect to the non-lawyers that you
22 spoke with in preparation -- in preparing for
23 this deposition, did you -- did that term come

Page 34

1 up?
2 A.  I'm sorry.  Can you --
3 Q.  In your discussion with the non-lawyer
4 individuals in preparing for this deposition, did
5 that term come up?
6 A.  No.
7 Q.  All right.  Before we move on, one more
8 thing.  Can you tell me in your words -- I'm not
9 asking for a legal opinion, I understand you are
10 not a lawyer -- but in your words tell me what is
11 your understanding of what this case, this
12 federal case is about?
13 A.  In essence it's a question of the -- who
14 the owner is as it relates to the note and
15 whether there is a separation between the
16 mortgage and the note.
17 Q.  Okay.  You said that before you got
18 involved in this case you didn't -- you weren't
19 familiar with 1641(g).
20     But in preparing for this deposition, did
21 you review that provision?
22 A.  Yes.  I've looked at it.
23 Q.  Okay.  There is a set of administrative

Page 35

1 history documents in the Federal Register, there
2 was an interim rule and a final rule.
3     Did you review any of those regulatory type
4 documents?
5 A.  I don't believe so.
6 Q.  Okay.  Other than the Fannie Mae Guidelines
7 that we talked about and the actual provision
8 itself, did you read any other material related
9 to 1641(g)?
10 A.  No.
11     MS. DOWNS:  Again, let me clarify for the
12 record since he's not a lawyer, you referred to
13 interim rule and final rule.  When he talks about
14 the statute, that includes the final regulation.
15 Q.  Okay.
16     MS. DOWNS:  That's the -- Sorry.
17 Q.  Well, I'd show you a version of it, but
18 there's so many iterations as far as how they
19 look.  The words are all the same, but I have no
20 idea -- So you saw material beyond just the
21 couple of paragraphs of what the actual statutory
22 language is in 1641(g)?
23 A.  Yes.

Page 36

1 Q.  Okay.  We will get to some of that.
2 A.  Okay.
3 Q.  I want to get an idea.  You have told me a
4 good deal about the corporate structure of Chase
5 as it pertains to these kinds of issues.  Chase
6 is big.  I don't want to go to every department
7 that there is.  And you -- We talked about the --
8 Let me see.  Make sure I get this right.
9     The Investor Reporting Department, do I
10 have that right?
11 A.  Yes.
12 Q.  Is that the department that deals with the
13 relationship in general between Chase and the
14 investor or is there another department that
15 deals with that?
16 A.  I'm not sure what you mean by the
17 relationship.
18 Q.  Some of the -- In just conducting 30(b)(6)
19 depositions in mortgage cases involving other
20 services, I've heard the term "Investor Relations
21 Department", something like that.
22     Is that something -- Is that a term that
23 exists in Chase as far as their departments?

Page 37

1 A.  I'm not familiar with Investor Relations.
2 Q.  Okay.
3 A.  I don't know.  Matt Kibble may be able to
4 speak to that more.
5 Q.  Okay.  Now, you mentioned Brad in the
6 Foreclosure Department.  Do I have it right that
7 there would be his department that would deal
8 with the local lawyers, making sure they had the
9 documents they needed to conduct a foreclosure?
10 A.  Yes.
11 Q.  Now, as far as the servicing side of
12 things, Chase Home Finance, they service loans
13 like this one where the investor is Fannie Mae,
14 right?
15 A.  Yes.
16 Q.  All right.  I assume that part of your
17 servicing portfolio includes other GSE's, cases
18 for Freddie Mac and the other -- is that right?
19 A.  Yes, yes.
20 Q.  Okay.  Does Chase Home Finance's servicing
21 portfolio also include mortgages that are held in
22 trust that are not related to Fannie Mae or some
23 other government sponsored entity?

Page 38

1 A.  Yes.
2 Q.  Okay.  What about does it service loans
3 that are actually owned by a Chase entity and not
4 some outside entity?
5 A.  Yes.
6 Q.  Okay.  What would you call that third
7 category?  Is there a term for that?  In-house
8 loans or something like that?
9 A.  Yes.
10 Q.  Is that a term y'all use?
11 A.  Yes.  Or Chase loans.
12 Q.  Okay.  Now, is there another category of
13 loans that y'all service that I've missed?  So
14 we've got GSE's and we have the non-GSE loans
15 that are held in a trust and then we have the
16 in-house loans?
17 A.  On occasion Chase also services loans for
18 other services.
19 Q.  As a subservicer?
20 A.  Yes.
21 Q.  That's not the case here though?
22 A.  No.
23 Q.  All right.  So with the addition of the

Page 39

1 loans that it services as subservicer, is that --
2 have I listed all the general categories of the
3 types of loans that are serviced, as far as you
4 know?
5 A.  Speaking generally, yes.  But I can't speak
6 for every loan.
7    MR. RIEMER:  I hate to do this early, but I
8 need a little break.
9    MS. DOWNS:  Sure.
10    (Recess: 10:45 a.m. to 10:56 a.m.)
11 BY MR. RIEMER:
12 Q.  Let's go back on.  In a little while we are
13 going to be getting into some of these documents,
14 so we were discussing how to proceed.  I have for
15 the witness two binders containing the documents
16 that were produced earlier.  It's not all the
17 documents that were produced because there were
18 others produced this morning.  But we'll identify
19 that later.
20    (Plaintiff's Exhibit Number 2
21    marked for identification and
22    retained by Mr. Riemer.)
23 Q.  The first binder, which we will mark as

Page 40

1 Plaintiff's Exhibit Two, contains Chase documents
2 Bates stamped Chase 00001 through 00643.
3    (Plaintiff's Exhibit Number 3
4    marked for identification and
5    retained by Mr. Riemer.)
6 Q.  And the second binder which we will mark as
7 Plaintiff's Exhibit Three is -- contains Chase
8 documents Bates 00643 through 01139.  Is that
9 right?  Yeah, that's correct.  Then we will do
10 our best to refer as the documents come up to the
11 Bates numbers.
12    Now, I wanted to go back and ask you one
13 question, Mr. Smith, about your preparations.
14 You told us about some individual you spoke to.
15    It sounds to me, you correct me if I'm
16 wrong, that you did not go and speak with anyone
17 who actually had a personal involvement in the
18 Chase loan with the Reeds, in the servicing of
19 the Reeds' loan?
20    Is that fair?
21 A.  I'm not sure what you mean by personal
22 involvement.
23 Q.  Well, there are folks that were actually

Page 41

1 involved in servicing the Chase Reed mortgage,
2 right, the folks that talked to the Reeds, the
3 folks that dealt with activities in that
4 particular loan as they were happening, getting
5 the foreclosure documents lined up, things like
6 that, right?
7 A.  Right.
8 Q.  All right.  Did you talk to any of those
9 folks?
10 A.  No, I did not.  I do want to say in regards
11 to other -- I may have mentioned I spoke with
12 Matt Kibble.
13 Q.  Okay.
14 A.  I did speak with him regarding the
15 Guidelines for the 1641(g), which is why I didn't
16 pursue it any further with the foreclosure
17 manager.
18 Q.  Okay.
19 A.  Because actually Matt is the individual
20 that would be responsible for monitoring when --
21 on what occasions that particular notice in the
22 Guidelines would apply for that loan.  So I
23 obtained that information from him.

1 Q.   Okay.  Mr. -- Is it Kibble?  Okay.  He will
2 be the person that will also be giving testimony
3 at a later date, right?
4 A.   Correct, yes.
5 Q.   That's your understanding?
6 A.   Yes.
7 Q.   Mr. Kibble is not a lawyer?
8 A.   No.
9 Q.   All right.  So what specifically did you
10 discuss with him with respect to the notice
11 requirements in 1641(g)?
12 A.   Well, I spoke with him and we discussed why
13 in this particular case the -- a notice would not
14 be required to be sent to the customer regarding
15 any type of transfer.  And I verified with him
16 that because of the fact that there was not a
17 change in ownership as it relates to the loan,
18 that there would -- this does not apply or a
19 notice did not apply in this particular case,
20 that there was no changes.
21 Q.   That's what Mr. Kibble said?
22 A.   Correct.
23 Q.   So was it his position that Fannie Mae held

1 the loan throughout the process, even after the
2 assignment of mortgage was executed and recorded?
3 A.   Fannie Mae was the owner of the loan and
4 the servicing never changed.  Chase always
5 remained the servicer of the loan.
6 Q.   Was Mr. Kibble relying on, as far as you
7 could tell, any particular type of guidance or
8 policy document in forming that opinion?
9 A.   I'm not sure what --
10 Q.   What was -- I will be able to ask him.  But
11 what was your understanding of the basis of that
12 position that he explained to you?
13 A.   The basis of --
14 Q.   Yes.  What was he basing that opinion, the
15 opinion that no 1641(g) notice was required
16 because ownership didn't change, that position,
17 what was he basing that on?  Was it some policy
18 document or regulation, if you know?  If you
19 don't --
20 A.   Well, yeah.  Specifically what he was
21 basing that on, I don't know.  We both discussed
22 what our internal system showed in reference to
23 changing in ownership.  And our system didn't

1 reflect that there was any change in servicing or
2 ownership as it relates to the loan.
3 Q.   What particular in your system did you
4 discuss?
5 A.   Well, we have -- We track the investor
6 internally and again, that never changed.
7 Q.   Well, that leads perfectly -- That's a
8 perfect segway into my next set of questions.
9        What system do you use to track the
10 ownership history of a loan as far as from one
11 investor to the other?
12 A.   Well, internally the information is updated
13 on our servicing system, 3270 Explorer.  In
14 reference to this loan because it's a MERS loan,
15 any transfers would be tracked through MERS as
16 well.
17 Q.   When you say "through MERS," you mean
18 referencing the MERS Milestone Report?
19 A.   Yes.
20 Q.   Through the 3270 Explorer, can you view the
21 Milestone Reports through that system or do you
22 have to go outside the system?
23 A.   You have to go outside the system to review

1 the Milestone.
2 Q.   Is that something that is available to
3 anyone who is involved in servicing a loan for
4 Chase?  Can they access the Milestone Report?
5 A.   I can't say that everyone can, but yes,
6 certain people do have access to that.
7 Q.   What is your -- Let me back up.  Is it your
8 understanding that someone in Chase in some
9 department made the decision that for this
10 particular type of loan, that no 1640(g) notice
11 was required?
12 A.   Yes.
13 Q.   All right.  What -- In what department was
14 that decision made?
15 A.   Well, again, I think Matt Kibble is going
16 to speak to that further.
17 Q.   So you don't know?
18 A.   Well, that's part of his area, yes.
19 Q.   What he -- Okay.  But since you are here
20 today, just give me your understanding of that,
21 and if you don't know, you don't know, but what
22 department it was.
23        MS. DOWNS:  I'd have to interpose an

1 objection because the question is confusing.
2 It's not just one department.  And as a new
3 statute comes online, there's also legal
4 counsel.  So you are -- you are asking questions
5 that also invoke the legal department as well.
6 Q.  Okay.  Let me just get his -- If you don't
7 -- Did you understand my question?
8 A.  I'm not clear specifically what you are
9 asking.
10 Q.  I'm just trying to get an idea of which
11 department and who within the department would
12 have made the decision with regard to whether to
13 send 1641 notices in these particular types of
14 cases?
15 A.  Well, I'm not sure which department.  There
16 is compliance.  We have so -- legal compliance
17 that tracks all updates as it relates to laws.
18 And if a particular -- If we need to comply as it
19 relates to a specific loan, it would be coded as
20 such and that would internally in our system
21 prompt whatever notices needed to be sent.
22    In speaking with Matt in this particular
23 case, that -- he verified that that notice was

1 not required.
2 Q.  Okay.  Getting back to the MERS reporting.
3 The Milestone Report -- we have one and we'll
4 look at it -- but it contains information
5 purportedly about the transfer of servicing
6 rights and beneficial rights for a loan, right?
7 A.  Correct.
8 Q.  Where does that -- That information is
9 reported to MERS from the servicer, right?
10 A.  Yes.
11 Q.  That information is voluntarily provided by
12 the servicer, right?  It comes from Chase,
13 correct?
14    MS. DOWNS:  Object to the form, the use of
15 voluntary.  You can answer, if you know.
16 A.  I'm not sure about voluntary.  If the loan
17 is a MERS loan, then that information is tracked
18 within the MERS System.
19 Q.  But it's tracked because Chase -- It's
20 tracked based on the information that Chase
21 decides to send to MERS?
22    MS. DOWNS:  Object to the form.
23 Q.  Right?

1 A.  I --
2 Q.  In other words, MERS doesn't send somebody
3 into Chase's records to do an audit to find out
4 where -- who owns a particular loan, do they?
5 A.  Does MERS do that?
6 Q.  Right.
7 A.  I don't know.
8 Q.  You don't know.  Okay.
9    Do you know anything about how this
10 report -- the information that MERS gets that
11 goes into the Milestone Report, do you know where
12 that comes from?
13 A.  No, not specifically.
14 Q.  Have you ever had any dealings with that
15 aspect of the servicing process?
16 A.  No.
17 Q.  I'm going to go to page 362 and this will
18 be in the binder, Exhibit Two.  Now, 362 is the
19 first page -- first page of a set of documents
20 that were produced, that were included in the
21 production, that -- It looks to me like the first
22 page of some print screen from this 3270 Explorer
23 System that you referenced; is that right?

1 A.  Yes.
2 Q.  If you will skip over to 392, can you
3 confirm with me that that is the last page so
4 that the Explorer notes that were produced or
5 appear at pages 362 through 392, is that what it
6 looks like?
7 A.  Yes.  That appears that is correct.
8 Q.  Okay.  This system -- Is this the system
9 that is available generally to folks that are
10 involved in other aspects of the servicing?  In
11 other words, for folks in the Loss Mitigation
12 Department when they access the system, is this
13 what they are accessing?
14 A.  Yes.
15 Q.  Okay.  So it's kind of the comprehensive
16 servicing system that Chase uses?
17 A.  Yes.
18 Q.  All right.  Who main -- Does Chase maintain
19 the system or is it maintained through a
20 third-party?
21 A.  I'm not sure what you mean by maintains.
22 Q.  Well, have you ever heard of a group called
23 LPS?

1  A.  Yes.
2  Q.  Okay.  Isn't LPS involved in the
3  maintenance of this software program?
4  A.  I don't know that they are involved in the
5  maintenance.  I'm not aware of that.
6  Q.  Are they involved in the foreclosure
7  process, as far as your understanding?
8  A.  Yes.
9  Q.  Tell me how they are involved.
10  A.  They are utilized for the purpose of
11  monitoring the foreclosure process and timelines.
12  Q.  Okay.  So the fellow we talked about,
13  Brad's group that works with the foreclosure
14  lawyers, local foreclosure lawyers, does Brad
15  deal -- does his group deal with LPS directly in
16  that process?
17  A.  They may.
18  Q.  Okay.  When you worked in the -- as a
19  foreclosure analyst, I think I have that right,
20  title -- foreclosure title analyst, right?
21  A.  Yes.
22  Q.  Did you work with LPS?
23  A.  Yes.

1  Q.  Okay.  Tell me how they were involved in
2  that part of servicing.
3  A.  Again, they -- I would communicate with
4  them in regards to the status of a -- the
5  foreclosure process or the status of a title
6  claim.  They would often communicate with the
7  foreclosure attorneys to verify the status and
8  follow up with us.
9  Q.  Okay.  So if you had a question, in your
10  job as foreclosure title analyst if you had a
11  question about a particular foreclosure that you
12  needed answered, would you -- answered by the
13  foreclosure law firm, would you deal with them
14  directly, would you pick up the phone and talk to
15  the law firm directly or would that communication
16  go through LPS?
17  A.  It varied.  I did both.
18  Q.  Any particular factor on whether you would
19  speak directly to the law firm versus go through
20  LPS?
21  A.  Not that I can recall.
22  Q.  Okay.  Now, that was with -- when you were
23  with EMC?

1  A.  Correct.
2  Q.  I know you don't work in Brad's department,
3  but is that your understanding, is that basically
4  the same process that exists at Chase?
5  A.  As it relates to LPS, I'm -- I'm not sure
6  currently.
7  Q.  In the process of the pre-foreclosure
8  process -- Well, let me back up.  Let me ask you
9  some more questions about the system.  You said,
10  I think -- and I don't mean to be putting words
11  because I don't take great notes, so I may have
12  this wrong.
13     But I thought I heard you say that in the
14  3270 Explorer System it tracks the ownership
15  history of a loan.  Does that -- Did I get that
16  right?
17  A.  Well, no.  I mean, what I stated there is a
18  particular screen within Explorer that reflects
19  who the current owner is.  It's not a tracking
20  system of ownership.
21  Q.  Okay.  So it's a screen that anybody using
22  the Explorer System could through a couple key
23  strokes, is that what you are saying, determine

1  who is the registered owner of the loan?
2  A.  Yes.
3  Q.  All right.  Now, where there has been an
4  assignment -- Let me back up and say, when there
5  has been what Chase would regard as a conveyance
6  or a change in the ownership of the loan, is that
7  reflected in the transactional history of the
8  loan or -- Well, does that make --
9  A.  I'm not sure what you --
10  Q.  Do you understand?  Well, if you look at --
11  Let me ask it this way.  If there is an event
12  that Chase regards as a change in the ownership
13  history of the loan, that's determined by going
14  to this part of the system that you were telling
15  me was available?
16  A.  Yes.
17  Q.  But in the pages that we see here starting
18  at 362, it goes through particular transactions
19  in the loan, discussions with -- when the
20  borrower calls, there will be an entry there
21  about a conversation with the borrower or if a
22  letter goes out, there will be a note.
23     Do you understand what I'm saying?  It

1 tracks the transactions that happen in the course
2 of servicing a loan, right?
3 A.   Yes.
4 Q.   All right.  So among those transactions
5 where there is a change in the ownership, is that
6 event documented in the system along with the
7 other transactions that happen in the --
8 A.   It -- It would be, yes.
9 Q.   It would be?
10 A.   Yes.
11 Q.   Okay.  So there would be two places to see
12 it on the system, right?
13 A.   Yes.
14 Q.   Okay.  How would it -- What does it look
15 like when that happens in terms of the notation
16 in the transactional part of the history?
17 A.   I'm not sure exactly what you mean.
18 Q.   Well, looking at the transactions that are
19 documented in these notes, for example, just --
20 We are not going to spend a lot of time on this.
21 I just want to get idea of how it works.  Go to
22 page 365.
23     Are you there?

1 A.   Yes.
2 Q.   Okay.  So this particular page which I've
3 randomly selected, the first note documents a
4 collection call, correct, at the top?
5 A.   Correct.
6 Q.   And there's a date August 23rd, 2010 and
7 then there is the first column that identifies
8 the department that is recording that particular
9 transaction, right?
10 A.   Yes.
11 Q.   So COL would be Collections Department?
12 A.   Yes.
13 Q.   Then there is a third column.  Does that
14 identify the person that is making the note?
15 A.   Yes.
16 Q.   Okay.  You can tell I've -- I've seen these
17 before.
18 A.   Right.
19 Q.   And then the fourth column is the
20 description of the transaction or the
21 conversation or whatever they are documenting,
22 right?
23 A.   Correct.

