# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **MAX LEROY REED, JR.** and **ELIZABETH REED, individually and on behalf of all similarly situated individuals,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | **CASE NO.: 1:11-cv-00412-WS-C** |
| **v.** | ) ) | **ORAL ARGUMENT REQUESTED** |
| **CHASE HOME FINANCE LLC,** | ) ) | |
| **Defendant.** | ) | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF <u>MOTION FOR SUMMARY JUDGMENT</u>

### INTRODUCTION

This case is well-suited for summary judgment because it turns largely on legal issues, most prominently the proper interpretation and application of 15 U.S.C. § 1641(g) of the Truth in Lending Act ("TILA"). The impetus behind the statute was very simple: to inform borrowers when ownership of their mortgage loan changes hands. The plaintiffs' legal theory would gainsay this simple premise, advancing an interpretation of the statute that distorts § 1641(g)'s express, logical scope. The potentially absurd result would be a declaration as a matter of law that two entities simultaneously own the loan, ignoring the incontrovertible fact that only one entity actually does.

Undisputed factual evidence submitted with the Motion for Summary Judgment establishes that since 2007, Federal National Mortgage Association ("Fannie Mae") has owned the Reeds' mortgage loan.  Defendant JPMorgan Chase Bank, N.A., successor to Chase Home Finance LLC, ("Chase") has been the servicer of the loan, and the servicer only.   In September 2010, as part of its servicing obligations, Chase procured an assignment of the mortgage instrument—the security interest in the underlying property—from the mortgage holder of record prior to foreclosure.[1]   Fannie Mae's Servicing Guide requires Chase as servicer to prepare such an assignment and foreclose in its own name on Fannie Mae's behalf.

The September 2010 assignment did not alter Fannie Mae's actual ownership of the Reeds' mortgage loan in any way; rather, it conveyed a limited interest in the security instrument.   This is a different type of interest from ownership of the debt obligation, evidenced by the promissory note.   Yet Plaintiffs insist that the assignment, combined with Chase's authority to foreclose on behalf of Fannie Mae, necessarily converted Chase into the owner of the Reeds' mortgage loan.  This conflicts with § 1641(g)'s terms and ignores key, undisputed evidence:

---

[1]   In common parlance, the term "mortgage" is often used to refer to a mortgage loan.  (*See* Ex. 4 at 201:12; 202:6).  In this case, however, it is critical to the analysis to distinguish the mortgage loan or Note, which evidences the underlying debt obligation, from the Mortgage, evidencing the security interest in the property.

Chase never added the Reeds' loan as an asset and receivable on its books, and Fannie Mae remains the owner subject to any right of rescission and entitled to repayment of the loan (or proceeds from a foreclosure sale).

Chase's activities as servicer for Fannie Mae, including becoming the mortgagee of record, never transformed Chase into a "new owner or assignee" of the loan for purposes of § 1641(g).  Moreover, TILA provides a safe harbor for servicers such as Chase.  *See* 15 U.S.C. § 1641(f); 12 C.F.R. § 226.39(a)(1).  Thus, requiring a § 1641(g) notice from Chase stating that it had become the owner of the Reeds' mortgage loan would have *misled* the Reeds, in contrast to Congress' clear goals for § 1641(g) and the governing provisions of TILA.

## PROPOSED DETERMINATIONS OF UNDISPUTED FACTS

### A.  The Plaintiffs' Mortgage Loan

1.    On November 13, 2006, plaintiffs Max and Elizabeth Reed refinanced their home, located at 10891 Weeks Bay Road in Foley, Alabama, and obtained a new mortgage loan in the amount of $377,000 from Pensacola Guarantee Mortgage.  (Ex. 2 at 16:12–17, 23; 20:13–15; Ex.1 at 9:6–12).[2]

2.    The Reeds signed a promissory note, promising to repay the money owed ("Note").  (Ex. 2 at 18:14–19:17; Ex. 2(A); Ex. 1 at 10:1-7). The Note is the

---

[2]    The Exhibits cited in the Statement of Facts and supporting Brief correspond to the exhibit numbers in Chase's Evidentiary Submission.

document that evidences the Reeds' underlying debt obligation.  Ex. 6 ¶ 2; Ex. 6(2),[3] p. 1, subpart (G) (definition of "Loan")).

3.     The Reeds separately signed a mortgage, which granted a security interest in the real property in the event the underlying debt was not repaid ("Mortgage").  (Ex. 2 at 19:21–20:22; Ex. 2(H), p. 1-2; Ex. 1 at 10:11-21).

4.     The Reeds reviewed the terms of the Note and Mortgage before signing them, thereby agreeing to the terms.  (Ex. 2 at 19:18–20; 20:23–21:2; Ex. 1 at 10:22–11:1).  Specifically, the Reeds acknowledged that Mortgage Electronic Registration Systems, Inc. ("MERS") would serve as mortgagee—solely as nominee for the lender and the lender's successors and assigns—with legal title to the security instrument.[4]  (Ex. 2(H), p. 1–3; Ex. 3 at 79:10–81:1).

_____

[3]     For citations to declarations, the number in the parenthetical refers to an exhibit attached to the declaration.  For example, Ex. 6(2) is a citation to Thomas Reardon's Declaration (Ex. 6 to the evidentiary submission) and the Note, which is Exhibit 2 to Mr. Reardon's declaration.

[4]     The Mortgage reads in pertinent part: ". . . MERS is a separate corporation that *is acting solely as nominee for Lender* and Lender's successors and assigns. *MERS is the mortgagee under this Security Instrument*. . . .  Borrower understands and agrees that *MERS holds only legal title to the interests granted by Borrower in this Security Instrument*, but, if necessary to comply with law or custom, *MERS (as nominee for the Lender and Lender's successors and assigns) has the right*: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the [p]roperty, and to take any action required of the Lender including, but not limited to, releasing and canceling this Security Instrument." (Ex. 2(H), p. 1 (¶(C)), 3) (emphasis added).

5.     The Reeds further acknowledged that MERS could act as the nominee, or agent, of the lender and the lender's successors and assigns, including the power of sale (in the event of foreclosure) and the release or cancellation of the security instrument.  (Ex. 2(H), p. 3; Ex. 3 at 175:16–176:13, 177:7–178:9).

6.     The Mortgage was recorded in the Probate Court of Baldwin County, Alabama, reflecting MERS as the mortgagee of record.  (Ex. 2 (H)).

7.     At the time of closing, the Reeds initialed a separate notice that a different lender—SunTrust Mortgage—would become the new owner[5] of the Reeds' mortgage loan.  (Ex. 2 at 86:6–19, 87:3–18; Ex. 2(G)).

8.     Pensacola Guarantee Mortgage, the original lender, executed an allonge to the Note with a specific endorsement transferring ownership of the loan to SunTrust Mortgage.  (Ex. 3 at 155:16–156:8, 18–23; Ex. 6(2), p. 7).  SunTrust Mortgage later endorsed the Reeds' Note without recourse, or in blank.  (Ex. 3 at 157:13–158:11; Ex. 6(2), p. 4).

9.     Fannie Mae became the new owner of the Reeds' debt in January 2007, when it acquired their mortgage loan from SunTrust Mortgage.  (Ex. 7 ¶ 2).

---

[5]     The owner of a mortgage loan is also referred to as the "investor."  The two terms are used interchangeably in this brief and the supporting evidence.

**B.      Chase's Role as Servicer for the Reeds' Mortgage Loan**

10.      In or around January 2007, SunTrust Mortgage separately acquired the servicing rights for the Reeds' loan.  (Ex. 2 at 73:5–10; Ex. 2(D)).   On September 1, 2007, Chase acquired the servicing rights for the Reeds' loan from SunTrust Mortgage.[6]  (Ex. 4 at 121:21–122:5; Ex. 3 at 92:12–19).  Chase remains the Reeds' servicer today.  (Ex. 3 at 163:1–6).