1 Q.   All right.  So my question to make sure I
2 understood, that if there is an event that Chase
3 regards amounts to a change in ownership of the
4 loan --
5 A.   Yes.
6 Q.   -- there would be a notation listed among
7 the list of transactions like what we are looking
8 at, right?
9 A.   Yes.
10 Q.   Okay.  So my question is:  What would it
11 look like?  Is there a code that goes with that?
12 Is it from a particular department?  How would I
13 recognize that event?
14 A.   Sure.  There would be a notation indicating
15 an investor change.  Investor is identified with
16 an investor number.  It's usually a three digit
17 number.  You would see the old investor number
18 and the new investor number if there was a
19 change.  If there was a service release, you
20 would see a note indicating service release, the
21 release date.
22 Q.   When you mean service release, you mean
23 servicing -- service being transferred from Chase

1 to somewhere else?
2 A.   Correct.  Additionally, in the payment
3 history, if there was an investor change, there
4 is a particular code again related to that
5 investor.  So you would see a movement as far as
6 the principal balance from the one investor
7 number to another investor number.
8 Q.   Okay.  That would all be -- The change in
9 investor numbers, that would all be depicted
10 somewhere in the notes?
11 A.   Yes.
12 Q.   In your review of system notes in other
13 cases, you have seen notations like that?
14 A.   Yes.
15 Q.   Did you review the notes, all of the notes
16 that were produced for this case?
17 A.   Yes.
18 Q.   Did you see any notations --
19 A.   Regarding --
20 Q.   -- like that regarding --
21 A.   No.
22 Q.   Let me make sure, because that got kind of
23 jumbled up and it was my fault.

1      In your review of the transactional notes
2  with regard to this case, you didn't see any
3  notes reflecting what Chase regards as a change
4  of ownership; is that what you are saying?
5  A.   Correct.
6  Q.   Do you know what the term "LPS Desktop"
7  refers to?
8  A.   Well, it's a system.
9  Q.   Software system?
10  A.   Yes.
11  Q.   Is it separate from what we are talking
12  about, what we are talking about as far as the
13  Explorer notes?
14  A.   Yes.
15  Q.   What is that system used for?
16  A.   That is for -- for tracking the foreclosure
17  process.  But anything updated within LPS
18  Desktop, that information is also relayed on to
19  the Explorer.
20  Q.   Okay.  So for any particular file, if you
21  print out the Explorer notes, they would include
22  the notes made in LPS Desktop?
23  A.   Correct.

1  Q.   Now, in the course of gearing up for a
2  foreclosure where a loan has been referred to
3  foreclosure, it's typical, is it not, that an
4  assignment of mortgage gets prepared by somebody?
5      MS. DOWNS:  Object to the form.
6  A.   I'm not --
7  Q.   Let's just go ahead and take a look at the
8  assignment.  That will be on Chase 23.  I believe
9  it goes to Chase 27, but I need to confirm that.
10  That would be contained in the notebook marked as
11  Exhibit Number Two.
12      Do you see that?
13  A.   Yes.
14  Q.   Okay.  Does that appear to be the
15  assignment that was prepared with respect to the
16  Reed loan and recorded in Baldwin County Probate
17  Court in Alabama?
18  A.   Yes.
19  Q.   You have seen that before, right?
20  A.   I have.
21  Q.   And you reviewed that in preparing to give
22  testimony this morning, correct?
23  A.   I have.

1  Q.   But this is not the first assignment that
2  looks like this that you have seen, is it?  You
3  have seen assignments of mortgage in the course
4  of your working with -- working in the mortgage
5  servicing business, haven't you?
6  A.   Correct.
7  Q.   All right.  So this -- the preparation and
8  recording of an assignment like this is part of
9  -- can be part of the process of preparing for a
10  foreclosure; is that right?
11  A.   It can be, yes.
12  Q.   And it can be one of the title documents
13  that's necessary to be prepared in conducting a
14  foreclosure; is that right?
15  A.   Yes.
16  Q.   And in your work as foreclosure title
17  analyst, you dealt with assignments, right?
18  A.   Yes.
19  Q.   All right.  With respect to the way Chase's
20  system works, when an assignment is prepared, is
21  that also an event that is reflected in the 3270
22  loan notes?  Never mind.  I got my numbers
23  wrong.  The Explorer notes?

1  A.   Well, the assignments are normally as it
2  relates to a foreclosure prepared by foreclosure
3  counsel.  So there may be a note in reference to
4  that updated in LPS, but not always.
5  Q.   Not always.  So Chase wouldn't always know
6  that there was an assignment that was prepared?
7  A.   I wouldn't say that Chase wouldn't always
8  know.
9  Q.   Well, how would it know if it's not on the
10  notes?  How would somebody working on the system
11  know that an assignment was prepared?
12  A.   Well, if -- Prior to sending a loan for
13  foreclosure, if a loan -- if the assignment was
14  not previously completed, then that would be part
15  of the foreclosure process.  It's to make sure
16  that the assignment was recorded prior to
17  foreclosure.
18  Q.   Well, let me back up and start this way.
19  Who determines whether or not a for -- an
20  assignment is needed for a particular file?
21  A.   Well, that would be once -- once the loan
22  is sent to foreclosure.
23  Q.   Okay.  Well, does somebody at Chase decide

Page 62

1 that an assignment is needed or is that something
2 that is initiated outside of Chase?
3 A.   In reference to a foreclosure?
4 Q.   Yes.
5 A.   That is part of the foreclosure firm's
6 process, is to complete a title search and if an
7 assignment is required, they would complete that.
8 Q.   Okay.  This skips a little bit ahead of
9 what I was going to ask you about, about this,
10 but let's go ahead and make sure I understand.
11     So in the course of a loan where there has
12 been what Chase regards as a default, at some
13 point if the default continues, Chase decides to
14 initiate foreclosure, right?
15 A.   Yes.
16 Q.   Okay.  And how is that -- How is that
17 initiated mechanically?  I mean, does something
18 happen on the system that -- that triggers the
19 beginning of the foreclosure process?
20 A.   Yes.
21 Q.   Okay.  I meant to give you this disclaimer
22 early on.  I'm going to ask some questions that
23 are going to seem totally obvious to you and some

Page 63

1 of that is because you know a lot more about this
2 business than I do.  Some of it is because we --
3 even information that you and I both know, I
4 still need it for the record.  So if I ask some
5 ridiculously simple question, that's why, one of
6 those two reasons.
7     Okay.  So I kind of want to track the
8 beginning of the process through the whole
9 foreclosure process from default, again just a
10 basic bird's eye view of how it works at Chase.
11 Okay.
12     MS. DOWNS:  Let me just interject for the
13 record that we did not view the topics as asking
14 us to put up a rep on the foreclosure process
15 generally.  So I really don't think this witness,
16 except for his general work background, is
17 prepared and he's not being proffered as a
18 corporate rep to speak to all that.
19     Of course, to the extent he can be helpful
20 as these questions relate to the assignment of
21 claims in this case, then he should answer all of
22 them.
23 Q.   Well, that's really --

Page 64

1     MS. DOWNS:  But I just want to clarify for
2 you all that we didn't read the notice that way.
3 Q.   Well, really I'm just getting at where this
4 -- where the assignment preparation part fits
5 into this.
6     So then -- So at some point someone in
7 Chase makes a decision to -- that the loan --
8 that foreclosure should be initiated on the
9 loan.  Is that fair?
10 A.   Yes.
11 Q.   Okay.  So what happens mechanically?  Is a
12 law firm contacted?  Is LPS contacted?  How does
13 it work, if you know?
14 A.   In essence, yes, the loan is forwarded to a
15 law firm to initiate the foreclosure proceedings.
16 Q.   Is that referral to the law firm through
17 the LPS System?
18 A.   I'm not involved in the referral process.
19 Q.   So it's referred to the law firm and is it
20 at that point that some title research is done?
21 You mentioned earlier that title research is done
22 and then if -- at that point an assignment, if an
23 assignment is needed, then it's prepared.

Page 65

1     Is that what you said before?
2 A.   Correct.
3 Q.   Okay.  So you have referral to the law firm
4 and then some title work is done, and then
5 someone decides whether or not an assignment
6 needs to be prepared; is that right?
7 A.   Yes.
8 Q.   Okay.  Where there has been -- is that --
9 Is it incumbent on the law firm to prepare the
10 assignment?
11 A.   Yes.
12 Q.   When the law firm makes the determination
13 that an assignment is needed, is that
14 communicated back to Chase?
15 A.   I don't know.
16 Q.   Okay.  So the assignment is -- if it's
17 needed, is prepared by the law firm and executed,
18 correct?
19 A.   Yes.
20 Q.   Is Chase involved in that process?  In
21 other words, does Chase review the assignment
22 language and -- Well, let's break that up.
23     Does Chase review the assignment language

Page 66

1  before it's executed?
2  A.  Not that I'm aware of.
3  Q.  Okay.  Is Chase involved in the execution
4  of the assignment on a MER -- Let's focus our
5  question to MERS loans, a MERS assignment.
6      Is Chase involved in the execution of that
7  assignment?
8      MS. DOWNS:  Object to the form.
9  A.  Well, I can't speak for every single loan
10 that's a MERS loan and who executed it.  In this
11 particular case the assignment was processed by
12 the law firm.
13 Q.  Sirote & Permutt --
14 A.  Correct.
15 Q.  -- in Birmingham, right?
16 A.  Yes.
17 Q.  In looking at that assignment, it's signed
18 by Colleen McCullough who is representing herself
19 as assistant secretary and vice-president of
20 MERS.
21     Do you see that?
22 A.  Yes.
23 Q.  She also is a partner at Sirote & Permutt.

Page 67

1  Do you understand that or you didn't know?
2  A.  Yeah.  I didn't know her.
3  Q.  Okay.  So her firm prepares the assignment
4  and executes the assignment.
5      Now, if you look at page three, there is a
6  signature.
7  A.  Page three of the assignment?
8  Q.  Yes, sir.
9      MR. UNDERWOOD:  What Bates number?
10 A.  Well, let's see.
11     MS. DOWNS:  Ken, let me just interject that
12 I object to that question because there was a
13 statement that you made before your posing the
14 question to the witness that was not a question
15 and to which he did not respond.
16     MR. RIEMER:  Did that surprise you that I
17 made a statement?
18     MS. DOWNS:  Just don't want my witness to
19 be bound by your statement without that being
20 clear on the record.
21 BY MR. RIEMER:
22 Q.  Okay.  There is a -- If you look at Bates
23 number 24, 25, you will see a set of signatures,

Page 68

1  signature blocks, and this is actually the second
2  page of the agreement for the signing authority
3  which was attached to the assignment.
4      Do you see that?
5  A.  Yes.
6  Q.  Okay.  Then there's a set of signatures.
7  Do you have any -- The one on the lower left-hand
8  side purports to be a signature from somebody
9  that is a Vice-president of Chase Home Finance,
10 L.L.C.
11     Do you see that?
12 A.  Yes.
13 Q.  Do you have any idea who that -- whose
14 signature that is?
15 A.  I do not.
16 Q.  Okay.  It's dated October 1, 2007.
17     Have you seen this agreement for signing
18 authority attached to other assignments?
19 A.  Yes.
20 Q.  Okay.  So the same agreement would be
21 attached to assignments in cases other than --
22 with regard to assignments, other than just this
23 assignment?

Page 69

1  A.  Yes.
2  Q.  So when this assignment was executed, is --
3  the execution of this assignment, is that event
4  reflected in the Explorer notes?
5  A.  I don't recall.
6  Q.  Okay.  Now, with your understanding of how
7  this Explorer System works and in your
8  experience, would you expect that execution of
9  the assignment be reflected in the Explorer
10 notes?
11 A.  I'm not sure.
12 Q.  Have you ever seen notes that reflect when
13 an assignment is executed?
14 A.  Well, I wouldn't say notes.  Within
15 Explorer there is a screen as it relates to the
16 foreclosure process where there are timeline --
17 timeline of events updated.
18 Q.  Okay.
19 A.  And that information may be there.
20 Q.  It may be there.  Is it supposed to be
21 there?  I mean, is that an event?  Is the
22 execution of an assignment an event that is
23 supposed to be updated on that system?

1 A.  I can't say off the top of my head one way
2 or the other.
3 Q.  Now, have you reviewed that part of the
4 system with respect to the Reed loan?
5 A.  I didn't.
6     MS. DOWNS:  No, because I didn't know about
7 it.  But we can certainly get it to you.
8 Q.  Well, let me ask.  So you didn't review it?
9 So you don't know whether that -- whether this
10 event, the event of the execution of this
11 assignment is reflected in that screen?
12 A.  I don't know.
13 Q.  Okay.  Well, we would want to get that.
14 Okay.  So -- and I have sort of the same set of
15 questions.  Hopefully I can do it a little bit
16 more efficiently with respect to the recording of
17 the assignment.
18     So the assignment gets prepared, executed
19 and then recorded, correct?
20 A.  Yes.
21 Q.  All right.  So is the recording of the
22 assignment something that you would expect to be
23 reflected in -- Let's ask the question with

1 respect to the system notes, what we are looking
2 at, notes like what we have seen in this case,
3 Explorer notes?
4     MS. DOWNS:  Object to the form.  It's
5 confusing which set of system notes was being
6 referred to, Explorer and LPS.
7 Q.  Do you know what I mean when I say the
8 Explorer notes?
9 A.  I'm not sure specifically what you are
10 referring to.
11 Q.  Well, look at page 362 again.  Remember, we
12 looked at that set which goes to 392?
13 A.  Yes.
14 Q.  And you confirmed for me that those are
15 transactional notes from the 3270 Explorer
16 System?
17 A.  Yes.
18 Q.  You are familiar with that system and these
19 types of notes?
20 A.  Yes.
21 Q.  Okay.  I asked you a series of questions.
22 I was trying to understand to what extent the
23 execution of the assignment listing that event

1 was reflected in these notes.  So I have the same
2 question with respect to the recording of the
3 assignment.
4     Was that something that you would be -- you
5 would expect to be reflected in those notes?
6 A.  In these particular notes, I don't recall
7 seeing that type of event updated.
8 Q.  Okay.  What about this separate screen we
9 were just talking about where it tracks the
10 transactions regarding, I guess, title?
11 A.  Possibly.
12 Q.  Possibly?
13 A.  Yes.
14 Q.  Okay.  Is it fair to say that once an
15 assignment is deemed necessary, the law firm
16 pretty much takes care of that aspect of it
17 without Chase's direct involvement?
18     MS. DOWNS:  Object to the form.
19 A.  No.
20     MS. DOWNS:  You can answer, if you know.
21 A.  I can't say that.
22 Q.  What would Chase's involvement be?
23     MS. DOWNS:  Generally, Ken, or in this

1 case?
2 Q.  Generally in the process?
3 A.  I would say that it would really depend on
4 the situation in the case, in the case.  In this
5 case it appears that Chase executed or signed off
6 on the assignment.  I can't say whether that's
7 done in every single loan file, but it was
8 completed in this case.
9 Q.  Okay.  What do you base that statement on?
10 Is there something in the records that reflect
11 that they signed off on the assignment?
12 A.  Well, based on the signature page of the
13 assignment, it appears that the Vice-president of
14 Chase countersigned or signed the assignment.
15 Q.  Well, you are talking about the signature
16 that appears on the second page of the agreement
17 for signing authority?
18     MS. DOWNS:  Which is the Bates Chase 25.
19 Q.  Right.  Is that what you are talking --
20 what we just looked at?
21 A.  Yes.
22 Q.  Okay.  Look at the date of that signature.
23 Do you see October 1st, 2007?

Page 74

1 A.  Yes.
2 Q.  Okay.  If you look at the first page of the
3 assignment, which would be Bates 23, do you see
4 that the date of the assignment is September 7th,
5 2010?
6 A.  Yes, I see that.
7 Q.  Okay.  So you would agree with me that this
8 signing authority agreement was signed a little
9 less than three years before or two years before
10 the actual -- this assignment?
11 A.  Yes.
12 Q.  Okay.
13 A.  Yes.
14 Q.  So does that change -- Well, let me back up
15 and ask my question again.
16     Is there an indication to you from your
17 review of the file that Chase would -- to use
18 your term, signed off on this particular
19 assignment?
20 A.  Well, gave signing authority to counsel to
21 prepare documents on their behalf.
22 Q.  Okay.  Any other indication to you that
23 Chase was involved in the execution and the

Page 75

1 recording of this assignment, the assignment in
2 the Reeds' case?
3     MS. DOWNS:  I'm just going to object to the
4 form to the extent the question -- the question
5 is confusing.
6 A.  Yeah.
7 Q.  Well, let me back up.  It probably is.
8 Just trying to get an idea of what Chase's
9 involvement in the preparing, executing and
10 recording of the assignment is.  It sounds like
11 it's something that the law firm takes and runs
12 with, but I wanted to make sure I understood
13 that.
14     If there is some Chase participation in
15 that process that you see from the file, that is
16 what I'm asking about.
17 A.  Yes.
18     MS. DOWNS:  I'm sorry.  I'll just interject
19 the reason, Ken, the question is confusing is
20 because if you are asking about system notes, is
21 that, I mean --
22 Q.  I asked him about the documents that he's
23 reviewed.  I think he's -- Your objection is on

Page 76

1 the record.
2     MS. DOWNS:  What is confusing is the
3 documents he's reviewed.  There's a Servicing
4 Guide that impacts this.  There's all kinds of
5 documents.
6 Q.  I'm not asking about the Servicing Guide.
7     MS. DOWNS:  Well, see, that's not what's
8 clear from your question.  He is --
9 Q.  All right.  Well, then let me ask -- Well,
10 can you -- Do you understand my question?
11 A.  No.
12 Q.  No.  My question goes to Chase's -- not
13 servicing guides -- to Chase's involvement in the
14 preparation, execution and recording of this
15 assignment.
16     Is this something that the law firm does
17 without Chase's direct involvement or is there
18 some reflection in the system notes that you have
19 seen that indicates some Chase -- some activity
20 by Chase in this process?
21 A.  And I'm not sure what you mean by direct
22 involvement.  As -- Chase referred the loan to
23 the foreclosure firm.

Page 77

1 Q.  Right.
2 A.  If an assignment is required, the
3 foreclosure firm has the authority to complete
4 that on behalf of Chase, and that is -- that is
5 what occurred here.
6 Q.  Okay.  Completed the whole process,
7 executing and recording it?
8 A.  Yes.  But that would be as it relates to
9 Guidelines of a Fannie Mae loan, a MERS loan.  So
10 Chase would expect that the foreclosure firm
11 would comply with all of those Guidelines.
12 Q.  Okay.  Let me make sure I understand it.
13 As far as -- Chase would know when an assignment
14 like this was recorded, not in the system notes
15 that we talked about, but in the separate screen
16 that you mentioned, you said that event might be
17 recorded there?
18 A.  Well, yes.  As well as within LPS the --
19 that information would be updated as well.
20 Q.  Let's go off the record.
21     (Recess: 11:43 a.m. to 11:55 a.m.)
22 BY MR. RIEMER:
23 Q.  All right.  Mr. Davis, I'm going to get you

Page 78

1 to look at the mortgage.  This is going to be the
2 part of the deposition where I'm going to ask
3 some real basic questions that I alluded to
4 earlier.
5 A.  Mr. Smith.
6 Q.  What did I say?
7 A.  Davis.
8 Q.  I said Davis?
9 A.  Yes.
10 A.  Just want to make sure.
11 A.  Just want to make sure.
12 Q.  Do you know how many depositions I've been
13 in in the last seven days?  I apologize, I really
14 do.  Okay.
15     Mr. Smith, if you would, go to Chase page
16 8, I think you will see the first page of the
17 mortgage.  Do you see that?
18 A.  Yes.
19 Q.  Did you review the mortgage as part of what
20 you looked at to prepare for this morning's
21 deposition?
22 A.  Yes.
23 Q.  Okay.  This mortgage, we will just -- For

Page 79

1 the record, let's identify all the pages.  It
2 goes from page 8 to, I believe, 22.  Let me
3 confirm.  Yes.  Page 22.
4     Would you agree with that?
5 A.  Yes.
6 Q.  Okay.  This is printed on a form.
7     You have seen this form in other cases,
8 right?
9 A.  Yes, I have.
10 Q.  This is what you would call -- This is a
11 MERS mortgage, right?
12 A.  Yes.
13 Q.  So turn to the first page.  I just want to
14 clarify on the record some aspects of this
15 mortgage.
16     If you look, do you see paragraph C there
17 where it starts with the term "MERS"?
18 A.  Yes.
19 Q.  Okay.  It says, MERS is Mortgage Electronic
20 Registration Systems, Inc.  MERS is a separate
21 corporation that is acting solely as a nominee
22 for lender and lender's successors and assigns.
23     Do you see that?