11.      Chase did not acquire any ownership interest in the Reeds' mortgage loan in September 2007; it acquired the servicing rights only. (Ex. 3 at 114:5–11; Exh. 4 at 118:20–120:3; Ex.4(A)).   Chase's records for this servicing transfer uniformly reflect that Fannie Mae was the investor for the Reeds' mortgage loan. (Ex. 4 at 48:22–49:2, 127:4–7, 129:14–130:10; Ex. 4(B); Ex. 4 at 145:5–10, 152:20–153:3; Ex. 4(C); Ex. 4 at 155:9–13, 156:9–157:6; Ex. 4(E)).

12.      Chase's servicing business has a division called "loan administration," comprised of separate groups that handle different aspects of standard, core servicing practices.  (Ex. 4 at 165:21–166:12, 167:1–6).

13.      Chase's administration of Fannie Mae-owned mortgage loans, governed by the Fannie Mae Servicing Guide, encompasses processing payments,

---

[6]      JPMorgan Chase Bank, N.A., acquired the servicing rights.  The bank's servicing arm, Chase Home Finance LLC, actually handled day-to-day servicing for the Reeds' mortgage loan as subservicer.  This arrangement continued until May 2011, when Chase Home Finance merged into JPMorgan Chase Bank.  (Ex. 3 at 196:2–197:16).  These entities are referred to herein as "Chase."

maintaining an escrow account, paying property taxes and insurance, and protecting the rights of the lender outlined in the Mortgage, which includes foreclosure. (Ex. 3 120:4–9; Ex. 3(G-H); Ex. 3 at 128:11–14, 129:5-9; Ex. 4 at 166:5–23; Ex. 2 at 75:19–22).

14.    Chase handles borrowers' loan payments and related issues that may arise. (Ex. 3 at 27:18–28:3; Ex. 3(G-H)). After September 2007, the Reeds sent their monthly mortgage payments to Chase as the servicer. (Ex. 3(F); Ex. 2 at 39:10–23; Ex. 2(F)). Chase allocated those payments, retained a portion for its servicing fee, and then disbursed the remaining portion (principal and interest) to Fannie Mae. (Ex. 3 at 150:9–22, 152:2–6; Ex. 4 at 165:21–166:23; Ex. 4 at 21:1–22:15; Ex. 6(6)).

15.    As servicer of Fannie Mae-owned loans, Chase may also serve as the document custodian for the original note, mortgage, and applicable title policies. (Ex. 3 at 118:7–15; Ex. 3(J), Pt. I, § 202.07.01).[7]

---

[7]    In August 2010, Chase Custody Services imaged the the original Note, Mortgage, and title documents, and stored an exact, imaged replica of these documents on Chase's custodial record system. (Ex. 3 at 139:5–140:4). The imaged replica of the original Note has been submitted in support of this summary judgment motion. (Ex. 6 ¶ 3; Ex. 6(2)).

### C.      No Transfer of Ownership under § 1641(g)

16.      Fannie Mae has solely and continuously owned the Reeds' mortgage loan since January 2007; no ownership interest in the *loan*—the Note evidencing the debt obligation—was sold or transferred to another entity, including Chase. (Ex. 7 ¶¶ 2-3; Ex. 7(1); Ex. 4 at 114:2–115:3, 116:4–14, 124:20–126:3; Ex. 3 at 163:10–165:20; Ex. 3(B); Ex. 3 at 166:1–167:10; Ex. 3(C); Ex. 4 at 130:11–14, 131:18–23, 132:15–19; Ex. 4(J); Ex. 3 at 53:17–54:13, 56:1–57:21; Ex. 4(I)).

17.      For accounting purposes, ownership of a loan or debt obligation would be booked by Chase as an asset or receivable; servicing rights are booked as a separately valued asset.  (Ex. 4 at 124:10–19).  Nothing in Chase's accounting indicates that Chase ever acquired the Reeds' loan or debt obligation as an asset. (Ex. 4 at 125:18–126:3, 176:22–177:10).

18.      Under certain circumstances, a servicer such as Chase must repurchase a loan from the investor, but Chase never repurchased the Reeds' loan from Fannie Mae.  (Ex. 4 at 135:13–21).

19.      As a factual matter, Chase never acquired any actual ownership interest in the Reeds' Note or debt obligation; therefore, Chase did not send the Reeds a § 1641(g) notice.  (Ex. 4 at 95:5–13, 114:11–115:3, 87:5–8).

**D.      Chase's Role in Foreclosure Proceedings based on Fannie Mae Directives in the Servicing Guide**

20.     In or around May 2009, the Reeds began having difficulty making their mortgage payments.  (Ex. 2 at 79:9–80:1).  Working through Chase, they were able to secure a trial payment plan, which cut their monthly mortgage payment in half.  (Ex. 2 at 83:9–18).[8]  Ultimately, the Reeds did not obtain a loan modification, and Fannie Mae did not approve a hold on the foreclosure.  (Ex. 3(E), p. CHASE 1024, 9/27/10 entry).

21.     Based on Fannie Mae's Servicing Guide, Chase must take prompt and appropriate action to address borrower delinquencies or default.  (Ex. 3 at 179:20–180:5, 128:11–14, 129:5–9; Ex. 3(G)).   Such actions include foreclosure proceedings, when necessary, "to liquidate a defaulted mortgage loan."  (*Id.*; Ex. 3(M).   Initiating foreclosure, when warranted, is an integral part of Chase's obligations as servicer for Fannie Mae.  (Ex. 4 at 167:12–168:8, 187:9-22).

22.     Fannie Mae's Servicing Guide dictates that Chase, as servicer, conduct foreclosure proceedings in the servicer's own name:

> When MERS is the mortgagee of record, the servicer must prepare an assignment from MERS to the servicer and bring the foreclosure in its own name unless Fannie Mae specifically

---

[8]     The Reeds live at the same address but have not made any mortgage payments since September 2010, based in part on a separate case alleging wrongful foreclosure and fraud in the loan modification process.  (Ex. 2 at 83:19–84:22).

allows the foreclosure to be brought in the name of Fannie Mae
. . ..

(Ex. 3(M); Ex. 3 at 116:19–117:6, 187:23–188:12).

23.    Fannie Mae's Servicing Guide also provides that Fannie Mae "is at all times the owner of the mortgage note . . . [and] at all times has possession of and is the holder of the mortgage note," except in limited circumstances.  (Ex. 3(J), Pt. I, § 202.07.01).  Fannie Mae remains the beneficial owner of the loan.  (Ex. 3(K)).

24.    As servicer for Fannie Mae-owned loans, Chase is responsible for ensuring that the proper steps are taken, including those of Chase's outside counsel, relating to a foreclosure sale.  (Ex. 4 at 191:20–192:5; Ex. 3 at 61:18–62:7, 74:16–21, 76:16–77:11).

25.    For the Reeds' loan, these responsibilities included preparation of an assignment to remove MERS as the mortgagee of record and deactivate the loan from the MERS® System, in accordance with Fannie Mae's guidelines.  (Ex. 3 at 116:3–18; Ex. 3(M), Pt. VIII, § 105; *see also* Ex. 3(L), Pt. I, § 408 (servicer "is responsible for the accurate and timely preparation and recordation of security instruments, assignments, lien releases, and other documents relating to MERS-registered mortgage loans and must take all reasonable steps to ensure that the information on MERS is updated and accurate at all times.")).

26.    Chase's system notes reflect that a title review was performed for the Reeds' property on September 3, 2010, which led to the preparation of MERS'

Assignment of Mortgage to Chase on September 7, 2010 ("Assignment").  (Ex. 3 at 170:8–172:6; Ex. 3(E), p. CHASE 1033, 9/3/10 entry).

27.    No foreclosure sale took place because the Reeds retained counsel and subsequently filed suit against Chase, alleging wrongful foreclosure and fraud in the loan modification process.  (Ex. 2 at 41:16–18, 60:1–23).  This lawsuit remains pending.  (Ex. 2 at 58:16-17).

**E.    MERS' Assignment of Mortgage**

28.    The MERS® System allows its members, which include originators, lenders, servicers, and investors, to track transfers of servicing rights and beneficial ownership interests in mortgage loans.  (Ex. 6 ¶ 8; Ex. 6(10) Rule 2, §3; Ex. 3(L)).  MERS members, such as Chase, have contractually agreed to appoint MERS to be the mortgagee and serve as the common nominee or agent for all MERS Member lenders/originators on all mortgage loans they register on the MERS System. (Ex. 6(10) Rule 2, §5).