Page 80

1 A.  Yes.
2 Q.  Did I read that correctly?
3 A.  Yes.
4 Q.  Okay.  It goes on to say, MERS is the
5 mortgagee under this security instrument.
6     Do you see that?
7 A.  Yes.
8 Q.  Okay.  And I read that correctly?
9 A.  Yes.
10 Q.  Okay.  And is it your understanding that
11 the original lender, the originating lender in
12 this mortgage was Pensacola Guaranty Mortgage; is
13 that right?
14 A.  Yes.
15 Q.  You see that they are identified in
16 paragraph D as the lender?
17 A.  Yes.
18 Q.  All right.  So it's your understanding that
19 as of this date, of the date of the execution of
20 the mortgage, we will start with that, November
21 13th, 2006, the lender is Pensacola Guaranty
22 Mortgage and MERS is the mortgagee as the
23 lender's nominee?

Page 81

1 A.  Yes.
2 Q.  Okay.  Then there's a reference to the note
3 which we will talk about later.  Okay.  If you
4 would, go to page 24 towards the bottom under the
5 title, "Transfer of Rights in the Property".
6     Do you see that?
7     MS. DOWNS:  What page are we on?
8 A.  Page 24.
9 Q.  24.  The second page of the mortgage.  I'm
10 sorry.  Page 8.  My copy is not Bates --
11     MS. DOWNS:  Bates number page 9.
12 Q.  Bates number 9.
13 A.  That's right.
14 Q.  Okay.  That's the second page of the
15 mortgage.  Under the title "Transfer of Rights in
16 the Property", you see that there's a paragraph
17 there?
18 A.  Yes.
19 Q.  All right.  The second sentence reads, for
20 this purpose borrower irrevocably mortgages,
21 grants and conveys to MERS solely as nominee for
22 lender and lender's successors and assigns and to
23 the successors and assigns of MERS with the power

Page 82

1 of sale the following described property.
2    Did I read that right?
3 A.   Yes.
4 Q.   Okay.  It goes on to describe -- to give
5 the reference to the legal description for the
6 Reeds' property, correct?
7 A.   Yes.
8 Q.   Okay.  The next full paragraph starting
9 with "together with" --
10 A.   Okay.
11 Q.   -- do you see that?  Then I'm going to read
12 the -- beginning with the third sentence.  All
13 the foregoing is referred to in this security
14 instrument as the property.  Borrower understands
15 and agrees that MERS holds only legal title to
16 the interest granted by borrower in this security
17 instrument, but if necessary to comply with law
18 or custom, MERS as nominee for lender and
19 lender's successors and assigns, has the right to
20 exercise any or all of those interests, including
21 but not limited to the right to foreclose and
22 sell the property.
23    Do you see that?

Page 83

1 A.   Yes.
2 Q.   Okay.  And it goes -- I'll go ahead and
3 read the rest of it.  It goes on to say, and to
4 take any action required of lender, including but
5 not limited to releasing and canceling this
6 security instrument.
7    Did I read that right?
8 A.   Yes.
9 Q.   Okay.  All right.  So if you skip down to
10 page 18, you will see towards the bottom
11 paragraph 22.  This --
12    MS. DOWNS:  I'm sorry.  What page of the
13 mortgage?
14 Q.   Well, it's page 8 -- It's Bates stamped 18.
15    MS. DOWNS:  Okay.
16 Q.   And it would be page 11 of 14 of the
17 mortgage.
18    MS. DOWNS:  Thank you.
19 Q.   Okay.  Now, I won't read this provision
20 here.  But you see the paragraph 22, it's the
21 paragraph regarding acceleration and remedies,
22 right?
23 A.   Yes.

Page 84

1 Q.   Okay.  And it starts out by saying, the
2 lender shall give notice to the borrower prior to
3 acceleration and then it talks about the notice
4 that the lender is to provide, correct?
5 A.   Yes.
6 Q.   Okay.  You will agree with me that it is
7 the lender that is required under this provision
8 to give the notice that is described?
9    MS. DOWNS:  Objection.  The document speaks
10 for itself, but you can answer.
11 A.   Yes, that's what that paragraph states.
12 Q.   If you turn the page, the last paragraph of
13 Section 22 describes the power of sale and the
14 procedure for noticing the foreclosure.
15    Would you agree with that?
16 A.   I'm sorry.  Where?
17 Q.   The last paragraph of Section 22 discusses
18 how notice is to be published in the newspaper,
19 et cetera?
20 A.   Yes.
21 Q.   Okay.  It starts by saying, if lender
22 invokes the power of sale, lender shall give a
23 copy of the notice to borrower in the manner

Page 85

1 provided in Section 15.
2    Did I read that right?
3 A.   Yes.
4 Q.   Okay.  This part of the mortgage simply
5 requires the lender to provide the borrower with
6 direct copy of a foreclosure notice in addition
7 to publishing it in the paper.
8    You would agree with me on that?
9 A.   Yes.
10 Q.   Okay.  This section imposes that
11 requirement on the lender, right?
12 A.   That's what the paragraph states.
13 Q.   Okay.  Again, this is one of those obvious
14 questions.
15    But you understand what the term
16 "acceleration" means with respect to debt secured
17 under a mortgage?
18 A.   Yes.
19 Q.   It means that all the debt that is
20 secured -- the unpaid debt that is secured by the
21 mortgage is accelerated to be due at once, right?
22 A.   Correct.
23 Q.   Okay.  And it's the lender that makes --

Page 86

1 that is the entity that accelerates the debt
2 under a mortgage?
3     MS. DOWNS:  Object to the form, that it
4 calls for a legal question.
5 Q.  Is that your understanding?
6 A.  Based on -- I'm not sure what you are
7 asking me specifically.
8 Q.  Well, okay.  We will cover that.  I'll ask
9 it another way.  Hang on.  We have got to find a
10 document here.  Let's go off.
11     (Off-the-record discussion.)
12     (Plaintiff's Exhibit Number 4
13     marked for identification and
14     same is attached hereto.)
15 Q.  Okay.  Mr. Smith, I will hand you what I've
16 marked as Plaintiff's Exhibit Four.
17     Have you seen that document before?
18 A.  Yes, I have.
19 Q.  Okay.  This was one of the documents you
20 reviewed to prepare for your deposition?
21 A.  Yes.
22 Q.  You have seen -- this is also -- Let me ask
23 you this:  Have you seen other letters in other

Page 87

1 cases that are like this?
2 A.  Similar, yes.
3 Q.  Is it your understanding this is a letter
4 that communicates the acceleration of the loan?
5 Would you agree with that?
6 A.  Yes.
7 Q.  All right.  The accelerated balance on this
8 loan is four hundred and one thousand eight
9 hundred forty-three dollars and ninety-five
10 cents, right?
11 A.  Yes.
12 Q.  Now, if you look at that sentence, that has
13 that amount there.  I guess this is the one, two,
14 third sentence, starts with by virtue of
15 default.
16 A.  The third sentence?
17 Q.  Yes.
18 A.  Yes.
19 Q.  Okay.  So it reads, by virtue of default in
20 the terms of said note and mortgage, Chase Home
21 Finance, L.L.C. hereby accelerates to maturity
22 the entire remaining unpaid balance of the debt,
23 including attorneys' fees, accrued interest and

Page 88

1 other lawful charges in the amount due and
2 payable as of the date of this letter is four
3 hundred and one thousand eight hundred
4 forty-three dollars and ninety-five cents.
5     I read that correct, right?
6 A.  Yes.
7 Q.  So this letter reflects an acceleration by
8 Chase Home Finance, L.L.C., correct?
9 A.  Yes.
10 Q.  Is Fannie Mae referenced anywhere on this
11 letter?
12 A.  No.
13 Q.  If you look, attached to the letter is a
14 copy of the foreclosure notice.  I think it would
15 be page three of the exhibit; is that right?  You
16 see at the top it has publication dates beginning
17 on September 10th?
18 A.  Yes.
19 Q.  Okay.  Again, you have seen notices that
20 look like this before, right?
21 A.  Yes.
22 Q.  Did you review this notice before your
23 deposition this morning?

Page 89

1 A.  Yes.
2 Q.  Let me have one of those copies I gave
3 you.  I should have kept one.  No.  The one that
4 you just made for us.
5     MS. DOWNS:  Okay.
6 Q.  Thanks.  Now, this is the notice of
7 foreclosure and this I'll represent to you is the
8 notice that was published in the newspaper with
9 regard to the Reeds' loan.
10 A.  Yes.
11 Q.  Your understanding is that notice was
12 actually published in the paper?
13 A.  Yes.
14 Q.  Okay.  So make sure we are on the same
15 page.
16     Is it also your understanding that the
17 foreclosure sale in this case never actually
18 occurred?
19 A.  Correct.
20 Q.  But the notice was published, right?
21 A.  Yes.
22 Q.  Okay.  Now, looking at this notice, do you
23 see any reference at all to Fannie Mae?

Page 90

1  A.  No.
2  Q.   If you -- The first several lines of the
3  foreclosure sale make -- describe the mortgage,
4  the original mortgage and identifies Pensacola
5  Guaranty Mortgage as the original mortgagee and
6  MERS as their nominee.
7      Do you see that?
8  A.  Yes.
9  Q.   Then there's a reference to the recording
10 in the Probate Court in Baldwin County and then a
11 reference to the particular instrument number
12 that goes with this mortgage, 1015807.
13     Do you see that?
14 A.  Yes.
15 Q.  All right.  Then right after that it reads,
16 said mortgage having subsequently been
17 transferred and assigned to Chase Home Finance,
18 L.L.C.
19     Do you see that?
20 A.  Yes.
21 Q.  Okay.  Now, is it your understanding that
22 that -- that this phrase refers -- and again this
23 is one of those obvious things -- refers to the

Page 91

1  assignment that we looked at earlier that was
2  executed by Colleen McCullough?
3  A.   Is it my understanding that this phrase
4  refers to that?
5  Q.  Yes.
6  A.  Not necessarily, no.
7  Q.  Okay.  Why do you say that?
8  A.  Well, this actually is what should have
9  occurred.  The actual servicing transfer occurred
10 in September of 2007, but, of course that was
11 recorded electronically through MERS.  So in
12 order to update the title within the county
13 record to reflect an assignment that had already
14 occurred, then this phrasing is used within this
15 letter.  So --
16 Q.  Well -- Okay.  Let me stop you there
17 though, because you said something.
18     You made a reference to the transfer of
19 servicing rights back in 2007, correct?
20 A.  Correct.
21 Q.  All right.  Now, servicing rights and
22 ownership of the mortgage and the loan, that's
23 two different things, right?

Page 92

1  A.  Yes.
2  Q.  In fact, the distinction between those two
3  things is the premise of Chase's servicing
4  business?  In other words, Chase services
5  mortgages, other than the in-house mortgages we
6  talked about, they service mortgages for other
7  entities who own the mortgages, right?
8      MS. DOWNS:  Object to the form of the
9  question, reference to ownership of mortgages.
10 Q.  Is that your understanding?
11 A.  I'm sorry.  Repeat the question.
12 Q.  Chase in its servicing is the servicer and
13 the -- they service mortgages on behalf of the
14 investors that own the loan, right?
15 A.  Well, they service the loans on behalf of
16 the investor, yes.
17 Q.  Right.  So there is a distinction between
18 the servicing rights and the ownership rights?
19 A.  Yes.
20 Q.  Okay.  Now, looking back at this
21 foreclosure notice, which is published in the
22 newspaper --
23 A.  Yes.

Page 93

1  Q.  -- is there any reference here to the
2  servicing rights being conveyed to Chase?
3  A.  No.
4  Q.  No.  It says, does it not, that the
5  mortgage having subsequently been transferred and
6  assigned to Chase, right?
7  A.  Yes.
8  Q.  Okay.  Now, does that not indicate that the
9  loan separate from the servicing rights has been
10 transferred?
11 A.  For the purposes of foreclosure, yes.
12     MS. DOWNS:  I just want to interject --
13 Q.  Object to the form.
14     MS. DOWNS:  Object to the form and use of
15 the word "loan" in the question.
16     Howard, do you have a way to mark where
17 that just was, so I can go back and look at the
18 question and answer, please?
19     THE COURT REPORTER:  Yes.
20 Q.  This assignment -- and this is, I guess,
21 the more basic question that I was asking.  Maybe
22 I did not ask it correctly.
23     But if you look back at the assignment we

Page 94

1 talked about earlier, Chase 23, the one signed by
2 Colleen McCullough --
3 A.   Yes.
4 Q.   -- okay, and then you look at Exhibit
5 Number Four and this language, the mortgage
6 having subsequently been transferred and assigned
7 to Chase Home Finance, L.L.C., you said for
8 foreclosure purposes, right?
9 A.   No, I didn't say that.
10 Q.   Okay.  Well, let me back up.  Read back
11 that -- Can you read his answer to my last
12 question?
13     MS. DOWNS:  The witness was confused.  We
14 will -- We can clear it up.  You can answer his
15 questions now as best you can --
16     THE WITNESS:  Okay.
17     MS. DOWNS:  -- and tell him what you feel
18 is the truth.
19     THE WITNESS:  Okay.
20     (RECORD READ AS FOLLOWS:
21 Q.   Okay.  Now, does that not indicate that the
22 loan separate from the servicing rights has been
23 transferred?

Page 95

1 A.   For the purposes of foreclosure, yes.)
2     MR. RIEMER:  Okay.
3     MS. DOWNS:  So the question was phrased
4 about the loan --
5     THE WITNESS:  The loan.
6     MS. DOWNS:  -- even though the discussion
7 was about the mortgage.
8     THE WITNESS:  Right.
9 BY MR. RIEMER:
10 Q.   Well, then let's go back to this
11 foreclosure notice.  This language, said mortgage
12 having been subsequently transferred and assigned
13 to Chase Home Mortgage -- Home Finance L.L.C.,
14 does that not indicate that the mortgage,
15 ownership of the mortgage as separate from the
16 certificating rights is being transferred to
17 Chase Home Finance, L.L.C.?
18 A.   No.
19 Q.   Why not?
20 A.   Because it does not reference ownership of
21 the mortgage.  There was no ownership transfer.
22 Q.   Well, so your testimony is said mortgage
23 having been subsequently transferred and assigned

Page 96

1 does not reference ownership of the mortgage?
2 A.   Yes.
3 Q.   That's what you are saying?
4 A.   Other than for the aspect of -- as nominee
5 or designee for Fannie Mae, but there is no
6 ownership interest on behalf of Chase.
7 Q.   Okay.  But again, Fannie Mae is not
8 mentioned here?
9 A.   It's not.
10 Q.   Okay.  But what you are saying is this
11 event, this transfer and assignment to Chase Home
12 Finance, L.L.C. as the mortgage -- of the
13 mortgage is being taken by Chase only in its
14 relationship -- in the context of its
15 relationship with its investor, Fannie Mae?
16 A.   Yes.
17 Q.   Well, before we get into that more, I do
18 want though and I need to ask you this.  How is
19 -- Isn't it true that this transfer and
20 assignment that is referenced in the mortgage
21 foreclosure notice, and again this is the basic
22 question, is this assignment that Colleen
23 McCullough executed that appears at Chase 23,

Page 97

1 it's the same event, right?
2 A.   Which?  I don't know which event
3 specifically this is referring to.
4 Q.   I mean, how many assignments to Chase have
5 you seen in this file?  I've only seen one.
6 A.   Well, through the MERS Milestones, I've
7 seen electronic transfer.  This is the paper
8 transaction that reflects that as required by
9 Fannie Mae and MERS when a foreclosure is
10 initiated.
11 Q.   All right.  Look at the MERS Milestone
12 Report which is -- We will be done in a few
13 minutes and we can take a break -- which is at
14 Chase 163.
15     Do you see that?  That is the MERS
16 Milestone Report, right?
17 A.   It's a summary, yes.
18 Q.   Well, does it contain the information you
19 were just referencing?
20 A.   No.
21 Q.   What else is there, because I haven't seen
22 any other mile -- MERS information?
23 A.   163, page --

1  Q.  Did I say 160?

2  A.  You said 164, I think.

3  Q.  I'm sorry.  Yeah.  163 and 164 are the two

4  pages of -- I see.  That's my fault, Mr. Smith.

5  I'm sorry.

6     So 163 is the MERS Milestone Report and

7  then there is an MIN summary on 164, right?

8  A.  Yes.

9  Q.  Okay.  Now, I asked you whether there was

10  any other assignment, other than the one signed

11  by Colleen McCullough on September 7th, 2010, and

12  you made reference to this MERS, the MERS

13  information?

14  A.  Yes.

15  Q.  Now, looking at those two pages, 163 and

16  164, tell me what indication you see, if any, of

17  any conveyance to Chase, other than servicing

18  rights, because we are not talking about

19  servicing rights.  We're talking about assignment

20  of the mortgage.  That was my question.

21  A.  Assignment as far as --

22  Q.  Assignment of any beneficial interest in

23  the mortgage to Chase.

1     Do you see that anywhere in the Milestone

2  Report?

3  A.  Well, there is no beneficial interest

4  assigned to Chase.  Chase, as required by Fannie

5  Mae, initiates a foreclosure in their name, but

6  there's -- other than that process as required by

7  Fannie Mae, who owns the loan, there is no other

8  beneficial interest.

9  Q.  All right.  Well, going back to my initial

10  question.  We have to go back to the mortgage --

11  We have to go back to the notice of foreclosure.

12  Okay.  The notice of foreclosure clearly

13  identifies an event, mortgage having subsequently

14  been transferred and assigned to Chase Home

15  Finance, L.L.C.

16     Let me ask my question first.

17  A.  Okay.

18  Q.  Maybe I'll do a better job of asking.

19  A.  Okay.  Okay.

20  Q.  So what I was trying to get to is what

21  event this language is referring to, the language

22  in the foreclosure notice.  And I asked you if

23  you agreed with me something I took as obvious,

1  but maybe it's not, that this event -- set aside

2  what it means because you and I are going to

3  disagree about what it means.

4  A.  Yes.

5  Q.  But this event that is described in this

6  notice is this assignment that was signed by

7  Colleen McCullough in September 2010, that

8  there's not some other assignment that I don't --

9  I have not been made aware of that's been

10  recorded.

11  A.  The MERS Milestone, the whole purpose of

12  MERS is to track assignments of the mortgage

13  without recording them within the county

14  records.  So the MERS Milestones will reflect the

15  transfers.  And so what we are looking at here,

16  when you see the transfer of servicing rights

17  reference on 9-13-2007, that relates to the

18  mortgage.

19  Q.  Is there -- On 9-13-2007, is there any

20  indication that anything other than servicing

21  rights were conveyed to Chase?  Yes or no?

22  A.  No.

23  Q.  Okay.  Anywhere else on --

1     MS. DOWNS:  Ken, can I offer a stipulation

2  on this -- on this issue?

3     MR. RIEMER:  Well, let me -- You may.  I

4  won't take much longer.  But I like

5  stipulations.  But let me just make sure I

6  understand, because my understanding is at issue

7  here, too.

8  BY MR. RIEMER:

9  Q.  Other that -- I asked you about 9-13-2007.

10     But anywhere on those two pages do you see

11  any indication of a conveyance to Chase of

12  anything other than servicing rights?  Just look

13  -- Just take a minute and look on both of those

14  pages.

15  A.  Which pages are you referring to?

16  Q.  Both pages of the MERS report, well, 163

17  and 164.

18  A.  And the question is?

19  Q.  Do you see -- it was the same question I

20  asked with respect to 9-13-2007.