29.    Prior to the Assignment dated September 7, 2010, MERS was the mortgagee of record for the Reeds' Mortgage in the county land records on behalf of the beneficial owner of the mortgage loan.  (Ex. 2(H); Ex. 6 ¶ 10; Ex. 6(11)).

30.    As a factual matter, Fannie Mae did not sell or transfer ownership of the Reeds' Note, evidencing the debt obligation, to MERS at any time.  (Ex. 7 ¶ 3;

Ex. 6 ¶ ¶4, 7; Ex. 6(3-7); Ex. 3 at 95:1–96:6, Ex. 3(L), Pt. I, § 408; *see also* Ex. 4 at 196:6–197:11; Ex. 2 at 35:1–15).

31.     The Assignment of MERS' interest as mortgagee, solely as the lender's nominee, occurred in the context of Chase's relationship with the loan's actual owner, Fannie Mae.  (Ex. 3 at 96:10–16; Ex. 3(G); Ex. 3(M)).  For example, the Assignment did not change the party authorized to resolve issues concerning the Reeds' loan payments.  (Ex. 4 at 137:14–23).

32.     If the Assignment had conveyed any ownership interest in the Reeds' loan, that would have deactivated Chase's servicing fee, which did not occur.  (Ex. 4 at 192:6–21).

33.     Based on Chase's records, policies, and internal discussions to implement § 1641(g), MERS' Assignment to Chase did not have any impact on the actual ownership of the Reeds' mortgage loan, and Fannie Mae still retains actual ownership today.  (Ex. 4 at 193:6–194:4; Ex. 6 ¶ 4, 6).

**F.     The Assignment of Mortgage as an Administrative Convenience**

34.     In servicing and loan administration, from a business perspective, any activity that enables a servicer to perform more effectively and efficiently is an administrative convenience for the servicer.  (Ex. 4 at 189:6–18).

35.     MERS' Assignment of Mortgage constituted an administrative convenience for Chase as the servicer, for several reasons.  First, it was necessary

for Chase's compliance with the Fannie Mae Servicing Guide. (Ex. 3(M); Ex. 3 at 190:5–18). Second, the Assignment constituted a necessary title document prepared in advance of foreclosure to avoid any potential cloud of title that could arise if MERS had remained the mortgagee of record. (Ex. 3 at 190:5–18, 60:7–18; Ex. 3(6), p. CHASE 1033). Third, the Assignment consolidated Fannie Mae's grants of authority into a single entity, Chase, which enabled the servicer to enforce the investor's remedies upon the Reeds' default more efficiently and effectively. (Ex. 4 at 189:19–191:6; Ex. 3 at 192:12–193:13; Ex. 3(M)).

### H.   Chase's Implementation of and Compliance with § 1641(g)

36.    In or around May 2009, when the Helping Families Save Their Homes Act was enacted, Chase formed a team to assess the scope and purpose of § 1641(g), comprised of representatives from various bank departments potentially impacted by the new law. (Ex. 4 at 44:1–16, 169:18–170:21).

37.    After many working sessions and input from compliance and legal, Chase's team reached consensus that § 1641(g) applies only when ownership of the underlying debt changes hands, with debt defined as "[t]he money that is owed for the loan." (Ex. 4 at 171:1–7, 113:10–15, 173:14–174:11).

38.    In mid-2009, before regulatory guidance was available, Chase opted to send several § 1641(g) notices for every loan it originated in situations in which the loans were moved to another Chase entity after origination. (Ex. 4 at 160:20–

162:9).  These multiple New Creditor Notices confused some borrowers, sparking calls to Chase customer service.  (Ex. 4 at 160:1–8).

39.   Other borrowers, who received a § 1641(g) notice from Fannie Mae after Fannie Mae acquired loans originated by Chase, subsequently misdirected their loan payments to Fannie Mae.  (Ex. 4 at 164:19–165:20).

40.   Chase prepared a customer service script for § 1641(g), which reflects Chase's understanding of the statute: "The law requires that all borrowers . . . be notified when the mortgage debt is sold or transferred to a new creditor, also known as an investor."  (Ex. 4 at 158:3–6, 158:13–159:11; Ex. 4(F)).  Chase also formulated a written procedure to enhance employees' compliance with § 1641(g).  (Ex. 4 at 169:18–170:4; Ex. 4(G)).

41.   After initial implementation of the § 1641(g), Chase monitored the emerging regulations and guidance for the statute.  (Ex. 4 at 173:14–20, 172:9–173:1).  The interim and final rules defining "covered persons" did not alter Chase's view of the event requiring a § 1641(g) disclosure; namely, when the owner of the debt changes.  (Ex. 4 at 174:19–175:11).

42.   The implementation team specifically considered Chase's activities following a borrower's default and assignments related to servicing activity.  (Ex. 4 at 179:19–20, 181:20–182:8).  With respect to an assignment of the mortgage to Chase as servicer, Chase concluded that no loan purchase or transfer of ownership

was occurring; therefore, Chase concluded that § 1641(g) did not apply.  (Ex. 4 at 180:12–20, 181:2–182:8).

43.    Chase determined that ownership of the debt would change hands in the following situations: a) Chase originates a loan, and ownership of the debt moves from one Chase entity to another; b) Chase as servicer must repurchase a debt from the investor; c) Chase acquires a new company that owns mortgage loans; or d) a Chase entity owning mortgage loans merges into another Chase entity.  (Ex. 4 at 111:11–112:18).

44.    Chase continues to send § 1641(g) notices, referred to by Chase employees as a "Notice of New Creditor form," when the owner of the debt changes.  (Ex. 4 at 44:20–45:1, 199:9–200:6; Ex. 4(H)).

**I.    No Injury-in-Fact on the Reeds' Part**

45.    MERS' September 2010 Assignment to Chase and Chase's alleged failure to send a resulting § 1641(g) notice did not impact the Reeds—financially, emotionally, or otherwise.[9]  (Ex. 2 at 97:14–98:7, 100:4–14, 77:21–78:3, 100:15–101:13).

---

[9]    Elizabeth Reed initially testified as follows regarding the lack of notice: "[I]t made us feel like we didn't know what was going on with something as important as our mortgage . . . we weren't clear on who held it, and who we owed the money to."  (Ex. 1 at 12:18–13:2).  Later testimony revealed her mistaken impression that the entity collecting the Reeds' mortgage payments changed without their

46.     The Reeds never attempted to rescind their mortgage loan.  (Ex. 2 at 90:2–5; Ex. 1 at 21:2–10).  If the Reeds had ever exercised that right, the owner of their mortgage loan—Fannie Mae—remained the same before and after September 2010, when the Assignment occurred.  (Ex. 4 at 135:22–136:15).  If, as a practical matter, the Reeds had sent a rescission notice to Chase as servicer, Chase would have forwarded the rescission notice to the owner of the loan; namely, Fannie Mae. (Ex. 4 at 137:4–13).

47.     The Reeds never asked Chase to identify the owner of their mortgage loan or provide contact information, either verbally or in writing.  (Ex. 2 at 76:19–77:3, 14–20).  Instead, Chase proactively informed the Reeds that Fannie Mae was the investor for their mortgage loan in March 2009, when Max Reed initially contacted Chase to request a loan modification.  (Ex. 3 at 167:17–169:15; Ex. 3(D), p. CHASE 168, 3/24/2009 entry; Ex. 2 at 75:23–76:5).  Max Reed understood generally that this meant Fannie Mae was the actual owner of the Reeds' mortgage loan.  (Ex. 2 at 76:12–18).

---

knowledge, (Ex. 1 at 31:16–33:7), which is not so.  Since September 2007, Chase has consistently received and processed the Reeds' loan payments.  (Ex. 4 121:21–122:2; Ex. 6(6)).  Moreover, after the Assignment at issue, the Reeds did not make any additional loan payments.  (Ex. 2 at 83:19–84:22).