21     That question is:  Do you see any

22  indication in either of those pages of a

23  conveyance to Chase of anything other than

Page 102

1 servicing rights?
2 A. That is what Chase was, is and has always
3 been, is the servicer.
4 Q. Okay. But I need you to answer my yes or
5 no question though.
6 A. No, I see nothing else other than
7 servicing.
8    MR. RIEMER: Okay. Great. Now, let's go
9 off the record.
10    (Off-the-record discussion.)
11    MR. RIEMER: So can we go back on? Now, I
12 guess to the extent it was unclear -- I think it
13 was fairly clear, but Ms. Downs has offered a
14 stipulation. Let me see if I can articulate it
15 correctly. It addresses the simple question I
16 had asked, relatively simple.
17    That the event referenced in the more --
18 the notice of foreclosure, mortgage having
19 subsequently been transferred and assigned, does
20 refer to the assignment dated September 7th,
21 2010, is that what you are stipulating is?
22    MS. DOWNS: Correct.
23    MR. RIEMER: All right. Can we eat now?

Page 103

1    MS. DOWNS: Yes.
2    (Recess: 12:35 p.m. to 1:35 p.m.)
3 BY MR. RIEMER:
4 Q. Okay. I wanted to kind of continue on the
5 process with respect to the mortgage before
6 moving on. So more or less for my benefit, I'm
7 just going to sort of recap and get us where we
8 were.
9 A. Okay.
10 Q. Okay. We went through the mortgage and we
11 talked about the notice of acceleration and the
12 foreclosure notice?
13 A. Yes.
14 Q. Okay. Of course, the foreclosure -- actual
15 foreclosure sale didn't happen here, but you are
16 familiar with the general process that leads to a
17 foreclosure sale and foreclosure deed, correct?
18 A. Yes.
19 Q. Okay. In cases where -- Well, based on
20 your familiarity with the general process, if
21 there would have been a foreclosure sale as
22 noticed in the notice we just saw, it would have
23 been in -- it would have been conducted by Chase

Page 104

1 Home Finance, L.L.C., right? The foreclosure
2 sale would have been conducted in Chase Home
3 Finance, L.L.C.'s name?
4 A. Correct.
5 Q. There would be a foreclosure deed conveying
6 title from Chase Home Finance, L.L.C. to whoever
7 the purchaser of the -- at the foreclosure sale
8 was, right?
9    MS. DOWNS: I just want to object to the
10 question as containing facts not in evidence.
11 You can answer.
12 Q. But that would be the normal course of
13 things?
14 A. Okay. I'm sorry. Repeat the question.
15 Q. The question would -- The question is: Had
16 there been a foreclosure sale, there would have
17 been a foreclosure deed executed by Chase Home
18 Finance, L.L.C. to whomever the purchaser at the
19 foreclosure was?
20    MS. DOWNS: Object to the form. It's
21 referencing facts not in evidence. You can
22 answer.
23 Q. You can answer.

Page 105

1 A. Yes.
2 Q. Okay. And that typically gets recorded in
3 local Probate Court right, the foreclosure deed?
4 A. I believe so, yes.
5 Q. Okay. All right. Well, let's go back to
6 the origination of this loan. So we go back to
7 the mortgage. I will ask you to go to page one
8 of Exhibit Number Two, it's Bates stamped 0001.
9 Exhibit Two is the big notebook in front of you.
10 A. Okay. Sorry.
11 Q. That's all right.
12 A. What page?
13 Q. Page one.
14 A. Okay.
15 Q. Would you agree with me that pages one,
16 two, three, and four contain a copy of the note
17 executed by my clients?
18 A. Yes.
19 Q. Okay. Then page six is an addendum also
20 executed by the Reeds and page seven is an
21 allonge, right?
22 A. Yes.
23    MS. DOWNS: We are referring to Bates Chase

Page 106

1 1 through 7?
2 Q.  Yes.  When the mortgage is executed and
3 after closing, tell me what happened to the note,
4 the possession -- Well, strike that.  Before we
5 get into that, let me ask you questions about --
6 some questions about the note.
7     The note -- In paragraph one the note
8 identifies the lender as Pensacola Guaranty
9 Mortgage, a Florida corporation, right?
10 A.  Correct.
11 Q.  Okay.  Then the second sentence in Section
12 I, it's actually a separate paragraph, says, I
13 understand that the lender may transfer.
14    Do you see this where I'm reading from?
15 A.  Yes.
16 Q.  Okay.  I understand that the lender may
17 transfer this note.  The lender or anyone who
18 takes this note by transfer and who is entitled
19 to receive payments under this note is called the
20 note holder.
21    Do you see that?
22 A.  Yes.
23 Q.  Now, when -- going back to -- I guess, page

Page 107

1 four is the signature page of the note and then
2 there's an endorsement.
3    Do you see that?
4 A.  Yes.
5 Q.  The endorsement is in blank and then there
6 is the name SunTrust Mortgage, Inc.
7    Do you see that?
8 A.  Yes.
9 Q.  All right.  Nowhere on the note does there
10 appear to be any endorsement by Pensacola --
11 Pensacola Guaranty Mortgage, does there?
12    MS. DOWNS:  Object to the form.
13 Misrepresents the document.
14 Q.  Do you see anything with their name on it
15 on that last page, signature page?
16 A.  No.  On page four.  But that's what the
17 allonge is for.
18 Q.  I'm just going step by step.
19 A.  Okay.
20 Q.  Okay.  Now, you would agree with me that
21 this is an -- the endorsement that does appear on
22 page four is an endorsement in blank?
23 A.  Yes.

Page 108

1 Q.  Now, tell me your understanding of what
2 happened to the note in terms of its location
3 from the beginning, from the origination, to the
4 extent you know.
5 A.  The physical location?
6 Q.  Yes.
7 A.  Prior to Chase taking custody of the note,
8 as custodian for Fannie Mae on September 19,
9 2007, I can't speak to the actual physical
10 possession of where the note was held.
11 Q.  Okay.  That September 13th, 2007, that's
12 the same date that was listed in the MERS report,
13 right?
14 A.  Well, actually I said September 19th, 2007
15 is when Chase Custody Services actually took
16 physical -- physical possession of the note.
17 Q.  Okay.  Where did you get that?  Where is
18 that indicated?
19 A.  I actually verified that information
20 with -- through Chase Custody Services.
21 Q.  As part of preparing for this deposition?
22 A.  Yes.
23 Q.  That department is Chase Custody Services?

Page 109

1 A.  Yes.
2 Q.  What do they do at Custody Services
3 Department?
4 A.  They retain the collateral files.
5 Q.  Do the collateral files include the actual
6 original notes?
7 A.  Yes.
8 Q.  Where are they located?  Where is that
9 department located?
10 A.  Monroe, Louisiana.
11 Q.  Wow.  Wasn't expecting that one.  Okay.
12    They were able to look up this loan by loan
13 number, some identification and then give you
14 this information; is that what happened?
15 A.  Yes.
16 Q.  Now, did you see any documents that reflect
17 that date or you were just going from what
18 someone told you over the phone?
19 A.  Yes, I was going based on what was relayed
20 over the phone as well as the -- the Milestones
21 indicate when the servicing was transferred and
22 the dates correspond within a few days to the
23 date when the file was received.

Page 110

1 Q. Okay. That gets us back to the September
2 13th date, '07 that's in the Milestone report?
3 A. Correct.
4 Q. Well, okay. I hate to keep having to go
5 back and forth in this notebook, but let's go
6 back to the Milestone Report and that's page
7 163.
8    Are you there?
9 A. Yes.
10 Q. Okay. Now, there is -- Starting from the
11 bottom of the page 163, there is a note,
12 something, there's a date here, sorry, January
13 19th, 2007.
14 A. Yes.
15 Q. Okay. So what does that mean? What is
16 that recording?
17 A. This is recording the registration with
18 MERS, the loan transaction in essence, the
19 servicer being SunTrust.
20 Q. Okay. On May -- Judging from this report,
21 on May 19, 2007, who is the investor?
22    MS. DOWNS: Object to the form. You said
23 May 19th.

Page 111

1 Q. Okay. I'm sorry. January 19th, 2007. I
2 apologize.
3 A. January 19th, 2007?
4 Q. Yes.
5 A. The investor transferred from SunTrust to
6 Fannie Mae on that date.
7 Q. Okay. So before that date, SunTrust was
8 the investor and it transferred to Fannie Mae?
9 A. Yes.
10 Q. Okay. What -- Is there an assignment of
11 the mortgage to Fannie Mae anywhere in the file
12 that you have seen?
13 A. A paper assignment?
14 Q. Yes.
15 A. No.
16 Q. Is there -- Other than this Milestone
17 Report, is there any other documentation of a
18 conveyance of the mortgage from or -- into Fannie
19 Mae from anybody?
20 A. A conveyance?
21 Q. Yes.
22 A. No, nothing --
23 Q. It's in the Milestone Report. That's what

Page 112

1 tells you that Fannie Mae became the owner of
2 this obligation, is the Milestone Report, right?
3    MS. DOWNS: Object to the form of the
4 question. The use of the word "obligation" is
5 ambiguous.
6 Q. Well, can you answer the question?
7 A. The question? I'm sorry.
8 Q. Fannie Mae acquired this loan in January
9 19th, 2007. That's what you are saying, right?
10 A. Yes.
11 Q. All right. They acquired this loan? They
12 acquired the Reeds' loan --
13 A. Yes.
14 Q. -- as the investor, as owner?
15 A. Yes.
16 Q. What document conveys that loan to them,
17 other than the MERS Milestone Report?
18 A. I'm not aware of any other document.
19 Q. Never seen any purchase agreement, a bill
20 of sale, assignment, any kind of transfer
21 document of this loan into Fannie Mae?
22 A. Well, this is the record of transfer. It's
23 a MERS loan.

Page 113

1 Q. Okay. Is the Milestone Report executed by
2 an individual --
3 A. I don't know.
4 Q. -- and signed?
5 A. No.
6 Q. No. Obviously it's not notarized either,
7 is it?
8 A. The Milestone?
9 Q. Yes.
10 A. No.
11 Q. Is there any document that you have seen
12 that is executed over a notary that conveys
13 interest in the Reeds' loan to Fannie Mae?
14 A. Not that I've seen, no.
15 Q. All right. Going back to the Milestone
16 Report.
17    The next event there chronologically would
18 be September 13th, 2007, right?
19 A. Yes.
20 Q. What -- Okay. On the far left it says
21 transfer and then a word I can't really read and
22 then servicing rights.
23    What is that? Is that season?

Page 114

1  A.  It looks like it, yes.
2  Q.  Do you know what that means?
3  A.  I'm not sure what that is -- the season is
4  referring to.
5  Q.  Now, this event, September 13, 2007, is
6  describing the transfer of servicing rights into
7  Chase, correct?
8  A.  Yes.
9  Q.  Any change in ownership in terms of the
10  investor indicated on 9-13-2007?
11  A.  No.
12  Q.  Who was the servicer prior to 9-13-2007?
13  A.  I believe it was SunTrust.
14  Q.  Okay.  Then the next event doesn't appear
15  to have a date, but it shows 1000104 SunTrust
16  mortgage.
17     Do you see where I'm reading?
18  A.  Yes.
19  Q.  What does that mean?
20  A.  Well, the transaction date refers to the
21  May 6, 2011 update where Chase Home Finance,
22  L.L.C. was merged into J.P. Morgan Chase Bank
23  NA.

Page 115

1     MS. DOWNS:  He was asking about the number
2  below, Al.
3  A.  I'm sorry.  1000104?
4  Q.  Right.
5  A.  Okay.  Yes, that relates to the servicing
6  transfer from SunTrust to J.P. Morgan Chase Bank.
7  Q.  Okay.  So just -- It's more another entry,
8  but it relates to the same event, this conveyance
9  of servicing rights to Chase, 9-13-2007?
10  A.  Yes.
11  Q.  Then May 6th, 2011, you are telling me that
12  that just reflects the merger of -- did you say
13  Chase Home Finance --
14  A.  Yes.
15  Q.  -- into Chase -- J.P. Morgan Chase NA?
16  A.  Yes.
17  Q.  Okay.  Now, the assignment that was
18  executed by Ms. McCullough reflected at Chase 23
19  that we talked about, dated September 7th, 2010,
20  that's not reflected on the MERS Milestone
21  Report, is it?
22  A.  No.
23  Q.  Okay.  And it's not reflected on the MIN

Page 116

1  summary on the next page, is it?
2  A.  No.
3  Q.  So is it your testimony and your
4  understanding that this assignment recorded --
5  that is executed and recorded in Probate Court
6  didn't change anything with respect to the
7  ownership of the loan?  Is that what you are
8  saying?
9  A.  That is correct.
10  Q.  Okay.  So what did this assignment do, to
11  your understanding?
12  A.  What that assignment did was it -- as part
13  of the foreclosure process, the loan would be --
14  MERS would be removed as the mortgagee and with
15  the completion of a foreclosure, that deactivates
16  the MERS loan.  So that is part of that process,
17  is to remove the name of MERS as required by
18  Fannie Mae to begin a foreclosure.
19  Q.  Is it your understanding that Fannie Mae
20  Guidelines require that Chase conduct any
21  foreclosure, the servicer, in this case Chase,
22  conduct the foreclosure in its own name?
23  A.  In the name of the servicer, yes.

Page 117

1  Q.  And not Fannie Mae?
2  A.  Correct.
3  Q.  Even though Fannie Mae considers itself the
4  owner of the mortgage and the owner of the
5  obligation throughout the tran -- the history?
6  A.  Correct.
7  Q.  Okay.  Now, we talked about -- We talked
8  about the custody of the note, the physical
9  possession of the note.
10     You said that you had no understanding of
11  what -- what happened with regard to the physical
12  location of the note prior to 9-13-2007, do I
13  have that right, or 9 -- yeah, 9-13?
14  A.  Well, yes.  I mean, where it was actually
15  physically held, I can't say for sure.
16  Q.  All right.  Well, so starting in September
17  2007, what is your understanding of the physical
18  location of the note?
19  A.  That the loan -- the note was received by
20  Chase Custody Services and held there on behalf
21  of Fannie Mae.
22  Q.  In Monroe, Louisiana?
23  A.  Yes.

Page 118

1 Q.  Okay.  Is there a vault or something in the
2 offices in Monroe that these notes are held in?
3 A.  Yes.
4 Q.  Okay.  They are held by Chase pursuant to
5 the Fannie Mae Guidelines, right?
6 A.  I'm not sure what you mean.
7 Q.  Well, the process of -- Well, you told me
8 that the Fannie Mae Guidelines pretty much
9 control the relationship between Chase and Fannie
10 Mae as servicer and investor, right?
11 A.  Yes.
12 Q.  All right.  As part of that relationship,
13 Chase held possession as custodian of the note,
14 right?
15 A.  Yes.
16 Q.  And that is typical of Fannie Mae loans?
17 A.  Typical that there would be a custodian
18 or --
19 Q.  Typical that Chase would hold the note as
20 custodian?
21 A.  It occurs, but --
22 Q.  Not always?
23 A.  Correct.

Page 119

1 Q.  Okay.  Well, when -- Just so I understand,
2 if Chase is not the custodian, then is it some
3 third person that's custodian for Fannie Mae?
4 A.  There may be.
5 Q.  Okay.  So some of these Fannie Mae notes
6 are transferred to or transported to the
7 custodian -- to Chase as a custodian to hold the
8 note and sometimes it's to some third-party?
9 A.  It's possible.
10 Q.  Well, in the Fannie Mae loans you have been
11 involved in, are they held by Chase as a
12 custodian?
13 A.  Off the top of my head, the ones that I'm
14 familiar with, Chase has been the custodian.
15 Q.  Okay.  All right.  Chase's role as a
16 custodian is -- and we are getting to the
17 Guidelines -- but that is all specified in the
18 Guidelines, right, that Chase -- Chase will hold
19 the note as a custodian?
20 A.  I'm not sure what you are asking me.
21 Q.  Is there some separate agreement that
22 exists between Chase and Fannie Mae that governs
23 where the note is going to be held or is it

Page 120

1 covered by the Fannie Mae Guidelines?
2 A.  Well, Fannie Mae Guidelines references
3 custody of the notes, yes.
4 Q.  Okay.  Just so I'm clear, I didn't miss
5 anything, is there some other document or set of
6 rules that governs the relationship between
7 Fannie Mae and Chase, other than the Fannie Mae
8 Guidelines?
9 A.  No.
10 Q.  All right.  So it goes into the vault in
11 Monroe around September 13, 2007, right?
12 A.  Yes.
13 Q.  What happens?  Is that where the original
14 note is today?
15 A.  No.
16 Q.  Okay.  Where is it today?
17 A.  The original note?
18 Q.  Right.
19 A.  I don't know.
20 Q.  Did we lose it?
21 A.  Yes.
22 Q.  The original note has been lost?
23 A.  Yes.

Page 121

1 Q.  Okay.  How do you know that?
2 A.  Again, through my discussion with the
3 representative at Custody Services.
4 Q.  Okay.  Where was it when y'all last saw it?
5 A.  It was sent to an individual within Chase
6 in 2010 and that individual for some reason never
7 -- did not receive it and --
8 Q.  How would -- Okay.  Do we know what month
9 in 2010 it was sent?
10 A.  It was November of --
11 Q.  November?
12 A.  -- 2010.
13 Q.  So it was after the assignment that we
14 talked about, which was in September?
15 A.  Yes.
16 Q.  Okay.  Who was the person to whom it was
17 sent?
18 A.  I can't remember the name off the top of my
19 head.
20 Q.  What department do they work in?  I'm
21 assuming they are a Chase employee?
22 A.  Yes.  I don't recall.
23 Q.  All right.  Well, who did you talk to about

Page 122

1 this that maybe would, you know -- You are not
2 obligated to know every answer to my questions.
3     But if you could, just tell me who might be
4 able to answer those questions.
5 A.  Well, I spoke with Sherry Stafford at Chase
6 Custody Services.
7 Q.  S-h-e-r --
8 A.  S-t-a-f-f-o-r-d.  Stafford.
9 Q.  I was talking about the first name.
10    MS. DOWNS:  It's S-h-e-r-r-y.
11 Q.  S-h-e-r-r-y.  Sorry.
12 Q.  Stafford.  She's in Monroe?
13 A.  Yes.
14 Q.  Ever been to Monroe?
15 A.  No.
16 Q.  Okay.  She's the person that gave you the
17 information about the history of the note?
18 A.  Yes.  When it was --
19 Q.  Did you talk to somebody else?
20 A.  Regarding the history of the note?
21 Q.  Yes.
22 A.  No.
23 Q.  Okay.  So who -- All right.  So you don't

Page 123

1 know who it was sent to?  Who -- Who was the
2 sender?
3 A.  The specific person?  It was sent from
4 Custody -- Custody Services.  I don't --
5 Q.  In Monroe?
6 A.  Yes.
7 Q.  To somebody at Chase?
8 A.  Yes.
9 Q.  Do you know the Chase facility that it was
10 sent to?
11    MS. DOWNS:  Let me just object.  The
12 sending was for purposes of defending
13 litigation.
14 Q.  Okay.  All right.
15    MS. DOWNS:  So just be cognizant as you
16 keep asking that you will get into lawyer names
17 and I'm going to object.
18 Q.  Yeah.  And really this is all kind of new
19 to us.  I'm just trying to pull out everything he
20 knows.  Okay.
21    So it was sent from Custody Services to
22 another department in Chase or to a third --
23 yeah, another -- you said another department in

Page 124

1 Chase?
2 A.  Yes.
3 Q.  What was the department in Chase it was
4 sent to?
5 A.  I don't know the department.
6 Q.  Do you know the person it was sent to?
7 A.  I don't remember.
8 Q.  I already asked you that and you said you
9 didn't know.
10 A.  Yes.  I don't remember.
11 Q.  Do you know the facility it was sent to?
12 A.  It was in Columbus, I believe.
13 Q.  Columbus.  Okay.  Because Chase has
14 various facilities, right?
15 A.  Yes
16 Q.  Do you know at what point Chase realized
17 the note was lost?
18 A.  No.
19 Q.  Okay.  Would it have been after the state,
20 if you know, after the state case was filed?
21 A.  I have no idea.
22 Q.  Okay.  I don't know if I asked this or not;
23 if I did, I apologize.  But when -- It was last

Page 125

1 seen in November of 2010; is that what you said?
2     MS. DOWNS:  Object to the form.  To clarify
3 that, you are talking about the original?
4 Q.  The original note, yes.
5 A.  Yes, the original.
6 Q.  All right.  Go off the record.
7     (Off-the-record discussion.)
8     (Recess: 2:03 p.m. to 2:09 p.m.)
9 BY MR. RIEMER:
10 Q.  We have been talking about the Fannie Mae
11 Guidelines, but we haven't pulled those out yet.
12 I'd like to do that.
13     I guess what I'd like to start with,
14 Mr. Smith, is you have reviewed the Fannie Mae
15 Guidelines before this deposition, right, or
16 parts of them?
17 A.  Yes.
18 Q.  Okay.  And you have described for us the
19 arrangement between -- in response to my
20 questions, between Chase and Fannie Mae.  I guess
21 what I'd like to start with is the portions of
22 the Guidelines that you reviewed.
23     Are those in that notebook back there?