48.     Thus, by September 2010, the Reeds had already been informed who owned their mortgage loan.  (Ex. 3 at 167:17–169:15; Ex. 3(D), CHASE p. 168; Ex. 2 at 75:23–76:5).  They had easy access to, and regularly used, Chase's contact information to coordinate with the servicer about their loan.  (*Id.*; Ex. 2 at 23:20–24:2, 80:2–16, 85:7–21, 100:15–22).

49.     Neither of the Reeds ever reviewed or relied on any information in the public records relating to their property.  (Ex. 2 at 29:7–30:8; Ex. 1 at 13:14–14:1).

50.     The Reeds do not know how or whether MERS' Assignment of Mortgage to Chase dated September 2010 plays any role in their § 1641(g) claim.  (Ex. 2 at 27:18–28:4, 30:9–17, 32:4–34:17, 92:17–93:14, 95:3–13).   The Reeds could not identify any specific facts or documents supporting their claim.  (Ex. 2 at 24:3–21, 25:6–9, 36:3–21, 40:1–19, 41:12–15, 93:18–94:4, 99:16–18, 107:22–108:18).

<u>**ARGUMENT**</u>

In enacting § 1641(g), Congress was focused on one thing—when ownership of a mortgage loan actually changes hands.  The evidence demonstrates irrefutably that Fannie Mae has owned the Reeds' mortgage loan continuously since 2007; ownership of the loan, or debt, did not change hands any time after passage of § 1641(g) in May 2009, much less within the one-year TILA statute of limitations for the Reeds' TILA claim.  Specifically, Chase never acquired ownership of the

17

Reeds' mortgage loan for purposes of § 1641(g); it acted as the servicer only. Despite this evidence, plaintiffs advance an interpretation of § 1641(g) of the Truth in Lending Act ("TILA") that diverges from the statute's plain meaning (expanding it unduly), the regulations as a whole (hand-picking a select, favorable few), and Congressional intent (ignoring its main thrust).

Plaintiffs rely on MERS' Assignment of Mortgage to Chase in September 2010, which passed "legal title" to the real property to Chase. They presume, incorrectly, that this equates to a transfer of loan ownership under § 1641(g). Chase submits that there can be no "creditor that is the new owner or assignee of the debt" for purposes of § 1641(g) unless actual ownership of a mortgage loan changes hands, generally gauged by a merger of legal and equitable title to the loan or debt obligation.

In the foreclosure context, Alabama law is clear that Fannie Mae's grant of authority to Chase to initiate foreclosure proceedings did not convert chase into the actual owner of the mortgage loan.[10]

---

[10]     Alternatively, if the Court were to apply § 1641(g) as broadly as plaintiffs advocate and require a disclosure from a servicer based on an assignment of legal title to the property (absent any other indicator of whether ownership of the mortgage loan actually changed hands and resulting in *two* entities owning the loan simultaneously), Chase fits within the administrative convenience safe harbor. *See* 15 U.S.C. § 1641(f)(2).

## I.   CHASE DOES NOT QUALIFY AS A "CREDITOR THAT IS THE NEW OWNER OR ASSIGNEE OF THE [REEDS'] DEBT" AND, THUS, HAD NO DISCLOSURE OBLIGATION UNDER § 1641(g).

Section 1641(g) was intended to be "a simple amendment, common sense." 155 Cong. Rec. S5099 (daily ed. May 5, 2009) (statement of Sen. Boxer).  A dose of common sense should be liberally applied in evaluating the Reeds' § 1641(g) claim against Chase as the servicer because their contentions are anything but simple.  Based on the regulatory definition of a "covered person" in 12 C.F.R. § 226.39, plaintiffs contend that MERS assigned "legal title to the debt obligation" to Chase in September 2010, which triggered the application of § 1641(g).  Chase never became the owner or assignee of the plaintiffs' "debt obligation," however, *which is the cardinal requirement of § 1641(g).*  An analysis of the statutory and regulatory framework reveals the true scope of this statute and places "legal title to the debt obligation" in proper context for the Court to assess Chase's compelling evidence that § 1641(g) does not apply.

Section 1641(g) requires a "creditor that is the new owner or assignee of the debt" to provide written notice of the transfer to the borrower.  The final rule defines "covered persons" under § 1641(g) to include any entity "that becomes the owner of an existing mortgage loan by acquiring legal title to the debt obligation." 12 C.F.R. § 226.39(a)(1).  The provisions of § 1641(g), Regulation Z, § 1602, and § 1641(f) must be construed together to give each full effect, to the extent possible.

"It is well established that courts must attempt to read a statute in a manner that harmonizes their provisions and avoids ambiguity, if possible, such that 'we read the statute to give full effect to each of its provisions.'" *Abrams v. Ciba Specialty Chems. Corp.*, 659 F. Supp. 2d 1225, 1236 n.16 (S.D. Ala. 2009) (quoting *In re Davis*, 565 F.3d 810, 823 (11th Cir. 2009)). This applies equally to a statute and its regulations, "so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error." *See United States v. Higgins*, 128 F.3d 138, 142 (3rd Cir. 1997) (internal quotations omitted); *Cremeens v. City of Montgomery*, 602 F.3d 1224, 1227 (11th Cir. 2010).

A comprehensive look at the statute, regulations, and legislative intent corroborates that MERS' assignment to Chase of legal title to the *security interest* does *not* elevate Chase to an owner of the Reeds' mortgage loan that acquired "legal title to the *debt obligation*." 12 C.F.R. § 226.39(a)(1) (emphasis added).

A.   **The Board's reference to "legal title to the debt obligation" in the definition of "covered persons" was designed to exclude passive investors in mortgage-backed securities from the reach of the statute, not water down the requirement that there be a transfer of actual ownership.**

The definition of a "covered person" as any entity "that becomes the owner of an existing mortgage loan by acquiring legal title to the debt obligation," begs the question of what this phrase means and how it relates to "the creditor that is the

new owner and assignee" under the statute.  The concepts inherent in "new owner or assignee," "debt obligation," and § 1602's definition of "creditor"—all of which relate to when ownership of a mortgage loan actually changes hands—are essential to this analysis and mesh with the compelling evidence that Chase never actually owned the Reeds' loan.

The Board used "legal title" in the definition of "covered persons" to avoid an unduly expansive interpretation of § 1641(g), which would have incorporated passive investors in "tranches" (slices) of securitized pools.  The discussion of the "beneficial interest" exclusion in the Official Commentary reflects this concern:

> Section 226.39 does not apply to a party that acquires only a beneficial interest or a security interest in the loan, or to a party that assumes the credit risk without acquiring legal title to the loan.  For example, an investor that acquires mortgage-backed securities, pass-through certificates, or participation interests and does not acquire legal title in the underlying mortgage loans is not covered by this section.

12 C.F.R. pt. 226, Supp. I, Official Staff Interpretation § 226.39(a)(1), at ¶ 3(i) (2011).  The Board's stance presumably derives from the legislative history:

> The Boxer amendment provides borrowers with the basic right to know who owns their loans by requiring that any time a mortgage loan is sold or transferred, the new note owner shall notify the borrower within 30 days . . .
>
> * * *
>
> To be clear, the amendment does not require borrowers to receive a notification every time a mortgage backed security with a slice of their mortgage changes hands.  Those are transactions between investors and do not involve a change in ownership of the physical note.

155 Cong. Rec. S5099 (daily ed. May 5, 2009) (statement of Sen. Boxer).

Unfortunately, the Board's injection of "legal title" into the definition of "covered person" and exclusion for a specific type of "beneficial interest" gives rise to a potential tension when applying § 1641(g), if those terms are taken out of context. Becoming a "new owner or assignee" of a mortgage loan and underlying debt obligation or, as the legislative history puts it, a "change in ownership of the physical note," go hand-in-hand with an entitlement to the benefits of the loan, or the *equitable* interest in the loan. Moreover, actual ownership of a mortgage loan, or debt obligation, is commonly defined by references to a "*beneficial interest*" in the loan, which include the entitlement to receive the debt payments (or other proceeds from the loan), listing the debt as an asset and receivable on one's books, being subject to the right of rescission, and possession of the note.