Page 126

1    MS. DOWNS:  They are in here.
2  A.  Yes.  I've got certain sections.
3  Q.  Yeah.  That's -- The Guidelines are
4  comprehensive, right?
5  A.  Yes.
6  Q.  Over a thousand pages?
7  A.  Yes, correct.
8  Q.  Most of which has nothing to do with the
9  issues in this case, so I don't want to go
10  through each section.  Why don't we start with
11  the section that you think defines Chase's --
12  Well, let's see.
13    Why don't you tell me the sections that you
14  reviewed?
15  A.  Well, there's a Section 202, which I guess
16  it's I, 202, which discusses services --
17  servicers basic duties and responsibilities.
18  Q.  Now, Section I, 202?
19  A.  Yes.
20  Q.  Is that what you said?  What page is that?
21    MR. UNDERWOOD:  That was I, 202?
22  Q.  Yeah.  Chapter --
23    MS. DOWNS:  Explain to him where you got

Page 127

1  them so you can talk about the pages.
2  Q.  Yes.
3  A.  Well, the particular page that I'm looking
4  at, this came from AllRegs, which we have
5  access -- Chase has access to.
6  Q.  Is that a web based resource?
7  A.  Yes, yes.  So the page numbers may not
8  match up directly.
9  Q.  Well, I'm looking at something.  On my copy
10  I see Chapter Two, contractual relationships.
11  Maybe we should start with what chapter you are
12  talking or what part you are talking, because it
13  does -- They are divided up into parts.
14  A.  Yes.
15  Q.  Part one is lender relationship.  Part two
16  is mortgage and property insurance, et cetera.
17  And then within the parts there are chapters and
18  within the chapters there are sections.
19  A.  This would be Chapter Two, so --
20  Q.  Chapter Two of part one, right?
21  A.  Yes.
22  Q.  All right.  Chapter Two is entitled
23  "Contractual Relationship".

Page 128

1    Is that the same chapter?  Are we talking
2  about the same thing?
3  A.  Yes.
4  Q.  Okay.  Then you said a Section 202?
5  A.  Yes.
6  Q.  All right.
7  A.  Really, I mean, to be honest, I can --
8  there are several pages within Chapter Two that I
9  reviewed, so --
10  Q.  Okay.  If I can find that section.  Here it
11  is.  Here we go.  Section 202 is entitled
12  "Servicer's Basic Responsibilities and Duties";
13  is that right?
14  A.  Yes.
15  Q.  Does this chapter -- section address
16  assignments to the servicer of the mortgage?
17    MS. DOWNS:  Object to the form of the
18  question.
19  A.  I'm sorry.  What are you --
20  Q.  Well, I'm trying to get an idea of the
21  pertinence of this section to -- to this case.
22    I mean, does it address the servicer's role
23  -- the servicer's role and taking assignment to a

Page 129

1  mortgage?
2    MS. DOWNS:  Object to the form.  It's
3  confusing.
4  A.  This particular section?
5  Q.  Yes.  Why did you review this section?
6  A.  Well, this particular section here relates
7  to the role of the servicer and what the servicer
8  -- some of the duties that the servicer performs
9  for Fannie Mae.
10  Q.  Okay.  What other sections did you look at?
11  A.  Well, I looked at 201, 202, several
12  sections within 202.  There's 202.02, Processing
13  of Funds.  202.06.  202.07.  206.  Chapter 4,
14  Sections 401, 402, 408.
15  Q.  Okay.  Chapter 4 addresses the mortgage
16  loan documents and records, right?
17  A.  Yes.
18  Q.  All right.  In Section 401, all records
19  pertaining to mortgage loans sold to Fannie Mae,
20  it goes on to say, are at all times the property
21  of Fannie Mae and any other owner of a
22  participating or participation interest in the
23  mortgage loan.

Page 130

1    Then it lists the particular documents,
2 right?
3 A.  Yes, yes.
4 Q.  So is it your understanding that Fannie Mae
5 considers itself the owner of the note from --
6 well, throughout the process, even through the
7 foreclosure process?
8 A.  Yes.
9 Q.  Okay.  And Fannie Mae considers itself the
10 owner of the mortgage throughout the whole
11 process?
12 A.  Yes.
13 Q.  Because it says underneath notes, it says
14 security instruments, right?
15 A.  Yes.
16 Q.  All right.  And a security instrument would
17 -- a mortgage would be an example of a security
18 instrument?
19 A.  Correct.
20 Q.  So Fannie Mae considers itself entitled to
21 the money that is required to be paid under the
22 note at all times throughout the process?
23 A.  Correct.

Page 131

1 Q.  And as far as Fannie Mae concerns -- is
2 concerned, that never changes even throughout the
3 Foreclosure Department -- the foreclosure
4 process?
5 A.  For this particular loan, yes.
6 Q.  Why -- You mean this particular loan, this
7 particular type of loan or the Reeds' loan?
8 A.  Well, you said never and so that's a very
9 broad statement.
10 Q.  Well, with regard to the notes, the loans
11 that are serviced by Chase pursuant to the Fannie
12 Mae Guidelines, okay --
13 A.  Yes.
14 Q.  -- all right, as far as -- Fannie Mae
15 considers itself the owner of the note and the
16 mortgage throughout the entire process even
17 through the foreclosure -- through the
18 foreclosure process and the foreclosure sale; is
19 that right?  Is that your understanding?
20 A.  For this particular loan?
21 Q.  I'm asking about any loan, the loans that
22 Chase is servicing pursuant to these Guidelines.
23 A.  Well, what I'm --

Page 132

1 Q.  Okay.
2 A.  Your question is very broad.  There are
3 instances where Fannie Mae requires a servicer to
4 buy back or purchase out a loan and so if that
5 occurs, they would not consider themselves an
6 owner.
7 Q.  Okay.  What -- Under what circumstances
8 would the servicers buy back the loan?
9 A.  If -- If the servicer violates some part of
10 the agreement in servicing the loan, doesn't
11 service the loan properly, if there's some fraud
12 related to their origination of the loan,
13 something to that effect.
14 Q.  Okay.
15 A.  Doesn't happen very often, but --
16 Q.  But it's like a recourse type mechanism?
17 A.  Yes.
18 Q.  Okay.
19 A.  Yes.
20 Q.  All right.  Well, in loans where that
21 mechanism is not triggered, the premise we talked
22 about is true?  In other words, other than the
23 loans where that recourse mechanism is triggered,

Page 133

1 Fannie Mae considers itself the owner of the note
2 and mortgage throughout the process, even
3 throughout the foreclosure process?
4 A.  Yes.
5 Q.  So Chase, despite the assignment we talked
6 about, is never -- is never entitled to the money
7 due under the note, is it?
8 A.  No.
9 Q.  And even though Chase is the physical or --
10 the custodian of the physical note, it is never
11 entitled to money due under the note, is it?
12 A.  No.  Correct.
13 Q.  And this is all a function of Fannie Mae --
14 this being the fact that Chase is not ever
15 entitled to the note is a function of the Fannie
16 Mae Guidelines; is that right?  That's what the
17 Guidelines say, don't they?
18 A.  Yes.  That's what the Guidelines say and
19 that's the general role of a servicer.
20 Q.  Right.  This may cut off some of this
21 process of going through some specific
22 provisions, although I think we will, of the
23 Guidelines, but -- You know more about these than

Page 134

1 I do.
2     But the general gist of Chapter 4 to me is
3 that the servicer can hold the note as custodian,
4 but under all circumstances it's holding it
5 strictly as custodian for Fannie Mae and not as
6 the owner of the note.  Is that your
7 understanding?
8     MS. DOWNS:  Object to the form of the
9 question as wrapping in legal issues.  You can
10 answer to the extent you know.
11 A.   And I'm sorry -- can you -- I'm --
12     MS. DOWNS:  I'm sorry to distract you with
13 objections, but I have to make --
14     THE WITNESS:  No.  That's -- That's okay.
15     MR. RIEMER:  Well, object -- But you can
16 say object to the form and that will do.
17     THE WITNESS:  Okay.
18     MS. DOWNS:  Actually, no.  You know in
19 Federal Court you have to give a summary of --
20     MR. RIEMER:  No, you don't.
21     MS. DOWNS:  -- what the problem is for the
22 form.
23     MR. RIEMER:  No, you don't.

Page 135

1     MS. DOWNS:  Well, we do, so --
2     MR. RIEMER:  We don't.  It says that's what
3 the Federal Rules -- In fact, you don't need
4 usual stipulations in Federal Court because it's
5 all set out in the rules.
6     MS. DOWNS:  I have a different view, Ken.
7     MR. RIEMER:  Objection to the form.  Well,
8 it's distracting the witness and more important,
9 it's distracting me.  But we'll go forward.  I'm
10 used to it.
11 BY MR. RIEMER:
12 Q.   Okay.  Really I'm summarizing -- I'm trying
13 to provide a usable summary of what all these
14 words say in Chapter 4.
15 A.   Okay.
16 Q.   And if you don't think it's a fair summary,
17 then you don't have to agree.  Okay.
18     But I've read through most of those
19 provisions and it seems to me the gist of Chapter
20 4, which deals with how these records are dealt
21 with, is that the servicer or some other
22 third-party custodian takes physical possession
23 of the note, but solely as the custodian for

Page 136

1 Fannie Mae and not as the actual owner of the
2 note, in other words, ownership does not
3 transfer?
4     MS. DOWNS:  Same objection.
5 A.   The servicer does not own the loan.  It
6 collects money on behalf of the owner and
7 performs duty -- duties under the loan as
8 outlined in the servicing agreement.  So yes,
9 they are not the owner.
10 Q.   That is true even when the servicer takes
11 physical possession of the note?
12 A.   Correct.
13 Q.   Okay.  You described for us accurately that
14 in some instances it's not the servicer who
15 actually is holding the note, it's some
16 third-party custodian, right?
17 A.   It could be, yes.
18 Q.   Okay.  I just want to clarify.
19     But even under those circumstances the
20 ownership situation is the same?  In other words,
21 Fannie Mae retains ownership according to Fannie
22 Mae?  I don't agree with this, but this is --
23 Fannie Mae's position is that Fannie Mae obtains

Page 137

1 ownership of the loan even -- and the ability to
2 receive the payments due under the note even when
3 a third-party is the custodian and not the
4 servicer?
5 A.   Correct.
6 Q.   With respect to notes that are on Fannie
7 Mae loans, in your experience have you ever seen
8 a note that was endorsed to Chase where Chase was
9 the servicer?
10 A.   A note?
11 Q.   Uh-huh.
12 A.   Where Fannie Mae endorsed to Chase?
13 Q.   Well, a note on a Fannie Mae loan endorsed
14 to Chase?
15     MS. DOWNS:  Object to the form.  It's
16 confusing.
17 Q.   My question is:  Have you ever seen that?
18 A.   Not that -- Not that I can recall.
19 Q.   Okay.  Judging from your response, you
20 would consider that strange; is that right?  Is
21 that fair?
22     MS. DOWNS:  Same -- Same objection.
23 A.   I was just thinking whether I had, you

1 know, I had or not.
2 Q.   Okay.   Now, we don't have a foreclosure
3 deed in this case, but have you seen foreclosure
4 deeds in loans that were serviced for Fannie Mae
5 whereby Fannie Mae was the purchaser, ultimately
6 the purchaser at the foreclosure sale identified
7 in the foreclosure deed?
8       MS. DOWNS:  I have to object as outside the
9 topics for this witness.
10 Q.   Well, if you can --
11 A.   I don't recall that.
12 Q.   Okay.  Mr. Smith, in your -- It could not
13 be this simple, probably more complicated than
14 this.
15       But in your version of the Fannie Mae reg
16 Guidelines, are there page numbers that start --
17 well, within Section -- with Chapter 4, 104 dash?
18 No?
19 A.   No.
20 Q.   Couldn't be that easy, could it?  Maybe
21 you -- Maybe you have seen this and this will
22 make it easier.  In Section 404 there's
23 references to this process of checking notes out,

1 going and removing them from the -- from custody
2 in a Form 209, 2009.
3       Are you familiar with that?
4 A.   No.
5 Q.   Do you know what the procedure would be if
6 someone would need to obtain physical possession
7 of the note, how they would go about that?
8 A.   With Chase being the custodian?
9 Q.   Yes.
10 A.   Yes.
11 Q.   Okay.  Tell me about that.
12 A.   There is a request that would need to be
13 submitted.  It's called an RUD.  I don't know
14 what that stands for.  That is submitted
15 internally to Chase Custody Services outlining,
16 you know, the request for the collateral file,
17 advising where that needs to be sent to.
18 Q.   Okay.
19 A.   And part of that process is that the Chase
20 Custody Services will ensure that all of the
21 documents within that collateral jacket are also
22 imaged within our system internally before
23 anything is sent out.

1 Q.   Well, did that happen here?  In other
2 words, there's an image of the original note
3 before it was removed?
4 A.   Yes.
5 Q.   Off the record.
6       (Off-the-record discussion.)
7 Q.   Let's go back on.  Let me ask you this,
8 Mr. Smith.  Was this -- We have talked about this
9 loan being held by Fannie Mae and Fannie Mae is
10 the investor.
11       But was this loan held in a particular pool
12 of loans --
13 A.   No.
14 Q.   -- as far as you know?
15 A.   No.
16 Q.   It was not?
17 A.   No.
18 Q.   Okay.  Is there -- There is references to
19 pool number, if you look at page 146 of Chase's
20 production, which would be part of the notebook
21 identified as Plaintiff's Exhibit Two.
22 A.   I'm sorry.
23 Q.   All right.

1 A.   Page 146.
2 Q.   That is -- Well, it may be 146, but I'm
3 looking at pool number on page 148, towards the
4 top.
5 A.   Yes.
6 Q.   All right.  That is 907749.
7       Do you see that?
8 A.   Yes.
9 Q.   Okay.  But your understanding is that it
10 wasn't included in a pool?
11 A.   That was my understanding, yes.
12 Q.   Where did you get that understanding from?
13 A.   Based on my review of the internal loan
14 file.  There is a screen that reflects the
15 investor and if it was a pool, it would mention
16 what pool that is.
17 Q.   Okay.  Well, are you familiar with the pool
18 numbers?
19 A.   No, I'm not.
20 Q.   What -- Where in the production, document
21 production is the -- would be the screen shot for
22 what you are talking about?
23 A.   Hold on one second.

Page 142

1 Q. Okay.
2     MS. DOWNS: Just use yours. Looking for
3 the screen you were talking about earlier?
4 A. Let me ask one -- I thought it would be --
5     MS. DOWNS: I thought you brought it with
6 you. Flip it back.
7 A. I did, too. There it is.
8 Q. Bates number again?
9 A. 441.
10     MS. DOWNS: Chase 441.
11 A. Yes.
12 Q. Okay. So this is part of the 3270 Explorer
13 notes?
14 A. Yes. Correct.
15 Q. Okay. Where would there be -- I see a
16 place for a pool number and it's blank.
17     Is that what you are talking about?
18 A. Yes. Under -- halfway down. Not only the
19 pool number where it says the INV FNMAA slash A,
20 underneath that it would show not only Fannie
21 Mae, it would show the pool.
22 Q. Okay. Now, it lists here an individual,
23 John Metsker, under Fannie Mae's address.

Page 143

1     Do you see that?
2 A. Yes.
3 Q. Is that a person, a Fannie Mae employee?
4 A. I'm not sure.
5 Q. Have you seen individuals listed on
6 documents like this before?
7 A. In this particular screen?
8 Q. Yes.
9 A. Not that I recall.
10 Q. That leads me to something that I have in
11 my notes to ask you. Is there -- Well, are there
12 Fannie Mae representatives that are on site at
13 Chase facilities that help deal with the
14 relationship between Chase and the investor?
15 A. An actual Fannie Mae employee?
16 Q. Right.
17 A. Not that I'm aware of.
18 Q. Okay. On the same page on the bottom
19 right-hand side it says, remove loss mitigation,
20 full settlement.
21     Do you know what that means?
22 A. I'm not sure what that is referring to.
23 Q. Okay.