When a borrower takes out a home mortgage loan, two documents are executed memorializing the lender's interest: (1) a promissory note evidencing the underlying loan obligation, and (2) a mortgage, evidencing the underlying security interest, which transfers "legal title" to the real property to the lender as collateral for the loan. *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1039 (9th Cir. 2011). When the mortgage loan is sold or transferred, the new lender becomes the owner of the beneficial interest in the loan, with an equitable lien, or security interest on the property. *Id.*; Ala. Code § 8-5-24 (2011).

The final rule, agency guidance and commentary, and legislative history for 1641(g) uniformly signal that, with the unique exception of passive investors in pools of mortgage-backed securities, becoming "a new owner or assignee of the debt" is fundamentally different than simply acquiring legal title to the security interest.[11]  *See* Final Rule Notice, 75 Fed. Reg. 58,489 (Sept. 24, 2010) ("The legislative history indicates, however, that TILA Section [1641(g)] was not intended to require notice when a transaction 'does not involve a change in ownership of the physical note,' such as when the note holder issues mortgage-backed securities but does not transfer legal title to the loan.") (quoting 155 Cong. Rec. S5099).[12]

For example, "the date of transfer" must appear in any § 1641(g) disclosure, which the regulations define to mean "either the date of acquisition recognized in the books and records of the acquiring party, or the date of transfer recognized in the books and records of the transferring party."   12 C.F.R. § 226.39(b)(2).

---

[11]     This is consistent with Alabama law.  *Cf. First Union Nat'l Bank v. Lee Cnty. Comm'n,* 75 So. 3d 105, 113 (Ala. 2011) (when legal title passes to a mortgagee, it does not have absolute ownership of the property; true ownership requires a merger of equitable title and legal title, and the mortgagor retains its status as "owner and holder of equitable title").

[12]     Commentary in rulemaking notices constitutes persuasive authority, rather than binding guidance, on a court considering a federal statute.  *See In re Wash. Mut. Overdraft Prot. Litig.*, 539 F. Supp. 2d 1136, 1148 (C.D. Cal. 2008).

Recognition of a loan or debt as an asset and receivable on a company's books is a concrete indicator of actual ownership, the merger of legal and equitable interests, which §1641(g) and Regulation Z adopt.

As another example, an entity newly assigned a partial, percentage interest in a mortgage loan may be covered by § 1641(g) unless "the party authorized to receive the consumer's notice of the right to rescind and resolve issues concerning the consumer's payments on the loan does not change as a result of the transfer of the partial interest."  *Id*. § 226.39(c)(3).  Under TILA, the right of rescission rests with the creditor or its assignee, or the owner of the mortgage loan.  15 U.S.C. §§ 1635(a), 1641(c).  This was emphasized in the legislative history as a key reason for the passage of § 1641(g). 155 Cong. Rec. S5098.

The requirement that the "new owner or assignee" notify the borrower of the "date of transfer"—the date on which the mortgage loan transfers to the new owner's books—is, in and of itself, dispositive of the plaintiffs' § 1641(g) claim. Chase has presented undisputed factual evidence that it never acquired the Reeds' loan or debt as an asset for accounting purposes. (Ex. 4 at 125:15–17). Specifically, in September 2010 when MERS assigned its interest in the Mortgage to Chase, the Reeds' mortgage loan was never booked by Chase as an asset or receivable.  (Ex. 4 at 125:18–126:3).  Requiring Chase to send a § 1641(g) notice when it could not possibly comply with the statute does not make common sense.

Moreover, Fannie Mae remains the entity subject to any right to rescind (to the extent the Reeds' could timely assert the right); MERS' Assignment did not alter that. (Ex. 4 at 135:22–136:15).

These indicia of "new owner or assignee" of a mortgage loan demonstrate that the statute has no application to Chase in this case.

**B.      Congress' deliberate use of the term "creditor" in § 1641(g) is not superfluous; rather, a key aspect of this defined term informs the phrase "new owner or assignee of the debt," as well as the concept of "legal title" introduced in the implementing regulation.**

Plaintiffs aver that Chase is a "creditor" for purposes of § 1641(g). Compl. ¶ 12, ECF No. 2. Congress' use of the term "creditor" in this statute, a term that TILA defines at 15 U.S.C. § 1602, can and should be harmonized with the regulatory definition of "covered persons" in 12 C.F.R. § 226.39(a)(1) to effectuate the straightforward purpose of § 1641(g). *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108 (1980) ("We begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."). Based on the plain terms of § 1641(g) and its legislative history, one aspect of "creditor" translates from § 1602: to become the "new owner or assignee" of a mortgage loan, the "debt" must be "payable" to the new owner or assignee. *See United States v. Perez,* 443 F.3d 772, 781 (11th Cir. 2006).

Integrating this aspect of "creditor" to inform the concept of true loan ownership in § 1641(g) reconciles the regulations and guidance with Congress' purposeful, repeated use of the term "creditor" in the statute, as well as legislative intent.  75 Fed. Reg. at 58,490-91 (quoting 155 Cong. Rec. S5099).  To give effect to "creditor" and Congressional intent, any "covered person" with "legal title to the debt obligation" should necessarily encompass the entity to whom the debt is payable.  *Compare* 12 C.F.R. § 226.39(a)(1) (definition of "covered person") *with* 15 U.S.C. § 1602(g) (definition of "creditor").  *See, e.g., Wilson v. Wells Fargo Bank, N.A.*, No: C 11-3394, U.S. Dist. LEXIS 79385, at *1 (N.D. Cal. July 21, 2011).

The Federal Reserve Board's rationale for departing from aspects of TILA's traditional definition of a "creditor" is not inconsistent with this analysis.  *See* 75 Fed. Reg. at 58,491 ("In issuing the interim rule, the Board indicated that it found nothing in the legislative history indicating that Section 1641(g) was intended to apply more broadly than the general TILA and Regulation Z requirements.").  In general, entities buying loans in the secondary market are not considered "creditors" for purposes of Regulation Z because they do not originate loans, and many do not regularly extend consumer credit.  The Board acknowledged this reality during its rulemaking phase and resolved as follows:

> Although TILA and Regulation Z generally apply only to persons to whom the credit obligation is initially made payable

and that regularly engage in extending consumer credit, Section 404(a)[13] and the final rule apply to persons that acquire mortgage loans without regard to whether they also extend consumer credit by originating mortgage loans.

Final Rule Notice, 75 Fed. Reg. at 58,489-90. Thus, the Board endeavored to give effect to § 1641(g) by crafting a definition of "covered persons" that would encompass the new loan owner following the sale, transfer or assignment of a mortgage loan. When viewed in context, this does not mean that § 1641(g) should be broadly applied to *any* party, regardless of "whether that party would be a 'creditor' for other purposes under TILA or Regulation Z." *See* 12 C.F.R. pt. 226, Supp. I, Official Staff Interpretation § 226.39(a)(1), at ¶1 (2011).[14]

Congress' use of the term "creditor," when viewed against the backdrop of Congressional intent, reveals why the Reeds' reliance on a transfer of legal title to the mortgagee should not prevail. Throughout the period since Chase became the servicer in 2007, the Reeds have directed their loan payments to Chase, but Fannie Mae has been the ultimate beneficiary of those payments. Thus, Chase does not

---

[13]    The commentary refers to the statute as Section 404(a) of the Helping Families Save Their Homes Act, which was later codified at 15 U.S.C. § 1641(g).

[14]    Similarly, § 1641(g) would be undermined by TILA's separate requirement for creditors' assignees that "violations [be] apparent on the face of the disclosure statement." *See, e.g., Parker v. Potter*, 232 F. App'x 861, 865 (11th Cir. 2007).

qualify as a "creditor" for purposes of § 1641(g).  *See, e.g., Parker v. Potter,* 232 F. App'x 861, 865 (11th Cir. 2007) (since the debt was not payable to the defendant, it was not a "creditor" subject to liability under TILA); *Moore v. Flagstar Bank*, 6 F. Supp. 2d 496, 503 (E.D. Va. 1997) (same).  This undisputed fact distinguishes Chase from a "creditor" covered by § 1641(g) and serves as another good indicator of which entity actually owns the mortgage loan.