Page 144

1 A. Excuse me.
2     (Off-the-record discussion.)
3 Q. All right. I just have a handful of
4 questions here about some of these notes. Go to
5 page 143. What is it -- What does this screen
6 depict?
7 A. This screen would reflect the mailing and
8 the property address for the borrower, phone
9 numbers, contact information.
10 Q. Are you familiar with the Fannie Mae
11 program called Laser?
12 A. No.
13 Q. Now, included in the production were some
14 documents regarding this new creditor notice.
15 See if I can -- I'm going to direct your
16 attention to page 393.
17     Are you there?
18 A. Yes.
19 Q. Did you look at that before today?
20 A. Yes, I did.
21 Q. Is this -- Is a Fannie Mae -- I'm sorry.
22 This is a Chase document that instructs folks how
23 to answer questions about the new creditor notice

Page 145

1 they might have received, right?
2 A. Yes.
3 Q. Okay. Now, is this generated by Chase or
4 Fannie Mae?
5 A. This particular document?
6 Q. Yes.
7 A. This is a Chase internal document.
8 Q. Okay. Then there's a -- There is a copy of
9 -- on page 408 of a sample notice. At least I
10 think that's what that is. You can tell me if I'm
11 wrong.
12 A. That's correct.
13 Q. Okay. This might get into more of what the
14 other witness is going to testify to.
15     But is it your understanding that Chase
16 does send these new creditor notices out under
17 some circumstances?
18 A. Yes. That's my understanding.
19 Q. Okay. So tell me your understanding of
20 Chase's policy with respect to which loans it
21 sends these notices out and which loans it does
22 not.
23 A. Well, I think really Matt could again speak

1 to that.
2 Q.   Is that getting into --
3 A.   Yes.
4 Q.   If I'm going to have the witness answer
5 that question, I'd rather we stick with one voice
6 on that then.  Thank you.
7      Well, so I know what I'm studying when I
8 study this before that next deposition, the 397,
9 the document that starts at 397, is this an
10 iteration of Chase's policy with respect to the
11 new creditor notice requirements?
12 A.   Yes.
13 Q.   All right.  Is this -- As far as you know,
14 is this the -- this part of the production
15 beginning at 397, is this the entire policy or is
16 there another policy document that addresses this
17 notice requirement?
18 A.   I don't know of another policy.
19 Q.   All right.  So let me -- what I'd like to
20 do --
21 A.   I swear I turned the phone off.
22      (Off-the-record discussion.)
23 Q.   All right.  What I'd like to do, I've got

1 one -- Let me recap, make sure I understand
2 something then.  Let's take a break.  Earl and I
3 can go over our notes.
4 A.   Okay.
5 Q.   And then we will be more concise on what
6 other questions we have.
7 A.   Okay.
8 Q.   But from what you are telling me, I want to
9 make sure I understand this, is that even though
10 -- Is it your understanding that Fannie Mae's
11 position is that it alone is the owner of the
12 obligation and the one entitled to enforce the
13 obligation throughout the entire process, even
14 after a foreclosure has been noticed and a
15 foreclosure sale is conducted?
16 A.   Okay.  When you say "obligation", you are
17 referring to the loan?
18 Q.   The note.
19 A.   Yes, yes.
20      MR. RIEMER:  Okay.  Let's take a break.
21      (Recess:  2:42 p.m. to 2:56 p.m.)
22 BY MR. RIEMER:
23 Q.   We will go on.  Mr. Smith, we talked about

1 this mechanism whereby Fannie Mae might buy back
2 a loan.  Remember us talking about that?
3 A.   Yes.
4 Q.   I might be using the wrong terminology, but
5 it --
6 A.   Well, actually let me restate that.
7 Q.   Okay.
8 A.   Fannie Mae right require a servicer to buy
9 the loan from Fannie Mae.
10 Q.   That's right.  I had it reversed.
11 A.   Yes, yes.
12 Q.   Okay.  Was there any indication in the file
13 that you saw with respect to the Reeds' loan that
14 indicated that at any time, even after the
15 lawsuit was filed, this loan was bought -- was
16 bought back by Chase?
17 A.   No.
18 Q.   Okay.  Did you -- Is there an indication
19 one way or the other, I mean, is that a
20 possibility here or --
21 A.   No.  As I stated before, the investor would
22 have changed as well as there would have been a
23 transaction within the payment history reflecting

1 that.
2 Q.   When that happens, does that show up on the
3 MERS report typically, the MERS Milestone Report?
4 You don't know?
5 A.   I don't know.
6 Q.   You don't know if -- We saw that term "full
7 settlement" listed there in the print screen.
8      That doesn't refer to, as far as you know,
9 to this buy back mechanism at all?  Do you --
10 A.   I don't believe so.
11 Q.   Okay.  Going to page -- Well, get back to
12 the note.  We started at page one.  We looked at
13 that language that defined the note holder.  Do
14 you remember that?  It says, the lender or anyone
15 who takes this note by transfer and who is
16 entitled to receive payments under the note is
17 called the note holder.
18      Do you see that?
19 A.   Are you talking 4 --
20 Q.   It's the second paragraph of Section I.
21 A.   Okay.
22 Q.   The second paragraph, second sentence in
23 that paragraph.

Page 150

1    Do you see that?
2 A.   Yes.
3 Q.   So you would agree with me according to the
4 note, the note holder includes the person who
5 takes the note by transfer and who is entitled to
6 receive payments under the note?
7    Isn't that what it says?
8 A.   Yes.
9 Q.   Okay.  So now that you have explained to me
10 your understanding of the relationship between
11 Fannie Mae and Chase with respect to this note,
12 what you are saying is that Chase never became
13 the note holder as described in the note?
14    MS. DOWNS:  Object to the form of the
15 question as drawing in legal issues.
16 Q.   You can answer.
17 A.   Well, as far as the entitlement to receive
18 payments, Chase, as servicer, collected the
19 payments on behalf of Fannie Mae.  So no, Chase
20 did not take the benefit of those payments.
21 Q.   Right.
22 A.   Any payments were passed to Fannie Mae.
23 Q.   Right.  It just collected it on behalf of

Page 151

1 Fannie Mae?
2 A.   Correct.
3 Q.   So using the definition of note holder that
4 appears in that provision I just read, in
5 section -- end of Section I in the note, at no
6 point in time did Chase ever become the quote,
7 note holder?
8 A.   Well, I'm not sure what you mean.
9 Q.   Well, let's look at this language.  This
10 language says --
11    MS. DOWNS:  He's just asking under this
12 language.
13 A.   Okay.
14 Q.   Let me rephrase the question so we can get
15 a concise question and answer here.  It describes
16 the note holder as the lender or anyone who takes
17 the note by transfer and is entitled to receive
18 payments under the note.
19    Do you see that?
20 A.   Yes.
21 Q.   All right.  So Chase is not the lender,
22 never was the lender, right, according to what
23 you told us today?

Page 152

1 A.   Correct.
2 Q.   Okay.  And Chase was never entitled to
3 receive any of the payments under the note,
4 according to what you told us today?
5 A.   As far as the benefit of the payments,
6 correct.
7 Q.   Right.  And so under that section, Chase
8 has never been the holder of this note?
9 A.   Under this section, yes.
10 Q.   Well, do you think Chase has ever become
11 the holder of the note?
12    MS. DOWNS:  Object to the form of the
13 question as requesting a legal conclusion.
14 A.   I'm not sure exactly what you are asking
15 me.
16 Q.   Well, strike that.  I think you answered
17 the question.
18    Do we have Sirote's file yet?
19    MS. DOWNS:  Can we just put on the record
20 while we're waiting, if it's a good point, that
21 there were two collective exhibits marked today
22 as Plaintiff's Exhibits Two and Three, each of
23 which are notebooks.

Page 153

1    And counsel have agreed that the originals
2 of these notebooks are going to be taken by the
3 court reporter, a copy of their contents made and
4 marked as deposition exhibits to Mr. Smith's
5 deposition, then the originals will be returned
6 to Plaintiff's counsel.
7    MR. RIEMER:  Okay.  We can do that.  That
8 -- I must have misstated.  What I was talking
9 about is that we would save the court reporter
10 that trouble and that we would -- Earl and I
11 would take these notebooks and then bring them to
12 Columbus for the next -- But it doesn't matter.
13 He can take it.
14    MS. DOWNS:  That's fine, too.  That's fine,
15 too.
16    MR. RIEMER:  Okay.  Let's just do that.
17    Ms. DOWNS:  Okay.  So let me rephrase the
18 agreement, please.  Counsel have agreed that the
19 originals of Plaintiff's Exhibits Two and Three
20 will remain in the custody of Plaintiff's counsel
21 following this deposition until the next
22 deposition in this case.  Okay.
23 BY MR. RIEMER:

Page 154

1 Q. Let me ask you this: In Sirote's file
2 there is a copy of the note. Under your
3 understanding of this process, would Sirote ever
4 receive as -- Sirote as the foreclosing law firm,
5 would they ever receive the original note?
6 A. Would they ever? That's a broad question.
7 Q. Let me make this caveat. Would they ever
8 in the context of conducting the foreclosure?
9 A. A basic foreclosure, no.
10 Q. Okay. Is there any indication that Sirote
11 was provided an original -- well, the original
12 version of this note in the Reeds' case? Did it
13 ever go to Sirote?
14 A. No.
15    MR. RIEMER: That's really all I was going
16 to ask about this. I don't think we need to mark
17 it as an exhibit anyway.
18    MS. DOWNS: Okay.
19    MR. RIEMER: Okay. I pass the witness.
20 EXAMINATION BY MS. DOWNS:
21 Q. Mr. Smith, my name is Helen Kathryn Downs.
22 As you know, I represent the Defendant in this
23 case.

Page 155

1 A. Yes.
2 Q. We've met previously as you reviewed this
3 file and gotten ready for this deposition, right?
4 A. Yes.
5 Q. I'm going to ask you some questions today
6 on behalf of Chase. A little unusual. I don't
7 always do a kind of direct examination in a
8 deposition setting, but we have a tight deadline
9 before the Federal Court. Okay?
10 A. Okay.
11 Q. If you -- If any of my questions are
12 confusing or you don't understand what I'm
13 asking, you will clear that up for me. All
14 right?
15 A. Okay.
16 Q. Let me ask you to look at what we are going
17 to go ahead and mark as Defendant's Exhibit One.
18    (Defendant's Exhibit Number 1
19    marked for identification and
20    same is attached hereto.)
21 Q. Identify that for me, please.
22 A. This is the promissory note for the Reed
23 loan with the addendum and allonge attached.

Page 156

1 Q. Okay. Based on your background and
2 experience and in preparing as Chase's corporate
3 representative for this deposition, if you look
4 at the last page of the note, which is Bates
5 number Chase 00007, Chase 7, do you know what
6 that is?
7 A. Yes. This is the allonge or kind of the
8 assignment of the note.
9 Q. When you say assignment of the note, does
10 this reflect to you a transfer of ownership of
11 the note?
12 A. Yes.
13    MR. RIEMER: Objection. Leading.
14 A. Yes. This would be the transfer of the
15 ownership of the note.
16 Q. Let me ask my question again, Mr. Smith, so
17 that we can address counsel's objection.
18    What, if anything, does this allonge
19 reflect to you with respect to ownership of the
20 Reeds' debt or note?
21 A. This would reflect that the ownership was
22 transferred from Pensacola Guaranty Mortgage to
23 SunTrust Mortgage.

Page 157

1 Q. Thank you. And if you look back for me at
2 Bates page Chase 4.
3    Do you see that page?
4 A. Yes.
5 Q. Mr. Riemer asked you about this SunTrust
6 Mortgage stamp.
7    Do you recall testimony that you indicated
8 this was endorsed in blank?
9 A. Yes.
10 Q. When he asked you those questions, the
11 specific question he posed is: Is this a copy of
12 the Reeds' note that they signed?
13    And what I want to clarify with you is,
14 when would the SunTrust endorsement stamp have
15 been added to this note? On the date the Reeds
16 signed it or later, if you know?
17 A. The endorsement would be after the
18 signature.
19 Q. Okay. So the Reeds would have signed this
20 without that signature -- that stamp appearing;
21 is that fair?
22 A. Yes.
23 Q. Okay. What does that stamp reflect to you

Page 158

1 in terms of the ownership of the debt or note?
2 A.  Well, with stamps such as this, sometimes
3 there's a name of who it's transferred to, pay to
4 the order of, and it will mention an entity.
5     In this particular case that -- that column
6 is blank.  There is no pay to the order of.  So
7 it's called endorsement in blank.  So what that
8 will mean is whoever the holder of the note is
9 would be the actual new owner, and in this case,
10 from the documents that -- that would be Fannie
11 Mae.
12    MR. RIEMER:  Can we go off just a second?
13    (Off-the-record discussion.)
14    MS. DOWNS:  We are back to the question,
15 Howard, that was something like, would this stamp
16 have been added before or after the Reeds signed
17 the note.  So the Reeds would sign it and then
18 what?
19    (RECORD READ AS FOLLOWS:
20 Q.  When he asked you those questions, the
21 specific question he posed is:  Is this a copy of
22 the Reeds' note that they signed,
23    And what I want to clarify with you is,

Page 159

1 when would the SunTrust endorsement stamp have
2 been added to this note?  On the date the Reeds
3 signed it or later, if you know?
4 A.  The endorsement would be after the
5 signature.)
6    MS. DOWNS:  Okay.  What is next?
7    (RECORD READ AS FOLLOWS:
8 Q.  Okay.  So the Reeds would have signed this
9 without that signature -- that stamp appearing;
10 is that fair?
11 A.  Yes.)
12    MS. DOWNS:  What is next?  Did I ask -- Did
13 I do it wrong?  Read the next Q and A.
14    MR. RIEMER:  Well, no.  Keep reading.
15    (RECORD READ AS FOLLOWS:
16 Q.  Okay.  What does that stamp reflect to you
17 in terms of the ownership of the debt or note?
18 A.  Well, with stamps such as this, sometimes
19 there's a name of who it's transferred to, pay to
20 the order of --)
21    MR. RIEMER:  You are right.  I just heard
22 it wrong.
23    MS. DOWNS:  Did I get it right?

Page 160

1    MR. RIEMER:  You got it right.
2    MS. DOWNS:  I didn't want the record to be
3 confusing.
4    MR. RIEMER:  Me neither.  I just heard it
5 wrong.  I'm sorry.
6    MS. DOWNS:  Okay.  That's all right.
7 That's fine.
8 BY MS. DOWNS:
9 Q.  Are we back on, Howard?  All right.
10 Mr. Smith, I just heard you say that after
11 describing what an endorsement in blank means
12 that here the documents reflect that the -- that
13 Fannie Mae was the owner of the note?  Did I hear
14 you right?
15 A.  Correct.
16 Q.  I'd like to mark what we are going to
17 call -- excuse me -- I'd like to mark Defendant's
18 Exhibit Two --
19    (Defendant's Exhibit Number 2
20    marked for identification and
21    same is attached hereto.)
22 Q.  -- and ask you to identify that for me.
23 A.  This is the MERS Milestones related to the

Page 161

1 loan.
2 Q.  You have discussed in detail this Milestone
3 with Mr. Riemer during your deposition today,
4 correct?
5 A.  Yes.
6 Q.  What is it about this document that makes
7 you say that SunTrust endorsement in blank, that
8 next owner or investor was Fannie Mae?
9 A.  Well, the -- on 1-19, batch 1000130, off to
10 the right there it references the new investor as
11 Fannie Mae and the old investor as SunTrust and
12 that occurred on the -- the transfer date is the
13 16th, January 16th, 2007.
14 Q.  So do I understand you to be saying that on
15 January 16th of 2007 that this entry you just
16 discussed, that's the date it relates -- that the
17 actual transfer was made?
18 A.  Yes.
19 Q.  As opposed to January 19th, 2007 when it
20 was reported or registered into the MERS System?
21 A.  Correct.
22 Q.  Okay.  Based on the note itself, Mr. Smith,
23 and this Milestone Report, was there any

Page 162

1 intervening owner or investor of the note between
2 SunTrust Mortgage and Fannie Mae, if you know?
3 A.  Based on the Milestones, no.
4 Q.  Was there any other transfer of ownership
5 of the Reeds' note or debt, to your knowledge,
6 after Fannie Mae received it?
7 A.  No.
8 Q.  What interest did J.P. Morgan Chase have
9 with respect to the Reeds?
10 A.  J.P. Morgan Chase was the servicer on -- of
11 the loan on behalf of Fannie Mae.
12 Q.  When did J.P. Morgan Chase first acquire
13 servicing rights for the Reeds' loan?
14 A.  January 4th -- I'm sorry -- September 4th,
15 2007 was the transfer date and that was updated
16 on the 13th of September, 2007.
17 Q.  So are you telling me that on September 4,
18 2007, that Chase became the new servicer for the
19 Reeds' loan?
20 A.  Correct.
21 Q.  Who had been the servicer prior to that
22 time?
23 A.  SunTrust.

Page 163

1 Q.  Was there any change in J.P. Morgan's
2 servicing rights after September of 2007?
3 A.  No.
4 Q.  So who is the current servicer of the
5 Reeds' loan?
6 A.  J.P. Morgan Chase Bank.
7      (Defendant's Exhibit Number 3
8       marked for identification and
9       same is attached hereto.)
10 Q.  I'm going to show you what we will mark as
11 Defendant's Exhibit Three and ask you to identify
12 that for me, please.
13      What is that, Mr. Smith?
14 A.  This is the 32 Explorer servicing record
15 for the Reed loan and this is what we would call
16 the investor screen.
17      MR. RIEMER:  For the record, it's Chase
18 00441.
19 Q.  Okay.  Is this kind of a screen something
20 that is accessible on Chase's internal databases?
21 A.  Yes.
22 Q.  And can you tell me, based on your work
23 experience, whether this is information in a

Page 164

1 screen that is generated by Chase?
2 A.  It is.
3 Q.  Is it generated in the normal course of
4 Chase's business --
5 A.  Yes.
6 Q.  -- in servicing loans?
7 A.  Yes.
8 Q.  And when you mentioned, Mr. Smith, that as
9 Chase's corporate representative you went to look
10 as a research analyst for documents that would
11 show what Chase's relationship was to the Reeds,
12 was this one of the documents that you retrieved?
13 A.  Yes.
14 Q.  And why would you go to this screen?
15 A.  Because this screen would actually reflect
16 who the actual owner of the loan is.
17 Q.  And what does it show you in that regard?
18 A.  It shows that Fannie Mae is the investor,
19 which would be the owner.
20 Q.  And that HDR under investor -- Strike
21 that.  Let me ask a question.
22      What line or section of this screen tells
23 you that information?  If you can, just read it

Page 165

1 into the record.
2 A.  The line, it's on the left side about
3 halfway down, it says INV and then it's FNMA,
4 which is the abbreviation for Fannie Mae.  And
5 then under that it actually says Fannie Mae with
6 the address in Herndon, Virginia.
7 Q.  Thank you.  Right in that area of the
8 document you were just looking at there's an
9 abbreviation that reads HDR.
10      Do you see that?
11 A.  Yes.
12 Q.  What does that stand for, if you know?
13 A.  I don't know.
14 Q.  What would have occurred with respect to
15 this type of a screen, Mr. Smith, if ownership of
16 the Reeds' loan had transferred from Fannie Mae
17 to Chase?
18 A.  That information would be updated on the
19 screen and it would reflect that Chase is the
20 investor or owner.
21      (Defendant's Exhibit Number 4
22       marked for identification and
23       same is attached hereto.)

Page 166

1 Q.  Let me show you what we will mark as
2 Defendant's Exhibit Four.
3     What is this, Mr. Smith?
4 A.  This -- These are actually also screens
5 within our servicing system, Fidelity MSP or 3270
6 Explorer.  The first page reflects the borrower's
7 address, mailing address, property address,
8 contact information and basic information related
9 to the property.
10 Q.  What information, if any, do these screens
11 show about the investor or owner of the Reeds
12 note or debt?
13 A.  The Chase number 00146 actually reflects
14 that the owner is Federal National Mortgage
15 Association, which is Fannie Mae.
16 Q.  Are these documents, documents that are
17 generated by Chase?
18 A.  Yes.
19 Q.  And are they stored or can they be accessed
20 on Chase's internal database?
21 A.  Yes.
22 Q.  For a loan like the Reeds, is this a type
23 of document that would be regularly generated in

Page 167

1 the normal course of Chase's business?
2 A.  Yes.
3 Q.  And as Chase's corporate representative in
4 your role and work in the company, would you
5 access these screens in the course of your work
6 if you wanted information about the loan?
7 A.  Yes.
8 Q.  And would you access them if you wanted
9 information about the investor, for example?
10 A.  Yes.
11     MR. RIEMER:  Can we clarify before you move
12 to that, Exhibit Four is 143 through 146?
13 Q.  Yes.
14     (Defendant's Exhibit Number 5
15      marked for identification and
16      same is attached hereto.)
17 Q.  Let me show you Defendant's Exhibit Five.
18 What are the pages Bates labeled Chase 165 to 172
19 that comprise Defendant's Exhibit Five, please?
20 A.  These are internal records from a servicing
21 system within Chase, Customer Care Work Bench
22 it's called, which actually reflects transactions
23 and tasks that are carried out in reference to

Page 168

1 the Reeds' loan.
2 Q.  In preparing to testify about the topics
3 that you were designated for today, Mr. Smith,
4 did you review these customer service notes?
5 A.  Yes.
6 Q.  Was there any indication that the Reeds
7 were ever informed of the identity of the
8 investor of their loan?
9 A.  Yes.  There was an entry related to
10 advising them who the investor was.
11 Q.  Look at page Chase 168 for me, please.
12 A.  Yes.
13 Q.  What entry are you referring to?
14 A.  Referring to the March 24th, 2009 entry,
15 which reflects a phone call.
16 Q.  Can you for me, Mr. Smith, these are --
17 these entries are all in a kind of abbreviation
18 or code, right?
19 A.  Yes.
20 Q.  Is that something that's regularly used by
21 the individuals who make these entries?
22 A.  Yes.
23 Q.  And it's a standardized kind of set of

Page 169

1 abbreviations in general?
2 A.  Generally, yes.
3 Q.  All right.  Can you interpret for us, if
4 you would, that March 24, 2009 entry?
5 A.  Yes.  It -- TT stands for talked to.
6 Borrower one would be the first individual on the
7 note.  References request loan modification.
8 Q.  So that would indicate that the borrower
9 was requesting a loan modification?
10 A.  Yes.
11 Q.  Okay.  Go ahead.
12 A.  It states that the customer was advised of
13 the MHA Obama plan, advised investor is Fannie
14 Mae and gave the number to the Modification
15 Department.
16 Q.  Are these type of customer service notes a
17 record generated at Chase?
18 A.  Yes.
19 Q.  And are they generated in the regular
20 course of Chase's business for servicing loans?
21 A.  Yes.
22 Q.  As Chase's corporate representative and
23 your work experience, would you generally look to

Page 170

1 this document on Chase's internal database for
2 information about communications with the
3 borrowers?
4 A.  Yes.
5     (Defendant's Exhibit Number 6
6     marked for identification and
7     same is attached hereto.)
8 Q.  Show you Defendant's Exhibit Six,
9 Mr. Smith.  What are those notes, please, sir,
10 that range from Chase 1006 to 1034?
11 A.  These are the foreclosure notes related to
12 the Reed loan.
13 Q.  What system are they on, please?
14 A.  They are on Explorer 3270.
15 Q.  So Mr. Riemer was asking you questions
16 about the Explorer System earlier --
17 A.  Yes.
18 Q.  -- where there might be information about
19 an assignment recorded.
20    Do you remember that?
21 A.  Yes.
22 Q.  You mentioned that there should be some
23 foreclosure screens in Explorer that might

Page 171

1 reflect information about that, right?
2 A.  Correct.
3 Q.  Are these some of the those system notes?
4 A.  Yes.
5 Q.  Now, there are black lines through here
6 which I'll represent to you are redactions that
7 we have made as Chase's counsel for privileged
8 communications that happened relating to
9 foreclosure or after the individual suit was
10 filed.
11    So work around those as best you can.
12 Okay?
13 A.  Yes.
14 Q.  If you will, look back to Chase 1033,
15 please.
16 A.  Yes.
17 Q.  What information, if any, does this record
18 from Chase reflect regarding an assignment?
19 A.  1033?
20 Q.  Uh-huh.
21 A.  On 9-3 there is a reference to the title
22 review and it states assignment prepared, title
23 clear.