### C.   Because this case involves a servicer, § 1641(g) and its implementing regulations must also be read in conjunction with 15 U.S.C. § 1641(f)(1).

The Board stated in commentary during the rulemaking period that § 1641(f) "addresses the treatment of loan servicers under the provisions of [§ 1641(g)] which were added by the 2009 Act."  Final Rule Notice, 75 Fed. Reg. at 58,91. Thus, this provision, too, must be harmonized with §1641(g) and interpreted to give each best effect.  Section § 1641(f) provides in pertinent part that a servicer "shall not be treated as an assignee of such obligation for purposes of this section unless the servicer *is or was the owner of the obligation.*"  15 U.S.C. § 1641(f)(1) (emphasis added).[15]  TILA does not define "owner of the obligation," but the concept necessarily encompasses the right associated with possessing the debt.  *See*

---

[15]   *See also* 12 U.S.C. § 2605(i)(2) (defining "servicer") and 12 U.S.C. § 2605(i)(3) (defining "servicing" as receiving any scheduled periodic payments from a borrower and, after making appropriate payments relating to the mortgage loan, forwarding principal and interest to the investor).

*Holcomb v. Fed. Home Loan Mortg. Corp.,* No. 10-81186, 2011 U.S. Dist. LEXIS 123935, at *3 n.1 (S.D. Fla. Oct. 26, 2011) ("A loan servicer is the party responsible for receiving any scheduled periodic payments from a borrower according to the terms of a loan.  Where, as in the instant case, the servicer is not the owner of the obligation, it is not treated as an assignee under TILA but is responsible for providing the borrower with the identity of the owner of the obligation upon request.") (citation omitted).

Based on § 1641(f)(1), § 1641(g) does not apply to Chase as the servicer unless independent factors demonstrate that Chase is the *owner* of the loan (i.e., the "debt obligation"), rather than merely holding legal title to the security interest or property.  *See id.*; *Patton v. Ocwen Loan Servicing, LLC*, No. 6:11-cv-445, 2011 U.S. Dist. LEXIS 48230, at *17 (M.D. Fla. May 5, 2011).[16]  This requirement reinforces § 1641(g)'s "new owner and assignee" element and negates liability here, in light of the substantial evidence that Chase acted solely as the servicer and never became the owner of the Reeds' loan.

Congressional intent that § 1641(g) apply only when ownership of a mortgage loan actually changes hands should be given effect by interpreting the

---

[16]    Notably, the driving factor behind the Board's use of the phrase "legal title" and related "beneficial interest" exclusion—to avoid imposing a disclosure requirement on passive investors in a securitized pool—has no bearing on servicers, which are actively involved when handling a mortgage loan.

statute, regulations, and guidance integrally with one another and relevant sections of TILA.  The Board's reference to "legal title to the debt obligation" under §1641(g)'s definition of "covered persons" and guidance that the definition applies regardless of whether the new owner or assignee is a "creditor" for other purposes under TILA's was designed to exclude to passive investors in securitized pools. These concepts must be augmented by scrutinizing other indicia of actual loan ownership evident from the statute, regulations, and legislative history, many of which are regularly referred to as beneficial ownership interests.

## II.   NO OWNERSHIP INTEREST IN THE REEDS' MORTGAGE LOAN EVER CHANGED HANDS AS A RESULT OF MERS' ASSIGNMENT TO CHASE IN SEPTEMBER 2010.

### A.   Undisputed Factual Evidence Renders Irrelevant the Common Law Presumption Relied upon by Plaintiffs.

As a factual matter, Fannie Mae has owned the Reeds' mortgage loan without interruption since January 2007; it never sold or transferred its ownership interest in the debt to Chase or any other entity.  Ex. 7 ¶ 3.  The common law presumption that ownership of a note automatically transfers with an assignment of the mortgage applies only ". . . in the absence of any evidence showing a separate or different assignment of the note."  *Crum v. LaSalle Bank, N.A.*, 55 So. 3d 266, 269 (Ala. Civ. App. 2009) (citing *Seabury v. Hemley*, 56 So. 530, 531 (Ala. 1911)); *see also Agricola Partners v. Parker*, 655 So. 2d 967, 968-69 (Ala. 1995).

The undisputed evidence defeats the notion that the presumption should apply here.

In *Crum*, which applied the common law presumption to a MERS assignment of mortgage, the note was not in evidence, nor was there any indication of an assignment of the note to an entity other than the mortgagee. *Crum*, 55 So. 3d at 268. Thus, the common law presumption kicked in to prevent a windfall for the borrower. *Restatement (Third) of Property: Mortgages* § 5.4, cmt. c (the reason for the rule "is that this is ordinarily what the parties desire and expect when a mortgage is assigned . . . even though they, through ignorance or inadvertence, have not fully documented it. *See* Illustrations 5 and 6 . . . ."); *see also Mortensen v. MERS*, No. 1:09-cv-00787-WS-N, ECF No. 78, slip op. at 10-14 (S.D. Ala. Dec. 23, 2010) (acknowledging that the result of plaintiff's "splitting-the-note" argument would permit the plaintiff to default on the note without risk of losing the property to foreclosure).

The Reeds' case is different.  There is compelling evidence of the identity of the true owner of the Note (Fannie Mae), as well as Chase's obligations as servicer to act on behalf of that owner.  (Ex. 7 ¶ 2; Ex. 6(2); Ex. (G-M)).  Moreover, Chase's records confirm that it never acquired any actual ownership interest in the Reeds' mortgage loan.  (Ex. 6 ¶ 4-7).  If the Assignment had vested the servicer with an ownership interest in the debt, there would have been changes in Chase's

corporate accounting, updates to Chase's system notes, notations in Chase's customer service records, revisions to the servicing screen identifying the investor, and termination of the servicing fee.  (Ex. 4 at 125:11, 126:3, 130:11–14, 131:18–23, 132:15–19, 192:6–21, 193:6–194:4; Ex. 3 at 163:10–165:20, 166:1–167:10, 53:17–54:13, 56:1–57:21).  None of these things occurred.

In addition, Alabama law gives effect to the terms of the Mortgage, signed by the Reeds, which provide that MERS: a) would serve as mortgagee, "acting solely as a nominee" for the lender, which remained the holder of the Note; and b) had the authority to assign its interest in the Mortgage to another entity.  Ex. 2(H), p. 1, 3; *Scivally v. CitiMortgage, Inc.*, No. 5:11-cv-1452-AKK, ECF No. 26, slip op. at 5, 6 n.3 (N.D. Ala. Sept. 12, 2011) (citing *Crum*, 55 So. 3d 266 and *Fed. Nat'l Mortg. Ass'n v. Nelson*, CV-2010-900390, at *3 (Cir. Ct. Jeff. Cnty., Ala. Jan. 18, 2011)).

For these reasons, the substantial evidence regarding actual ownership of the Note governs, and the common law presumption has no application.

### B.   MERS Did Not Transfer to Chase Any Actual Ownership Interest in the Note or Debt Obligation.

Plaintiffs focus on the Assignment, contending that MERS' legal title to the Reeds' Mortgage, solely as nominee[17] for the lender, satisfies Regulation Z's

---

[17]   "Nominee in its most common usage means one who holds property of record for another, and who acts at the direction of another, with the other having

reference to acquiring "legal title to the debt obligation."  These concepts are distinctly different.  C*ompare Residential Funding Co. v. Saurman*, 2011 Mich. LEXIS 1950 at *1-2 (Nov. 16, 2011) (MERS' interest through the mortgage instrument allows it to validly foreclose on the property but does not equate to an ownership interest in the note) *with* 12 C.F.R. § 226.39(a)(1).