Page 172

1 Q.  What is the date of that entry that
2 references an assignment?
3 A.  9-3-2010.
4 Q.  And that reference again is reflected on a
5 Chase internal business record?
6 A.  Yes.
7 Q.  Are these notes kept regularly in the
8 course of Chase's business in servicing loans on
9 an internal database at Chase?
10 A.  Yes.
11 Q.  What familiarity would you have with these
12 types of records in your work for Chase or your
13 role as a corporate representative today?
14 A.  Well, I would have access to review these
15 notes as part of the foreclosure file.
16 Q.  And are these notes that Chase employees
17 like yourself would regularly refer to for
18 information about the foreclosure process for a
19 particular borrower?
20 A.  Yes.
21    (Defendant's Exhibit Number 7
22    marked for identification and
23    same is attached hereto.)

Page 173

1 Q.  I'm going to mark the mortgage just for
2 housekeeping purposes as Defendant's Exhibit
3 Seven and ask you to look down for me at the
4 bottom of Chase 8 to the definition of loan.
5    Do you see that?
6 A.  Yes.
7 Q.  Can you read that into the record for me,
8 please?
9 A.  Loan means the debt evidenced by the note
10 plus interest, any prepayment charges and late
11 charges due under the note and all sums due under
12 the security instrument, plus interest.
13 Q.  So occasionally even in this deposition
14 there has been a little bit of confusion about
15 the use of the words "mortgage loan" and "loan"
16 and "obligation".
17    When you have testified about the loan or
18 note or debt today, Mr. Smith, what are you
19 talking about?
20 A.  The -- The money due NOA.
21 Q.  So you are talking about the debt the Reeds
22 owed to the owner of their loan?
23 A.  Correct.

Page 174

1 Q.   And is the note, to your knowledge, a
2 document that memorializes that debt?
3 A.   Correct.
4 Q.   And loan is also a word that is refused --
5 excuse me -- used interchangeably with note?
6 A.   Yes.
7 Q.   When we talk about a note, there's also a
8 definition here in the mortgage, what are we
9 talking about?
10 A.   I'm sorry.  Say that again.
11 Q.   Yes.  When we have made reference to a
12 note, what is -- how is note defined here in the
13 mortgage?
14 A.   It's defined as the loan.
15 Q.   The promissory note?
16 A.   Yes.
17 Q.   And that is the document that we have
18 marked as Defendant's Exhibit One, signed by the
19 Reeds?
20 A.   Correct.
21 Q.   Okay.  If you would, turn back to Chase 10
22 for me on the mortgage.
23     MR. RIEMER:  Page 10?

Page 175

1 Q.   Chase Bates number 10.
2     MR. RIEMER:  Okay.
3 Q.   A third of the way down the page, do you
4 see the paragraph that starts "together with"?
5 A.   I'm sorry.  You said a third of the way
6 down?
7 Q.   Yes.  The paragraph that starts "together
8 with".
9 A.   Together with all the improvements.
10 Q.   Yes.
11 A.   Yes.
12 Q.   All right.  Mr. Riemer asked you some
13 questions about this paragraph.
14     Do you remember that?
15 A.   Yes.
16 Q.   I want you to look for me down toward the
17 end of the paragraph.  It's the third sentence.
18 It actually comprises most of the paragraph.  I'm
19 just going to read it into the record so I can
20 ask you as a question.  Okay?
21 A.   Okay.
22 Q.   All of the foregoing is referred to in this
23 security instrument as the property.  Borrower

Page 176

1 understands and agrees that MERS holds only legal
2 title to the interests granted by borrower in
3 this security instrument, but if necessary to
4 comply with law or custom, MERS, as nominee for
5 lender and lender's successors and assigns, has
6 the right to exercise any or all of those
7 interests including but not limited to the right
8 to foreclose and sell the property, to take any
9 action required of lender including but not
10 limited to releasing and canceling this security
11 instrument.
12     Did I read that right?
13 A.   Yes.
14 Q.   What I want to ask you, Mr. Smith, is,
15 based on your experience, what authority would
16 MERS have as nominee for the lender under this
17 mortgage with respect to a task like releasing
18 the security instrument --
19     MR. RIEMER:  Objection.  You can try to
20 answer.
21 Q.   -- in terms of Chase's conduct as -- and
22 operations as a servicer?
23     MR. RIEMER:  Objection.  You can try to

Page 177

1 answer.
2 Q.   Go ahead.
3 A.   What does -- What authority does MERS
4 have?
5 Q.   Let me ask the question.
6 A.   Okay.
7 Q.   After viewing that section of the Reeds'
8 mortgage --
9 A.   Yes.
10 Q.   -- what in terms of practical walking
11 around business operations does this translate to
12 into what MERS can do, in your experience at
13 Chase, as a nominee for the lender, if you know?
14     MR. RIEMER:  Objection.  Objection.  Go
15 ahead.
16 A.   Well, MERS can, if they choose to do so,
17 exercise the right to foreclose, to sell the
18 property or release or cancel the mortgage.
19 Q.   So hypothetic -- Well, let me see how to
20 phrase this question.
21     Would MERS have the authority under the
22 Reeds' mortgage, based on your experience as a
23 Chase employee or representative, not as a

Page 178

1 lawyer, if necessary, to sign a release of the
2 security interest which wipes out the mortgage,
3 if it was paid off, for example?
4     MR. RIEMER:  Objection.  You can answer.
5 A.  They could.
6 Q.   And they could do that on behalf of the
7 lender as the lender's nominee?
8     MR. RIEMER:  Same objection.
9 A.  They could, yes.
10     (Defendant's Exhibit Number 8
11     marked for identification and
12     same is attached hereto.)
13 Q.   I'll show you what we are going to mark as
14 Defendant's Exhibit Eight and ask you what this
15 is?
16 A.   This is the notice that Chase prepared when
17 it acquired the servicing rights to the loan, to
18 mail to the customer and advise them of the
19 servicing transfer.
20 Q.   That was in the September 2007 time frame,
21 if I remember right?
22 A.   Yes.  Yes.
23 Q.   So Chase, when it became the servicer for

Page 179

1 the Reeds' loan, sent out a welcoming service
2 letter or a disclosure telling the Reeds who
3 their new servicer was, right?
4 A.  Correct.
5 Q.   As the servicer of the Reeds' loan,
6 Mr. Smith, what would Chase have done if the
7 Reeds had called and said or written and said, we
8 would like to know who our investor is?
9     MR. RIEMER:  Objection.  Calls for
10 speculation.  You can try to answer.
11 A.  We have to advise them of who the investor
12 is.
13 Q.   Why do you say, we have to advise them?
14 A.   That is -- Part of our policy is if they
15 request -- submit a request to know who owns
16 their loan, that we have to provide that
17 information.
18 Q.   Having looked back at the customer service
19 notes -- Strike that.  We have already done that
20 for the Reeds.  We have talked a lot, Mr. Smith,
21 today about Chase as the Reeds' loan servicer.
22     What, for the benefit of the court, does --
23 is a loan servicer?

Page 180

1 A.   A servicer collects payments on behalf of
2 the lender, owner, pays any taxes that may come
3 due, and protects any rights of the lender that
4 are secured, that are outlined within the
5 mortgage, which could include foreclosure.
6     (Defendant's Exhibit Number 9
7     marked for identification and
8     same is attached hereto.)
9 Q.   I'm going to show you what we have marked
10 as Defendant's Exhibit Nine.  And Ken and Earl,
11 this is Section -- part one, Chapter 2, 202 of
12 the Fannie Mae Servicing Guide.
13     What is this section numbered and entitled,
14 Mr. Smith?
15 A.   It's Section I, 202, servicer's basic duties
16 and responsibilities.
17 Q.   And with respect to Chase's servicing of
18 the Reeds' loan for Fannie Mae, what application
19 does this section have with respect to Chase's
20 duties and obligations?
21 A.   Well, it outlines some of the things that I
22 mentioned as far as paying property taxes,
23 maintaining hazard insurance, responsibilities

Page 181

1 related to delinquent loans, which could include
2 foreclosure, and the general protection of the
3 lender's interest.
4 Q.   So with respect to the Reeds' loan, is it
5 fair to say that this would be some of the
6 obligations of Chase in administering their
7 loans --
8 A.  Yes.
9 Q.   -- as servicer?
10 A.  Yes.
11     (Defendant's Exhibit Number 10
12     marked for identification and
13     same is attached hereto.)
14 Q.   I'll show you what we will mark as
15 Defendant's Exhibit Ten.
16 A.   Okay.
17 Q.   What is that document?
18 A.   This is Section I, 202.06, execution of
19 legal documents.
20 Q.   What application -- Excuse me.  What role
21 does this section play when Chase acts as
22 servicer for Fannie Mae, if you know?
23 A.   Well, it references that the servicer may

Page 182

1 execute legal documents related to payoffs,
2 foreclosure, release of liability, releases of
3 security instrument, loan modification,
4 subordinations, assignments.
5 Q.  And the servicer has that authority on
6 behalf of Fannie Mae under this agreement for any
7 mortgage loan where it is reflected in the public
8 records as the mortgagee, right?
9 A.  Yes.  For Chase or for MERS.
10 Q.  Okay.  I was going to ask if MERS is the
11 mortgagee of record, the Chase -- servicer also
12 has that authority?
13 A.  Yes.
14     MR. RIEMER:  That was Number Ten, is that
15 what you said?
16 Q.  Yes.
17     (Defendant's Exhibit Number 11
18     marked for identification and
19     same is attached hereto.)
20 Q.  We will mark Defendant's Eleven, which is
21 several sections, and ask you to identify that
22 for me, please?
23 A.  Section I, 202.07, note holder status for

Page 183

1 legal proceedings conducted in the servicer's
2 name.
3 Q.  When Chase, acting as servicer for Fannie
4 Mae, began the foreclosure process, based on the
5 next section of this, what was Fannie Mae's
6 interest in the Reeds' loan?
7     MR. RIEMER:  Objection.  You can answer.
8 A.  Well, Fannie Mae was the owner of the loan.
9 Q.  So -- Strike that.  And that is reflected
10 in Section 202.07.01 of this guide between Chase
11 as servicer and Fannie Mae, correct?
12 A.  Yes.
13 Q.  If you would, look back for me to Section
14 202.07.03.
15 A.  Yes.
16 Q.  What is that section titled, please?
17 A.  Physical possession of the note by the
18 servicer.
19 Q.  Can you read the first sentence for me?
20 A.  In most cases a servicer will have a copy
21 of the mortgage note.
22 Q.  What, at the time that the acceleration
23 notice and foreclosure notice were sent out with

Page 184

1 respect to the Reeds' loan, was Chase's situation
2 with respect to the note, the original note?
3     MR. RIEMER:  Objection.
4 A.  At that time, per my discussion with
5 Custody Services, Chase was in possession of the
6 original note.
7 Q.  For any subservicers who work for Chase and
8 serviced Fannie Mae loans, are they required to
9 adhere to Fannie Mae's Servicing Guide just like
10 Chase would be?
11 A.  Yes.
12 Q.  Mr. Riemer asked you questions today about
13 Section 401 of Chapter 4.
14     Is that a copy of what the two of you were
15 discussing?
16 A.  Ownership of mortgage loan files and
17 records, yes, yes.
18     MR. RIEMER:  That is going to be Twelve?
19 Q.  Twelve.  We are just going to mark that for
20 the record then as Exhibit Twelve.
21     (Defendant's Exhibit Number 12
22     marked for identification and
23     same is attached hereto.)

Page 185

1
2     (Defendant's Exhibit Number 13
3     marked for identification and
4     same is attached hereto.)
5 Q.  I'll show you what we have marked as
6 Defendant's Exhibit Thirteen and ask you to
7 identify that section of the guide, please.
8 A.  Section I, 408, MERS registered mortgage
9 loans.
10 Q.  What interest does MERS have in the debt
11 note or loan of a borrower for which it serves as
12 mortgagee as the lender's nominee, if you know?
13     MR. RIEMER:  Objection.
14 A.  I'm sorry.  Can you ask --
15 Q.  That was a really thick question.  I
16 agree.
17     What interest does MERS have in the
18 mortgage loan if it's the nominee for Fannie Mae
19 in the security instrument, if you know?
20 A.  They have no interest in the loan.  They
21 are just -- They are the nominee for the lender.
22 Q.  Okay.  If you look down to the next to last
23 paragraph where it starts, registration of Fannie

Page 186

1 Mae owned or Fannie Mae securitized mortgage loan
2 in MERS.
3    Do you see that?
4 A.  Yes.
5 Q.  In the middle of that paragraph it reads,
6 MERS will have no beneficial interest in the
7 mortgage loan even if it is named as the nominee
8 for the beneficiary in the security instrument.
9    Did I read that correctly?
10 A.  Yes.
11 Q.  What relationship does that language have,
12 Mr. Smith, to what you just told me about MERS
13 and its relationship to the loan?
14    MR. RIEMER:  Objection.
15 A.  That they have no interest in the loan even
16 if they are listed as the nominee.
17 Q.  My question wasn't very clear.  It's late
18 and we are tired.
19 A.  Right.
20 Q.  But to be more clear, what does Fannie
21 Mae's Servicing Guide that governs Chase's
22 servicer provide with respect to MER's interest
23 or lack of interest in a loan?

Page 187

1 A.  Well, the Servicing Guide reflects that
2 there is no beneficial interest in the mortgage
3 loan.
4 Q.  On MERS' part?
5 A.  MERS, correct.
6    (Defendant's Exhibit Number 14
7    marked for identification and
8    same is attached hereto.)
9 Q.  What in your experience, Mr. Smith, happens
10 when MERS is the mortgagee of record as nominee
11 for the lender, Chase is the servicer, Fannie Mae
12 owns the loan, and foreclosure proceedings need
13 to be initiated?
14 A.  What happens?
15 Q.  Yes.
16 A.  Yes.  The -- Per Fannie Mae's Guidelines,
17 the servicer is to foreclose in their name, in
18 the name of the servicer, so --
19 Q.  When MERS is the mortgagee of record?
20 A.  When MERS is the mortgagee of record.  So
21 the assignment from MERS to the servicer occurs
22 to complete that transaction.
23 Q.  I'm going to show you what we've marked as

Page 188

1 Defendant's Exhibit Fourteen and ask you to
2 identify that for me.
3    What section of the guide is that, please,
4 Mr. Smith?
5 A.  Section VIII, 105, conduct of foreclosure
6 proceedings.
7 Q.  When you say the guide provides that if
8 MERS is the mortgagee that the foreclosure
9 proceeding should go forward in the servicer's
10 name on behalf of Fannie Mae, was this the
11 section you were talking about?
12 A.  Yes.
13    MS. DOWNS:  All right.  Gentlemen, if we
14 can take a short break, I'll get the last of my
15 questions together and we can try to wrap it up.
16 Y'all can do whatever follow-up you need to.
17    MR. RIEMER:  Okay.
18    (Recess: 3:51 p.m. to 4:02 p.m.)
19    MS. DOWNS:  I only have a few more
20 questions.
21    MR. RIEMER:  Okay.
22 BY MS. DOWNS:
23 Q.  All right.  We are back on the record.

Page 189

1 Mr. Riemer asked you this morning, Mr. Smith,
2 whether you ever talked with Erin Culley about
3 whether the Reeds' loan payments ever stopped
4 going to Fannie Mae and went to Chase.
5    Do you remember that?
6 A.  Yes.
7 Q.  And your answer was you never asked her
8 that specifically?
9 A.  No.
10 Q.  That is correct?
11 A.  That is correct.  That was my answer.
12 Q.  Now, based on your review of Chase's
13 records and your work experience at Chase,
14 sitting here today as its corporate
15 representative, what did you conclude with
16 respect to all of the Reeds' loan payments that
17 were ever made?  Where did they go?
18 A.  Well, based on my discussion with her, the
19 -- all of the payments continued to go to Fannie
20 Mae, all the payments that were received.  I
21 didn't have to ask that.  She -- That information
22 was verified without my request.
23 Q.  Okay.  So when the Reeds made loan payments

Page 190

1 to -- based on your research and testimony, they
2 all were remitted through Chase as the servicer
3 to Fannie Mae?
4 A.   Yes.
5 Q.   Why was MERS' assignment of the mortgage to
6 Chase that's dated September 7, 2010 prepared?
7 A.   There are a couple different reasons for
8 that.  First, Fannie Mae requires that any loan
9 listed in the name of MERS, that the Chase -- the
10 servicer foreclose in their name.  And since MERS
11 is listed as the mortgagee of record there -- for
12 titling purposes there needs to be a clear record
13 of who has the authority to process the
14 foreclosure on behalf of Fannie Mae.
15     And per Fannie Mae's Guidelines, that's
16 Chase.  So the assignment is recorded per the
17 Guidelines to ensure that the title is clear and
18 correct.
19 Q.   So listening to you, MERS is assigning
20 whatever interest it has in the mortgage on
21 behalf of the lender over to Chase?
22     MR. RIEMER:  Objection.  You can answer.
23 A.   Yes, yes.  MERS is assigning whatever

Page 191

1 interest it has over to Chase.
2 Q.   And what authority in the Reeds -- with
3 respect to the Reeds' loans did Chase have to
4 send the acceleration notice and the notices of a
5 foreclosure sale?
6     MR. RIEMER:  Objection.  You can answer.
7 A.   Well, Chase has the authority through the
8 Servicing Guidelines.  Chase is the servicer for
9 Fannie Mae and Chase -- Fannie Mae gives Chase
10 the authority to send the notices and take
11 whatever action is necessary to protect their
12 interest in the loan.
13 Q.   So here Chase's servicers are standing in
14 the shoes of Fannie Mae and taking those steps
15 toward foreclosure?
16     MR. RIEMER:  Objection.  Objection.
17 A.   Yes.  Chase is at all times in the --
18 taking the place of Fannie Mae, yes.
19 Q.   As its servicing agent?
20 A.   As its servicing agent only.
21     MS. DOWNS:  Okay.  I don't have anymore
22 questions, sir.  Thank you.
23 RE-EXAMINATION BY MR. RIEMER:

Page 192

1 Q.   I just have a few follow-up.  I don't know
2 if -- Well, I'll just kind of start at the tail
3 end of Ms. Downs' examination here.  Now, there
4 is discussion here in Section VIII, 105.
5     I don't know if this was given a number.
6 Do you know?  Do you have that in front of you?
7 A.   Fourteen, yes.
8 Q.   Okay.  Fourteen.  Sorry.  It uses the term
9 "mortgagee of record".  That's really what I want
10 to talk to you about, because that's not a term
11 that we used earlier today.
12     But looking at the assignment, the
13 September 2010 assignment, now is what -- From
14 what you are saying, I gather that prior -- your
15 understanding is that prior to that assignment
16 the mortgagee of record is MERS?
17 A.   Yes.  In the county records the mortgagee
18 would be MERS.
19 Q.   By virtue of what the mortgage that is
20 recorded says about who the mortgagee is and that
21 MERS is the nominee for the lender and all that
22 language we went over this morning, right?
23 A.   Yes.