### 1.     MERS' Role and the Nature of Its Interest

MERS is a private electronic database that tracks the transfer of the "beneficial interests" in home mortgage loans, as well as any changes in loan servicers.  Ex. 6 ¶ 8; *see also Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1038-39 (D. Ariz. Oct. 3, 2011).  If a lender sells the loan to an entity that is a member of the MERS® System, the transaction is reflected in the database.  *Id.* The parties do not have to record every transfer because MERS remains the holder of legal title to the security interest on behalf of the new lender. *Id.*  MERS itself does not acquire any beneficial ownership interest in the notes. *Bank of New York v. Silverberg*, No. 2010-131, 2011 N.Y. App. Div. LEXIS 4899, at *13-14 (N.Y. App. Div. June 7, 2011); Ex. 6(9) Rule 8, §2(a)(i); MERS Terms and Conditions, ¶¶ 2, 6 (May 21, 2008) *available at* http://www.mersinc.org/MersProducts/publications.aspx?mpid=1.

---

the entire beneficial interest." *In re Escher*, 369 B.R. 862, 867 n.8 (Bankr. E.D. Pa. 2007) (internal quotations omitted).

The Reeds' Mortgage provides that "MERS holds only legal title to the interests granted by Borrower in this Security Instrument," and authorizes MERS, solely as the lender's nominee, to take action with respect to the security interest. Ex. 2(H), p. 3.  This does not equate to an ownership interest in the Note or the underlying debt obligation.  *Saurman*, 2011 Mich. LEXIS 1950 at *1-2; Ex. 3(L), Pt. I, § 408 ("MERS will have no beneficial interest in the mortgage loan, even if it is named as the nominee for the beneficiary in the security instrument.").

## 2.    MERS' Assignment of Mortgage

The Assignment makes no mention of any transfer of the Note from MERS to Chase.  Ex. 6(11).  Even if the Assignment had contained such language, MERS could not have conveyed any such an interest because MERS itself possessed no ownership interest in the Note, for purposes of § 1641(g).  *Id.; In re Lopez*, 2011 Bankr. LEXIS 475 *5 (Bankr. D. Mass. Febr. 9, 2011); *King v. American Mortg. Network, Inc.*, No. S-10 3268, 2010 U.S. Dist. LEXIS 92210 at *3-4 (D. Utah Sept. 1, 2010).  *See also* Ex. 7 ¶ 3. Under Alabama law, a party may not assign more rights than it possesses.  *See Mannsfeld v. Evonik Degussa Corp.*, No. 10-0553-WS-M, 2011 U.S. Dist. LEXIS 1412, at *58 (S.D. Ala. Jan 5, 2011); *Singer Asset Fin. Co., L.L.C. v. Conn. General Life Ins. Co.*, 975 So. 2d 375, 380 (Ala. Civ. App. 2007).  Thus, MERS did not hold, much less transfer to Chase, any actual ownership interest in the Reeds' debt obligation sufficient to invoke § 1641(g).

Ex. 3 at 95:10–96:6; *see also Cervantes*, 656 F.3d at 1039-40 (MERS has no financial interest in the loan, no right to payments, and does not service the loan); *Silverberg*, 2011 N.Y. App. Div. LEXIS 4899 at *14-15 (MERS never loaned any money, never received any loan payments, had no rights to proceeds upon default, and was not possession of the physical note).

The evidence and relevant case law establish that actual ownership of the Reeds' Note and underlying debt obligation did not pass to Chase in September 2010 through MERS' Assignment.   Thus, plaintiffs' § 1641(g) claim cannot survive summary judgment.

## III.   TO THE EXTENT THAT CHASE INITIATED FORECLOSURE PROCEEDINGS AS THE SERVICER, SUCH ACTIVITIES DID NOT CONVERT CHASE INTO A "NEW OWNER OR ASSIGNEE" FOR PURPOSES OF § 1641(g).

Fannie Mae's Servicing Guide directed Chase to handle foreclosure but did not endow Chase with *ownership* of the mortgage loan, such that the loan actually change hands.   Indeed, the Fannie Mae Servicing Guide directs Chase to act in a representative capacity and foreclose in its own name as servicer.   (Ex. 3(M)). Fannie Mae granted Chase the requisite authority as the servicer *specifically to protect Fannie Fae's interests as the owner of the mortgage loan.*  Ex. 3 at 191:2-20; ex. 3 (G-M).   *See also* Ala. Code § 35-10-12 (the power of sale "may be executed by any person, *or the personal representative of any person* who, by assignment or otherwise, becomes entitled to the money thus secured" by the

mortgage) (emphasis added).  Thus, had a foreclosure sale taken place (which it did not), Chase could have executed the power of sale as the servicing agent for Fannie Mae.  *See Coleman v. BAC Servicing*, No. 2100453, 2012 Ala. Civ. App. LEXIS 23, at *9-10 (Ala. Civ. App. Feb. 3, 2012); *Crum*, 55 So. 3d at 269-270 (foreclosure by MERS' assignee on behalf of the lender did not violate § 35-10-12); *Cervantes*, 656 F.3d at 1039, 1044 (agents of the note holder with authority to act on the note and the debt together can validly foreclose).[18]  This representative capacity is obviously quite different than owning the mortgage loan, or debt obligation.  *U.S. Bank, N.A. v. Congress*, No. CV-09-901113-JSV, slip op. at 11 (Cir. Ct. Jeff. Cnty., Ala. Feb. 23, 2011) (a person entitled to enforce a note can legally demand payment, enforce the note, and foreclose, even if that party is not the "owner" of the note); *see also Farkas v. SunTrust Mortg., Inc.*, No. 10-cv-0512, 2010 U.S. Dist. LEXIS 138803, at *12 (S.D. Ala. Dec. 15, 2010), *report and recommendation adopted*, 2011 U.S. Dist. LEXIS 968 (S.D. Ala. Jan. 5, 2011) (as a non-judicial foreclosure state, Alabama's procedures do not require the

---

[18]    Notably, during discovery, plaintiffs' counsel repeatedly underscored Chase's repudiation of an ownership interest in the Reeds' mortgage loan or any entitlement to the ultimate benefits of the Reeds' debt payments.  Plaintiffs apparently hope to convert this evidence into a sword, arguing that Chase's defenses to the Reeds' TILA claim equate to an admission in foreclosure litigation that Chase lacks standing to foreclose under § 35-10-12 (i.e., Chase is not the "entity entitled to the debt thus secured"), and subsequently attacking the validity of Chase' foreclosures in Alabama and elsewhere.  Chase's positions this § 1641(g) litigation and, separately, foreclosure cases are not mutually exclusive.

foreclosing party to "demonstrate ownership of the mortgage note before taking any action against" the mortgagor).

As an added precaution for the administrative convenience of the servicer, Chase became the mortgagee of record on September 7, 2010, by virtue of the MERS Assignment.  Thus, Chase had the requisite authority as servicer and mortgagee to conduct a foreclosure sale, but neither of these grants of authority transformed Chase into the actual owner of the mortgage loan.  Thus, the acceleration and foreclosure sale notices sent to the Reeds did not transform Chase into a "new owner or assignee" for purposes of § 1641(g).

## IV.   Alternatively, MERS' Assignment of Mortgage Was an Administrative Convenience for Chase in Servicing the Obligation.

If a foreclosure sale had taken place, Chase, as the mortgagee, would have passed legal title to the property.  *See, e.g., Maiden v. Fannie Mae,* 69 So. 3d 860, 865 (Ala. Civ. App. 2011) ("Alabama is a 'title theory' state; thus, when a person mortgages real property, the mortgagee obtains legal title to the real property and the mortgagor retains an equity of redemption.").  Plaintiffs bank on the fact that Chase's "legal title" to the Reeds' real property renders Chase a "covered person" under Regulation Z.  Yet these two notions of "legal title" are not the same at all,

for the reasons discussed in Part I *supra*.[19]   *See, e.g*, *First Union Nat'l Bank v. Lee Cnty. Comm'n,* 75 So. 3d 105, 113 (Ala. 2011) (citing *Ala. Home Mortg. Co. v. Harris*, 582 So. 2d 1080, 1083-84 (Ala. 1991)).