Page 193

1 Q.   Okay.  But that changed in September 2010
2 by virtue of the assignment, didn't it?
3 A.   Yes.
4 Q.   And after -- As a result of the assignment,
5 you would agree with me that Chase Home Finance,
6 L.L.C. became the mortgagee of record by virtue
7 of that assignment, right?
8 A.   Yes.  For the purpose of the -- processing
9 the foreclosure.
10 Q.   For whatever purpose, when the foreclosure
11 notice was published, Chase was the mortgagee of
12 record?
13 A.   Yes.
14 Q.   Fannie Mae wasn't anything of record, was
15 it?  Not a single recorded document with respect
16 to the Reeds' loan has Fannie Mae's name on it,
17 does it?
18 A.   Well, as I stated before, this is a MERS
19 loan.  So the transfer of the ownership was
20 within MERS.
21 Q.   I didn't ask you why there wasn't a
22 recorded document that has Fannie Mae's name on
23 it.

Page 194

1   I'm asking you to agree with me or not with
2 the statement that you haven't seen a single
3 recorded document with respect to the Reeds' loan
4 that has Fannie Mae identified as anything?
5 A.   Correct.
6 Q.   Okay.  And just to make sure I have this
7 right, you have not seen in your review of the
8 records any conveyance instrument, either a
9 deed, assignment, contract, bill of sale, that
10 conveys interest, ownership interest in the note
11 or the mortgage to Fannie Mae?
12   MS. DOWNS: Object to the form.  That is
13 inconsistent with his testimony.
14 Q.   Have you?
15 A.   I'm not sure what -- exactly what you are
16 asking.
17 Q.   Well, we went -- Let's go -- Have you seen
18 any document in this file, other than the Fannie
19 Mae Guidelines and other than the MERS report,
20 that purports to convey any interest with respect
21 to this loan to Fannie Mae?
22   MS. DOWNS: Object to the form.
23 A.   The MER --

Page 195

1   MS. DOWNS:  Mischaracterizes testimony.  Go
2 ahead.
3 A.   Well, from what I reviewed, the MERS
4 Milestones.
5 Q.   I'm sorry.  Other than the MERS Milestone
6 Report?
7 A.   Our investor information which shows who
8 the owner of the loan is.
9 Q.   These print screens that we talked about?
10 A.   Yes.
11 Q.   Okay.  Anything else?
12 A.   Yeah.  That's it.
13 Q.   Okay.
14 A.   As far -- And the passing of payment to
15 Fannie Mae as well.
16 Q.   The passing of -- The transfer of dollars
17 to Fannie Mae; is that what you are talking
18 about?
19 A.   Yes.
20 Q.   Okay.  Anything other than that?
21   MS. DOWNS: Object to the form.
22 A.   No.
23 Q.   Okay.  Ms. Downs asked you about a question

Page 196

1 relating to subservicers.
2   Do you know whether any subservicer had any
3 role in the servicing of the Reeds' loan?
4 A.   Yes.
5 Q.   Who is that?
6 A.   Well, you asked me if I -- Well, Chase Home
7 Finance would be considered -- Chase Home
8 Finance, L.L.C. would be considered a
9 subservicer.
10 Q.   Okay.  Subservicer to what servicer?
11 A.   Chase, J.P. Morgan Chase Bank NA.
12 Q.   So if I understand this right, so in the
13 agreement with Fannie Mae, J.P. Morgan Chase is
14 identified as a servicer and Chase Home Finance,
15 L.L.C. is a subservicer?
16 A.   Yes.
17 Q.   Okay.  Now, I didn't ask you this.
18   But is the relationship between J.P. Morgan
19 Chase and Chase Home Finance, L.L.C, is that a
20 parent-sub relationship?  In other words, that --
21 the L.L.C. is owned entirely by J.P. Chase, J.P.
22 Morgan Chase Bank?
23   MS. DOWNS: Object to the form, because

Page 197

1 Chase Home Finance doesn't exist anymore.  You
2 have to specify the time you are asking about.
3 Q.   Okay.  Well, when it did exist?
4 A.   Yes.  Chase Home Finance, L.L.C. was owned
5 by J.P. Morgan Chase Bank NA.
6 Q.   And then it ceased to exist when it was
7 merged into J.P. Morgan Chase Bank?
8 A.   Yes.
9 Q.   And did we say that was 2009?
10 A.   No.  2 -- May of 2011.
11 Q.   May of 2011?
12 A.   Yes.
13 Q.   Besides Chase Home Finance, L.L.C., any
14 other subservicer had anything to do with this
15 loan?
16 A.   No.
17 Q.   To your knowledge, is the MERS Milestone
18 Report available to the general public?  Is there
19 -- Well, let me just stop there.
20 A.   I don't know.
21 Q.   You don't know.  It's not recorded
22 anywhere, is it, that you know of?
23   MS. DOWNS:  In the public records you mean?

Page 198

1  Q.  Public records.
2  A.  Not that I'm aware of.
3  Q.  Okay.  You don't know whether someone who
4  is a stranger to a loan can access MERS in MERS
5  System and look at the same information we looked
6  at in the MERS Milestone Report?  You don't know?
7  A.  No.
8  Q.  Now, on Exhibit Eight -- probably still
9  have that right in front of you.  That's the
10  welcome letter you and Ms. Downs went over.
11  A.  Yes.
12  Q.  This letter addresses the transfer of
13  servicing to Chase, but it doesn't -- it doesn't
14  speak to who is the owner of the loan, does it?
15  It strictly addresses servicing, right?
16  A.  Correct.
17  Q.  Nowhere on this letter, either page, front
18  -- the first page or the second page, is there
19  any mention of Fannie Mae, is there?
20  A.  Not that I can see, no.
21  Q.  Go to page -- I'm sorry -- Exhibit Six,
22  page 1033.  Ms. Downs asked you about this entry
23  dated September 3rd, 2010.

Page 199

1  A.  Yes.
2  Q.  Okay.  Now, with respect to this
3  information we are looking at on this page, where
4  does it come from?  Where does this -- What is
5  the origin of this information?
6  A.  This would be part of the LPS monitoring of
7  the foreclosure process.
8  Q.  Okay.  Someone at LPS is entering these
9  words in the system?
10  A.  I don't know who made this specific entry.
11  Q.  Well, there's a name Donna Smelser.
12  A.  Yes.
13  Q.  Okay.  Is she a Chase employee or LPS
14  employee, or do you know?
15  A.  I don't know.
16  Q.  Well, okay.  Then it mentions title
17  review.
18      Who performed the title review, if one was
19  even performed?
20      MS. DOWNS:  Object to the last argumentive
21  phrase.
22  A.  Well, this appears to be an entry by Donna
23  Smelser regarding the status of the title.

Page 200

1  Q.  It's got the words "title review" there,
2  but my -- but it doesn't indicate whether a title
3  review was performed, right?  Just the words
4  "title review" appear?
5  A.  Well, it's title review and then colon,
6  assignment.  So that was referencing what was
7  being reviewed.
8  Q.  Okay.  So this is a bit of information
9  presumably, but you don't know, entered by Donna
10  Smelser, right?  We are assuming that she entered
11  this?
12  A.  Yes.
13  Q.  But we don't know and you don't know who
14  she is employed with?
15  A.  No.
16  Q.  You don't know who conducted a title
17  review?
18  A.  I'm not sure what you mean by who conducted
19  the review.
20  Q.  Well, a title review could be conducted by
21  LPS, by someone at Chase, by someone at Sirote,
22  by someone at some title company outside of all
23  three of those institutions, correct?

Page 201

1  A.  Well, this review mentions the assignment
2  and states that it was prepared on 9-3.  That's
3  what it's referencing.  That's the review.
4  Q.  So you read from this, a review performed
5  by Donna Smelser?
6      MS. DOWNS:  Object to the form.  That
7  mischaracterizes what he just said.
8  A.  I don't know specifically if Donna Smelser
9  did the review.  The note reflects that -- title
10  review, the assignment prepared.
11  Q.  Would it be difficult to determine from the
12  system whether Donna Smelser was a Chase
13  employee?
14  A.  It depends.
15  Q.  Well, investigating disputes and litigation
16  is something that you do.
17      I mean, in terms of investigation, have you
18  ever tried to locate someone who is identified in
19  some of these notes?
20  A.  Sometimes.
21  Q.  How would you do that?
22  A.  I could search by their name or their user
23  ID.

Page 202

1  Q.  Okay.  In this system, right?
2  A.  I'm sorry?
3  Q.  Within this system?
4  A.  Within Explorer, yes.
5  Q.  Okay.  This notation looks like an open
6  paren PS.  What does that mean?
7  A.  It's an LPS entry.
8  Q.  So does that tell that you Donna Smelser
9  was from LPS?
10     MS. DOWNS:  Asked and answered.
11  A.  I can't confirm that.
12  Q.  But it's a possibility?
13  A.  I don't know either way.
14  Q.  Okay.  On number five, which is page -- and
15  I'm only going to ask you about page 168 of
16  that.
17     These notes, do you have any idea who
18  entered -- entered these notes here?
19  A.  Which notes are you referring to?
20  Q.  That's that -- Well, I'm sorry.  You are
21  right.  I'm skipping ahead, because we are all
22  tired.
23     The one entry that Ms. Downs asked you

Page 203

1  about which is 3-24-09, talked to borrower one.
2  A.  No.
3  Q.  You don't have any idea, do you?
4  A.  No.
5  Q.  Okay.  Would it necessarily have been a
6  Chase employee or could it have been someone at a
7  vendor, LPS or some other entity?
8  A.  No.
9  Q.  It would have been a Chase employee?
10  A.  Yes.
11  Q.  Okay.  Do we know what department the Chase
12  employee would have been from?
13  A.  Customer service.
14  Q.  Customer service?
15  A.  Yes.
16  Q.  Now, this number 866-550-5705, is that a
17  Chase number or Fannie Mae number?
18  A.  I don't recognize the number.
19  Q.  Okay.  On number four, and we are going to
20  go -- I'm only going to ask you about the last
21  page of Exhibit Four, which is page 146.  This is
22  another document that this investor loan number
23  appears.

Page 204

1     Do you see that?
2  A.  Which?  Which loan number?
3  Q.  I'm sorry.  I'm sorry.  I did the wrong --
4  circled the wrong number.  Scratch that whole
5  question.
6     This is another document where this pool
7  number appears and it's -- where it says group
8  slash pool number?
9  A.  Yes.
10  Q.  Where does this information come from?  Who
11  inputs this information?
12  A.  I don't know who specifically input the
13  information.
14  Q.  Do you know, does it come from within Chase
15  in some department or outside of Chase, or do you
16  have any idea?
17  A.  Who specifically enters the investor
18  information?
19  Q.  Well, this is information you have been
20  asked about that you are relying on for some of
21  your responses to Ms. Downs' questions.  So I
22  want to know if you know where it comes from.
23  A.  I'm not sure what you mean by where it

Page 205

1  comes from.
2  Q.  Well, somebody inputted this information in
3  the system, right?
4  A.  Yes.
5  Q.  Okay.  Do you know one way or the other if
6  that person would have been a Chase employee?
7  A.  Well, yes.
8  Q.  Okay.  But in fairness -- Now, it sounds
9  like a dumb question, but in fairness, you have
10  described to me a situation where people outside
11  of Chase have had -- have been able to interact
12  with this system, LPS, Sirote, Fannie Mae.  So
13  it's a fair question.
14     So -- But sitting here today, this
15  information that you relied on, you are saying
16  would have had to come from someone in Chase?
17  A.  Let me just -- You said -- I've never said
18  that Sirote had any access to change -- make any
19  changes within Chase's system, so --
20  Q.  Okay.  I stand corrected.  I apologize.
21  A.  And so your question, it depends on when
22  this information -- I don't know when this
23  information was entered.  But if the loan was

Page 206

1 acquired, Acquisitions would update the
2 information on who the investor is, all that
3 information, if it changes throughout. I'm not
4 -- I don't know exactly who makes those changes,
5 but --
6 Q. Acquisitions is a department within Chase?
7 A. Yes.
8 Q. Okay. So that's where this pool number
9 would come from, someone in Acquisitions, if it
10 was inputted after Chase became a servicer?
11 A. Yes. As part of the Boarding System, yes.
12 Q. Okay. Do you know why the system would
13 show in some places an investor pool number, but
14 in other places -- Well, when -- You have already
15 testified that based on review of the other
16 records that this loan was not in the pool?
17 A. I don't know why this reflects a pool
18 number.
19 Q. Okay. Did -- Of the folks that you talked
20 about in preparing for today's deposition, did
21 you ever ask whether or not it was in a pool?
22 A. No.
23 Q. Did you ever ask about this pool number?

Page 207

1 A. No.
2 Q. Let's go to Exhibit Number Two. I'm almost
3 done. I'm working my way back.
4     I understand -- Well, I guess my question
5 about this Milestone Report is the same, and it's
6 simply this: This Milestone Report includes
7 information that someone has inputted into a
8 system that generates the support, right?
9 A. Yes. The information has to be relayed to
10 MERS.
11 Q. Okay. You are relying on the information
12 reflected on this report for your conclusions as
13 to when ownership and servicing rights were
14 transferred with respect to this loan? That's
15 fair, right?
16 A. Yes.
17 Q. All right. Do you know where the
18 information comes from? In other words, do you
19 know who inputs this information?
20 A. The specific person, no, I don't.
21 Q. I wouldn't expect you to know the name of
22 the person. Okay.
23     But by what -- What entity does this come

Page 208

1 from? MERS, Fannie Mae, Chase or some other
2 entity, if you know?
3 A. I'm not sure specifically.
4 Q. Okay. Exhibit Number Three, it's a screen
5 shot, is this something that's also inputted by
6 someone at Fannie -- at Acquisitions as part of
7 the boarding of the loan?
8 A. The investor information would be input,
9 yes.
10 Q. Okay. For the court's information, I
11 mean -- make sure we are on the same page. We
12 use the term "boarding the loan."
13     That's a process by which the servicer,
14 after it acquires the servicing rights, puts all
15 the information about that loan into its system
16 and starts the servicing process, right?
17 A. Yes.
18 Q. Okay. Have you ever taken one of these
19 pool numbers and tried to research and determine
20 whether a particular loan is part of that pool
21 number?
22 A. Taking it where?
23 Q. Researching it anywhere? To take a pool

Page 209

1 number and try to determine if there are any
2 records with respect to -- well, strike that --
3 determine whether a particular loan is included
4 in a pool associated with a number?
5 A. No.
6     MR. RIEMER: No. Okay. That's all I have.
7 RE-EXAMINATION BY MS. DOWNS:
8 Q. Mr. Smith, when did Chase acquire physical
9 possession of the Reed's original note?
10     MR. RIEMER: Asked and answered.
11     MR. UNDERWOOD: Answered that. Unless
12 there's some kind of foundation for it.
13     MR. RIEMER: Wait, wait. Let me -- It's
14 been asked and answered.
15 Q. I'm just establishing it as preface for my
16 next question, which is follow-up on Mr. Riemer's
17 questions.
18 A. September 19th of 2007.
19 Q. And why did Chase receive the original note
20 in September 2007?
21     MR. RIEMER: Objection.
22 A. They received it as custodian for Fannie
23 Mae in relation -- in relation to servicing the

Page 210

1 loan.
2 Q. Mr. Riemer asked you for a list at the end
3 of a long day of everything that you rely on to
4 point to the fact that Fannie Mae owns the loan.
5    Would Chase's receipt of that original note
6 and service as custodian of Fannie Mae play any
7 role on your list?
8 A. Yes.
9    MR. RIEMER: Objection.
10 Q. How so?
11 A. Well again, that verifies that we were in
12 possession of the note as -- as custody for
13 Fannie Mae and in my review of the documents I
14 show that in relation to that note we disbursed
15 all payments received from the customer to Fannie
16 Mae.
17 Q. Right. And that original note, based on
18 your review of the records, had an endorsement
19 from SunTrust in blank, correct?
20 A. Correct.
21 Q. Did Chase consistently have possession of
22 the Reeds' original note from September 2007 until
23 November 2010?

Page 211

1    MR. RIEMER: Objection.
2 A. Yes.
3 Q. With respect to Defendant's Exhibit Six,
4 the Explorer foreclosure notes about which
5 Mr. Riemer just asked you questions --
6 A. Yes.
7 Q. -- whose records are those?
8 A. Chase.
9 Q. Regardless of who put in the information,
10 can Chase employees look at those records within
11 their internal databases?
12 A. Yes.
13 Q. And you were able to access those records
14 and prepare and learn about this case?
15 A. Yes.
16    MS. DOWNS: I don't have any other
17 questions.
18 RE-EXAMINATION BY MR. RIEMER:
19 Q. At any point in time, would Chase be
20 entitled to keep the money it collects on this
21 note?
22 A. To keep?
23 Q. To keep it?

Page 212

1 A. No.
2 Q. At any point in time had Chase ever
3 owned the money that comes in, an interest in the
4 funds that come in on this note?
5 A. Other than the servicing fees, no.
6 Q. Okay. It's just -- It's a conduit for --
7 for Fannie Mae? The money flows through -- minus
8 the fees flows through at all times Chase and
9 goes to Fannie Mae, right?
10 A. Yes. Money received from the customer goes
11 to Fannie Mae.
12 Q. With respect to the LPS System that -- the
13 LPS Desktop System we talked about --
14 A. Yes.
15 Q. -- isn't it true that Sirote can make entry
16 into that system?
17 A. Yes.
18    MR. RIEMER: All right. That's it.
19    MS. DOWNS: We are off the record.
20    FURTHER DEPONENT SAITH NOT
21    (-Deposition concluded at 4:32 p.m.-)
22
23

Page 213

1    C E R T I F I C A T E
2
3 STATE OF ALABAMA)
4 JEFFERSON COUNTY)
5
6    I hereby certify that the above and
7 foregoing deposition was taken down by me in
8 stenotype, and the questions and answers thereto
9 were transcribed by means of computer-aided
10 transcription, and that the foregoing represents
11 a true and correct transcript of the deposition
12 given by said witness upon said hearing.
13    I further certify that I am neither of
14 counsel nor of kin to the parties to the action,
15 nor am I in anywise interested in the result of
16 said cause.
17
18    /s/Howard R. Burns
19    HOWARD R. BURNS, CCR
20    CCR # 561, Expires 9/30/12
21    Commissioner for the
22    State of Alabama at Large
23    My Commission Expires: 5/11/13