Even if the Court were to adopt plaintiffs' position, the Reeds' claim is still due to be dismissed.  A servicer does not become a "new owner or assignee" for purposes of § 1641(g) "on the basis of an assignment of [an] obligation from the creditor or another assignee to the servicer solely for the administrative convenience of the servicer in servicing the obligation." 15 U.S.C. § 1641(f)(2); 12 C.F.R. § 226.39(a)(1).

Chase has presented substantial evidence that the Assignment was for the servicer's administrative convenience.   First, Fannie Mae requires Chase to procure such an assignment from MERS prior to a foreclosure sale; this was part and parcel of Chase's job as the servicer. Ex. 3(M) and Ex. 3(L) (Pt. VIII, §§ 105, 408).  *See generally Restatement (Third) of Property: Mortgages* § 5.4, Illustration 7 (an assignment of the mortgage from the originating mortgagee to the servicer "is convenient because it facilities actions that the servicer might take, such as releasing the mortgage, at the instruction of the purchaser").

_____

[19]   If, *arguendo*, Chase acquired legal title to the debt obligation for purposes of § 1641(f)(2) by virtue of its possession of the original Note, that occurred on September 19, 2007, well outside the limitations period for a TILA claim.

Second, the Assignment also prepared to resolve any title issues that could arise if MERS remained the mortgagee of record.  Ex. 3 at 60:7–18; Ex. 3(E), p. CHASE 1033; *see also In re Frank*, No. 10-cv-84435, 2011 Bankr. LEXIS 859, at *3-4 (Bankr. N.D. Ala. Mar. 8, 2011); *Saurman*, 2011 Mich. LEXIS 1950 at *2 ("It has never been necessary that the mortgage should be given directly to the beneficiaries. The security is always made in trust to secure obligations, and the trust and the beneficial interest need not be in the same hands. The *choice of a mortgagee is a matter of convenience*.") (quotations omitted).

Third, with respect to a hypothetical foreclosure sale, the Assignment confirms that the separate grants of authority from Fannie Mae to execute a foreclosure deed all resided in one entity—Chase.  *See generally* Ex. 3(H), Pt. I, § 201, p. 2 ("To facilitate performance of the servicer's contractual responsibilities to Fannie Mae and the borrower, the servicer ordinarily appears in the land records as the mortgagee.")  Accordingly, Chase fits well within TILA's safe harbor for servicers.

## V.   This Case Should Be Dismissed for Lack of Subject Matter Jurisdiction Because the Reeds Lack Article III Standing.

It is axiomatic that a plaintiff must have standing to invoke the jurisdiction of the federal courts.  *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1266 (11th Cir. 2006).  Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defenders of Wildlife*, 504 U.S.

555, 560 (1992) (citations omitted).  To establish standing, a plaintiff must show

an injury-in-fact that is (1) concrete and particularized; (2) actual or imminent (not

conjectural or hypothetical); (3) fairly traceable to the challenged action of the

defendant; and (4) likely to be redressed by a favorable decision (as opposed to

speculation).  *Lujan*, 504 U.S. at 560-61; *Mulhall v. Unite Here Local 355*, 618

F.3d 1279, 1286 (11th Cir. 2010).   When a plaintiff fails to establish these

requirements,[20] the case does not "present[] a live case or controversy . . ."  *Fla.*

*Wildlife Fed'n v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1302 (11th Cir. 2011).

Max Reed's testimony could not be clearer that the Reeds did not suffer any

injury-in-fact based on their § 1641(g) claim:

> Q:   Can you point me to any loss or economic harm that you've
>      suffered as a result of this supposed lack of notice?
> A:   No.
>
> * * *
>
> Q:   In or after September of 2010, which would be approximately
>      the last twelve to fourteen months, has the lack of any notice to
>      you from Chase that it owned your loan caused you any
>      emotional distress or upset with respect to this case?
>                   *(objections omitted)*
> A:   No.
>
> Q:   In October, 2010, Chase's contact information would not have
>      been new information for you, is that fair?
> A:   Yes.

---

[20]    "In the face of a factual challenge to subject matter jurisdiction, the burden
is on the plaintiff to prove that jurisdiction exists."  *OSI, Inc. v. United States*, 285
F.3d 947, 951 (11th Cir. 2002) (citations omitted).

Q:    Did you – you had been dealing with Chase with respect to your loan for some years by that time, right?

A:    Yes.

Q:    You never wrote the servicer and asked who owned your loan, correct?

A:    Correct.

Q:    Never tried to assert a right of rescission, correct?

A:    Correct.

Q:    No foreclosure sale ever took place, correct?

A:    Correct.

Q:    Was there any impact you can point me to on you or your wife flowing from the absence of this notice that you're claiming Chase should have given you?

A:    No.

(Ex. 2 at 98:4–7, 100:4–101:13).  Based on this testimony, essential elements of standing are flatly missing.

Constitutional standing and statutory standing are separate requirements, and both must be met for a plaintiff to have access to the federal courts.[21]  *See Baloco v. Drummond Co.*, 640 F.3d 1338, 1343 (11th Cir. 2011).  Congress has no authority to statutorily bestow Article III standing on a plaintiff who has not been

---

[21]    Chase respectfully submits that this Court's recent decisions in *Brown v. CitiMortgage, Inc.*, No. 11-cv-403, 2011 U.S. Dist. LEXIS 117612 (S.D. Ala. Oct. 11, 2011), and *Squires v. BAC Home Loans Servicing, LP*, No. 11-cv-413, 2011 U.S. Dist. LEXIS 137581, at *16-17 (S.D. Ala. Nov. 29, 2011), addressed *statutory* standing only, which still leaves *constitutional* standing in question for the Reeds.

injured.  *Hydro Investors, Inc. v. FERC*, 351 F.3d 1192, 1197 (D.C. Cir. 2003).  In other words, Congress "cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997); *see also Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979).

Nothing in sections 1641(g) or 1640(a) can remedy the Reeds' lack of any injury-in-fact.  *See Little v. Strange,* 796 F. Supp. 2d 1314, 1326-27 (M.D. Ala. 2011).  Because plaintiffs have not (and cannot) establish constitutional standing under Article III, there is no subject matter jurisdiction in this case.[22]

### CONCLUSION

Under these circumstances, Chase could not legitimately send a § 1641(g) disclosure to the Reeds in September 2010.  Chase could not have listed even the most basic information required by the statute (i.e., no date of transfer) because Fannie Mae owned the Reeds' loan continuously after January 2007, and Chase never acquired the requisite ownership interest.  Thus, any statement by Chase in September 2010 that it had become the new owner or assignee of the Reeds' mortgage loan would have been untrue.

---

[22] The Supreme Court has granted certiorari in *Edwards v. First Am. Fin. Corp.*, 610 F.3d 514 (9th Cir. 2010, *cert. granted*, 131 S. Ct. 3022 (U.S. June 20, 2011) (No. 10-708), to decide whether a plaintiff who alleges a technical violation of RESPA but has no injury-in-fact lacks Constitutional standing under Article III.

For these reasons, Chase respectfully requests that the Court enter summary judgment for the defendant and dismiss the plaintiffs' Complaint in its entirety.

/s/ *Helen Kathryn Downs*
Helen Kathryn Downs (DOWNH8460)
Alan D. Mathis (MATHA8922)
Daniel J. Martin (MARTD8327)

One of the Attorneys for Defendant
JPMorgan Chase Bank, N.A., successor
by merger to Chase Home Finance LLC

**JOHNSTON BARTON PROCTOR & ROSE LLP**
Colonial Brookwood Center
569 Brookwood Village, Suite 901
Birmingham, AL  35209
Telephone:   (205) 458-9495
Facsimile:   (205) 458-9500
Email:         hkd@johnstonbarton.com
                  adm@johnstonbarton.com
                  djm@johnstonbarton.com

**OF COUNSEL**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 24th day of February, 2012, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following counsel of record:

> Kenneth J. Riemer, Esq.
> Earl P. Underwood, Jr., Esq.
> Underwood & Riemer, P.C.
> 166 Government Street
> Suite 100
> Mobile, AL 36602

> */s/ Helen Kathryn Downs*
> Of Counsel

W0829191