IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **MAX LEROY REED, JR., et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | ) CIVIL ACTION 11-0412-WS-C |
| | ) |
| **CHASE HOME FINANCE, LLC,** | ) |
| | ) |
| **Defendant.** | ) |

**ORDER**

This matter is before the Court on the parties' cross-motions for summary judgment. (Docs. 53, 57). The parties have submitted briefs, evidentiary materials and other filings in support of their respective positions, (Docs. 54-56, 58-60, 73-76, 88, 90-93), and the motions are ripe for resolution. After careful consideration, the Court concludes that the plaintiffs' motion for summary judgment is due to be denied and that the defendant's motion for summary judgment is due to be granted.[1]

**BACKGROUND**

According to the complaint, the plaintiffs obtained a mortgage loan from a third party and executed a mortgage in favor of that third party. Servicing of the loan was later transferred to the defendant. In September 2010, "ownership interest in the Plaintiff's mortgage and note was assigned to" the defendant. The single count of the complaint is that the defendant did not give the plaintiffs the notice required by 15 U.S.C. § 1641(g). (Doc. 2). The defendant argues: (1) that the Court lacks subject matter jurisdiction; (2)

---

[1] The defendant's request for oral argument, (Doc. 58 at 1), construed as a motion for oral argument, is **denied**. *See* Local Rule 7.3.

that it is not subject to Section 1641(g); and (3) that, if it would otherwise be so subject, it falls within the "safe harbor" of Section 1641(f).

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; accord *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis in original); accord *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick*, 2 F.3d at 1116; accord *Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[2]  Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited. Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

## I. Subject Matter Jurisdiction.

In the absence of constitutional standing, a court lacks subject matter jurisdiction. *E.g., Stalley ex rel. United States v. Orlando Regional Healthcare System*, 524 F.3d 1229, 1234-35 (11th Cir. 2008). In the short concluding section of its principal brief, the

---

[2] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so.").

defendant points to testimony that the plaintiffs suffered no economic harm, emotional distress or other adverse impact from failing to receive the notice required by Section 1641(g).  Without elaboration, the defendant concludes that this testimony proves the plaintiffs experienced no injury-in-fact and therefore lack constitutional standing.  (Doc. 58 at 39-42).[3]

An injury-in-fact that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," is part of "the irreducible constitutional minimum of standing."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotes omitted).  But "'[t]he … injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.'"  *Id*. at 578 (quoting *Linda R.S. v. Richard D*., 410 U.S. 614, 617 n.3 (1973)).

This principle is fairly illustrated by *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).  Section 804(d) of the Fair Housing Act of 1968 made it unlawful to falsely represent to any person, because of race, sex or other listed category, that a dwelling is not available for inspection, sale or rental.  The *Havens Realty* Court held that Section 804(d), "which, in terms, establishes an enforceable right to truthful information concerning the availability of housing, is such an enactment" as described by *Linda R.S. Id*. at 373.  "A tester who has been the object of a misrepresentation made unlawful under § 804(d) has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions," even if the tester had no intention of renting or buying and even if she did not rely on the false information.  *Id*. at 373-74.  In particular, "the Art. III requirement of injury in fact is satisfied."  *Id*. at 374.  In the same way, Section 1641(g) creates a legal right to certain disclosures, and an invasion of that right can create standing.

---

[3] The defendant does not challenge the existence of statutory standing.  (Doc. 58 at 41 n.21).

A violation of Section 1641(g) enables a plaintiff to recover both actual damages and statutory damages, and the latter are recoverable even in the complete absence of the former. *E.g., Brown v. CitiMortgage, Inc.*, 817 F. Supp. 2d 1328, 1331 (S.D. Ala. 2011). Courts have repeatedly held that the availability of statutory damages for the violation of a statutory right satisfies Article III's injury-in-fact requirement, even when no actual damages were incurred. *E.g., Alston v. Countrywide Financial Corp.*, 585 F.3d 753, 762-63 (3rd Cir. 2009) (Real Estate Settlement Procedures Act); *Beaudry v. TeleCheck Services, Inc.*, 579 F.3d 702, 707 (6th Cir. 2009) (Fair Credit Reporting Act); *Robey v. Shapiro, Marianos & Cejda, L.L.C.*, 434 F.3d 1208, 1212 (10th Cir. 2006) (Fair Debt Collection Practices Act); *DeMando v. Morris*, 206 F.3d 1300, 1303 (9th Cir. 2000) (Truth in Lending Act); *Mabary v. Hometown Bank, N.A.*, ___ F. Supp. 2d ___, 2012 WL 3765020 at *3 (S.D. Tex. 2012) (Electronic Funds Transfer Act); *Hammer v. JP's Southwestern Foods, L.L.C.*, 739 F. Supp. 2d 1155, 1161-62 (W.D. Mo. 2010) (Fair and Accurate Credit Transactions Act); *Landsman & Funk, P.C. v. Lorman Business Center, Inc.*, 2009 WL 602019 at *3 (W.D. Wis. 2009) (Telephone Consumer Protection Act).

The defendant does not acknowledge these lines of authority, even though the plaintiffs' brief invokes them both. (Doc. 76 at 26). Instead, it notes only that Congress "cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." (Doc. 90 at 18 (quoting *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997)). This is a correct proposition, but it is inapposite here. In *Raines*, Congress inserted into the Line Item Veto Act a provision that "[a]ny Member of Congress or any individual adversely affected by [this Act] may bring an action … on the ground that any provision of this part violates the Constitution." 521 U.S. at 815-16. That Congress authorized its members to sue could not of itself invest them with constitutional standing, which depends upon the plaintiff's suffering of an injury-in-fact as defined in *Lujan* and other cases. *Id*. at 818-20. But Congress in Section 1641(g) did not simply tell borrowers they could sue; it created a legally protected right to receive certain information under certain circumstances and granted a financial remedy for violations of that right, a remedy obtainable even absent other damage.

For the reasons set forth above, the Court concludes that the plaintiffs have alleged an injury-in-fact and that the Court thus possesses subject matter jurisdiction to hear this action.

## II. Coverage under Section 1641(g).

Section 1641(g) reads as follows:

> In addition to other disclosures required by this subchapter, not later than 30 days after the date on which a mortgage loan is sold or otherwise transferred or assigned to a third party, the creditor that is the new owner or assignee of the debt shall notify the borrower in writing of such transfer, including –
> (A) the identity, address [and] telephone number of the new creditor;
> (B) the date of transfer;
> (C) how to reach an agent or party having authority to act on behalf of the new creditor;
> (D) the location of the place where transfer of ownership of the debt is recorded; and
> (E) any other relevant information regarding the new creditor.

Section 1641(g) imposes a notification obligation on the "new creditor" or "new owner or assignee of the debt." The Court thus traces the history of the plaintiffs' loan and the mortgage securing it.[4]

In 2006, the plaintiffs obtained mortgage refinancing from Pensacola Guarantee Mortgage ("Pensacola"). In connection with the refinancing, the plaintiffs executed a promissory note ("the Note") in favor of Pensacola. (Doc. 59, Exhibit 2(A)). They also executed a mortgage ("the Mortgage") naming Mortgage Electronic Registration Systems, Inc. ("MERS") as the mortgagee. (Doc. 54, Exhibit 1). The Mortgage identifies MERS as "a separate corporation that is acting solely as a nominee for [Pensacola] and [Pensacola's] successors and assignees." (*Id*. at 1). The Mortgage conveys to MERS (as nominee) legal title to the realty and grants to MERS (as nominee)

---

[4] Except as expressly noted, the parties are in agreement as to all statements of fact listed in this section.

the power of sale. (*Id*. at 2-3). Specifically, the Mortgage provides that "Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument." (*Id*. at 3).

Shortly after closing, Pensacola executed an allonge to the Note, transferring ownership of the Note to SunTrust Mortgage ("SunTrust"). (Doc. 59, Exhibit 6(2) at 7). SunTrust later endorsed the Note in blank. (*Id*. at 4).

According to the declaration of Thomas Kowick, a director of the Federal National Mortgage Association ("Fannie Mae"), Fannie Mae acquired ownership of the Note from SunTrust in early 2007. (Doc. 59, Exhibit 7). The plaintiffs object that Kowick has no personal knowledge concerning this proposition and is instead relying on a computer screen grab from a Fannie Mae website rather than on a "conveyance document" transferring ownership of the Note to Fannie Mae. (Doc. 76 at 2-4, 13, 17-19). For reasons that appear below, the Court concludes it is uncontroverted that Fannie Mae received ownership of the Note in or before September 2007.

First, in September 2007, the defendant received physical possession of the Note from Fannie Mae and thereafter served as custodian of the Note on behalf of Fannie Mae. (Smith Deposition at 108, 117-20, 209-10; Doc. 76 at 5). This uncontroverted evidence establishes that Fannie Mae had physical possession of the Note prior to its delivery of the Note to the defendant.

Second, the Note is a "negotiable instrument" as that term is defined by Alabama law. Ala. Code § 7-3-104(a). As used in that chapter, "'[i]nstrument' means a negotiable instrument." *Id*. § 7-3-104(b). "If an instrument is payable to bearer, it may be negotiated by transfer of possession alone." *Id*. § 7-3-201(b). Specifically, "[w]hen endorsed in blank, an instrument becomes payable to bearer and may be negotiated by transfer of possession alone unless specially indorsed." *Id*. § 7-3-205(b). Because the

Note was endorsed in blank and without special endorsement, it was negotiable by transfer of possession alone.

Since negotiation of the Note could be accomplished by mere transfer of possession, and since it is uncontroverted that Fannie Mae had possession of the Note when it transferred possession to the defendant, the Note necessarily had been negotiated to Fannie Mae by transfer of possession. Negotiation made Fannie Mae the Note's holder, Ala. Code § 7-3-201(a), and, as a holder, Fannie Mae was entitled to enforce the Note. *Id*. § 7-3-301.

Servicing of the loan was transferred from Pensacola to SunTrust shortly after closing. (Doc. 59, Exhibit 2(D)). Servicing was transferred from SunTrust to the defendant in September 2007. (Smith Deposition at 91; Kibble Deposition at 121-22; Doc. 76 at 4).

In July 2010, the defendant sent the plaintiffs an "acceleration warning (notice of intent to foreclose)," based on the plaintiffs' failure to make several monthly payments. (Doc. 54, Exhibit 4). By letter dated September 3, 2010, the defendant issued the plaintiffs a "notice of acceleration of promissory note and mortgage" and announced that it was "commencing foreclosure under the terms of the Mortgage." (*Id*., Exhibit 5). On September 7, 2010, MERS executed an "assignment of mortgage" ("the Assignment"), transferring to the defendant "all right, title and interest of [MERS] in and to that certain Mortgage executed by" the plaintiffs. (*Id*., Exhibit 6).

It is this September 2010 Assignment that, according to the plaintiffs, triggered Section 1641(g). At the risk of oversimplification, the Court summarizes the plaintiffs' argument as follows. Citing an implementing regulation, the plaintiffs argue that a "new owner or assignee" under the statute is one holding "legal title" to the underlying debt. Citing Alabama case law, the plaintiffs argue that legal title means "apparent ownership" of the debt, with no requirement of a beneficial interest in the debt. Citing the Mortgage, the plaintiffs argue that it gives MERS all rights of the lender, including the right to foreclose. Citing the Assignment, the plaintiffs argue that the defendant succeeded to these rights. Citing an Alabama statute, the plaintiffs argue that foreclosure can lawfully

8

be undertaken only by one "entitled to the money thus secured." Citing Alabama case law, the plaintiffs argue that transfer of a mortgage raises a presumption that title to the secured debt is transferred as well. Citing an Alabama case, the plaintiffs argue that the Mortgage and Assignment thereby conveyed to the defendant the apparent ownership of the debt and thus legal title to it. (Doc. 54 at 6-10).[5]

The parties' briefing as to the defendant's status vel non as a "new owner or assignee of the debt" under Section 1641(g) raises several interesting and apparently intricate questions of state and federal law. But the Court need not address them because, even were they to be resolved favorably to the plaintiffs, under the uncontroverted facts the defendant falls within the safe harbor of Section 1641(f) as a matter of law.

### III. Administrative Convenience.

Section 1641(f) provides in pertinent part as follows:

(f) Treatment of servicer

    (1) In general

    A servicer of a consumer obligation arising from a consumer credit transaction shall not be treated as an assignee of such obligation for purposes of this section unless the servicer is or was the owner of the obligation.

    (2) Servicer not treated as owner on basis of assignment for administrative convenience

    A servicer of a consumer obligation arising from a consumer credit transaction shall not be treated as the owner of the obligation for

---

[5] While suggesting vaguely at various points in their briefing that perhaps Fannie Mae retains no beneficial interest in the loan, the plaintiffs expressly represent that the proposition that "Fannie Mae remains the beneficial owner of the loan," (Doc. 58 at 10), is "not disputed." (Doc. 76 at 6). That admission is dispositive, and only the location of legal title to the debt is at issue.

purposes of this section on the basis of an assignment of the obligation from the creditor or another assignee to the servicer solely for the administrative convenience of the servicer in servicing the obligation.

….

Under subsection (1), a servicer has no duty of notification under Section 1641(g) unless the servicer "is or was the owner of the obligation." Under subsection (2), the servicer "shall not be treated as the owner of the obligation," and thus shall not be subject to Section 1641(g), if it was assigned the obligation "solely for the administrative convenience of the servicer in servicing the obligation."

It is uncontroverted that the defendant was appointed as servicer of the plaintiffs' loan. (Doc. 76 at 4). The question is whether it is uncontroverted that the defendant – assuming for the moment that it was assigned the obligation at all – was assigned the obligation solely for its administrative convenience in servicing the obligation.

The parties have identified, and the Court has located, no case defining "administrative convenience" under Section 1641(f), and the implementing regulation uses the term without attempting to explain it. 12 C.F.R. § 226.39(a)(1). Invoking "common sense," the plaintiffs assert that the phrase captures only "non-substantial ministerial duties." Using this crabbed definition, they conclude that administrative convenience "could never encompass something as fundamental and essential to the mortgagee/mortgagor relationship as acceleration and foreclosure." They insist that any contrary conclusion would be "bizarre." (Doc. 76 at 23-24).

The Court acknowledges that "[t]he rule of common sense must be applied to the construction of criminal statutes, the same as others." *United States v. Haun*, 494 F.3d 1006, 1009-10 (11th Cir. 2007) (internal quotes omitted). But that is not where the inquiry commences. Instead, "[w]e begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself." *Jian Le Lin v. United States Attorney General*, 681 F.3d 1236, 1239 (11th Cir. 2012) (internal quotes omitted). "And where the statutory language provides a clear

answer, it ends there as well." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999).

The term "administrative convenience" is not defined by statute. Therefore, the Court "assum[es] that the ordinary meaning of that language accurately expresses the legislative purpose." *Dionne v. Floormasters Enterprises, Inc.*, 667 F.3d 1199, 1205 (11th Cir. 2012) (internal quotes omitted). "In determining the ordinary meaning of statutory terms, we often find guidance in dictionary definitions." *In re: James*, 406 F.3d 1340, 1343 (11th Cir. 2005).

Something is "convenient" if it is "[a]ppropriate or favorable to one's comfort, purpose, or needs." Webster's New College Dictionary at 252 (3rd ed. 2008).[6] "Convenience," then, denotes "[s]omething that increases comfort or makes work less difficult." *Id*.[7] To "administer" is to "manage." *Id*. at 15.[8] "Administration" is simply "[t]he act or process of administering …," and "administrative" is merely the adjectival form of the word. *Id*. Thus, "administrative convenience" is that which makes it easier or

---

[6] *Accord* Oxford English Dictionary (online ed. 2012) ("OED") (defining "convenient" as "[p]ersonally suitable or well-adapted to one's easy action or performance of functions; favourable to one's comfort, easy condition, or the saving of trouble; commodious"); American Heritage Dictionary 400-01 (5th ed. 2011) ("AHD") (defining "convenient" as "[s]uited or favorable to one's comfort, purpose, or needs").

The Supreme Court and the Eleventh Circuit have repeatedly relied on these and similar dictionaries in construing statutory language. *See, e.g., Mohamad v. Palestinian Authority*, 132 S. Ct. 1702, 1707 (2012); *Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011); *Stein v. Paradigm Mirasol, LLC*, 586 F.3d 849, 854 (11th Cir. 2009); *Jackson v. State Board of Pardons and Paroles*, 331 F.3d 790, 795 (11th Cir. 2003); *In re: Cash Cow Services, LLC*, 296 F.3d 1261, 1263 (11th Cir. 2002).

[7] *Accord* OED (defining "convenience" as "[t]he quality of being convenient" as defined above); AHD at 400 (defining "convenience" as "[t]he quality of being suitable to one's comfort, purposes, or needs").

[8] *Accord* OED (defining "administer" as "to carry out or oversee the tasks necessary for the running of (an organization) or the effecting of (a state of affairs); to manage, run (an operation, affairs, etc.); to manage the affairs of (an institution, community, etc.)"); AHD at 22 (defining "administer" as "[t]o have charge of; manage").

less difficult to manage whatever is being managed.  *Cf. Reno v. Flores*, 507 U.S. 292, 311 (1993) (equating "administrative convenience" with "administrative efficiency").

The plaintiffs' restriction of administrative convenience to "non-substantial ministerial duties" will not hold water.  They cite no authority of any kind for the proposition that administrative convenience can be so tightly cabined, and even a casual review of the contexts in which the phrase is used demonstrates that it cannot be so limited.  For example, the Supreme Court has recently described a union's decision to calculate the fee that non-members must pay by using the union's expenses during the previous year as sustainable "[i]n the interest of administrative convenience," *Knox v. Service Employees International Union*, 132 S. Ct. 2277, 2285 (2012) (describing *Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986)), yet it cannot be seriously suggested that a union's determination of the fee charged to non-members is a "non-substantial ministerial dut[y]."  Similarly, the High Court has found a tax exemption for businesses with fewer than eight employees to be rational in light of the "administrative convenience" of not taxing smaller businesses, *Armour v. City of Indianapolis*, 132 S. Ct. 2073, 2081 (2012) (describing *Carmichael v. Southern Coal & Coke Co.*, 301 U.S. 495 (1937)), even though taxation plainly is not a ministerial task.

Congress as well has used the term "administrative convenience" in contexts that could not possibly support the construction the plaintiffs attempt to place on it.  For example, a reorganization plan under Chapter 11 must place each claim in a particular class "only if such claim or interest is substantially similar to the other claims or interests of such class," except that "[a] plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience."  11 U.S.C. § 1122.  The classification of claims in a bankruptcy case cannot easily be construed as a ministerial task, especially given that the classification must be judicially approved.  Similarly, Congress has prohibited the termination or reduction of certain tribal grants based on the administrative convenience of the administering agency, 25 U.S.C. §§ 2502(g), 3303(d), yet grant decisions cannot be viewed as ministerial.

The plaintiffs' novel proposed restriction of "administrative convenience" to ministerial duties makes no more sense in the context of Section 1641(f) than it does elsewhere.  By its terms, the statute negates servicer liability whenever the servicer receives ownership of the underlying obligation for its administrative convenience "in servicing the obligation."  It thereby extends protection to assignments of the obligation that are administratively convenient to any and all servicing duties undertaken by the servicer – substantive as well as ministerial.

The plaintiffs suggest that their narrow reading of Section 1641(f) has been endorsed by the Northern District of Illinois.  (Doc. 76 at 24-25).  According to them, the Court in *Fairbanks Capital Corp. v. Jenkins*, 225 F. Supp. 2d 910 (N.D. Ill. 2002), "soundly rejected the notion that [the servicer] could at the same time be both an owner of the debt for the purposes of conducting a foreclosure in its own name and also a 'servicer' accepting assignment 'solely for administrative convenience.'"  (Doc. 76 at 24).  But the *Fairbanks Capital* Court said no such thing.  What it actually stated was that the servicer could not allege in its complaint that it was the owner of the note and simultaneously deny that it fell within Section 1641(f)(1).  225 F. Supp. 2d at 914.  In addressing the safe harbor provision of Section 1641(f)(2), the Court made only the unremarkable ruling that, on a motion to dismiss, it could not determine the factual issue of whether the assignment had been made solely for administrative convenience.  *Id*.

"We will only look beyond the plain language of a statute at extrinsic materials to determine the congressional intent if:  (1) the statute's language is ambiguous; (2) applying it according to its plain meaning would lead to an absurd result; or (3) there is clear evidence of contrary legislative intent."  *In re:  Tennyson*, 611 F.3d 873, 877 (11th Cir. 2010) (internal quotes omitted).  A statute is ambiguous when it is "capable of being understood in two or more possible senses or ways."  *Chickasaw Nation v. United States*, 534 U.S. 84, 90 (2001) (internal quotes omitted).  Since only two readings of Section 1641(f) have been proposed, and since the statute is not capable of being understood as the plaintiffs would read it, there is no ambiguity to be resolved.  Applying the Court's construction leads to no absurd results, and the plaintiffs suggest none.  Nor do they

13

identify any evidence of contrary legislative intent – indeed, they do not address legislative intent at all.  The Court's reading therefore obtains.

To the question, then:  was assignment of the obligation to the defendant (if it indeed occurred) "solely for the administrative convenience of the servicer in servicing the obligation"?  That is, did such assignment make it less difficult for the defendant to perform a servicing duty, and was that the purpose of the assignment?  The answer plainly must be in the affirmative.

As noted in Part II, the plaintiffs insist that assignment of a mortgage carries with it as a matter of Alabama law an assignment of the debt and that foreclosure can legally be undertaken in Alabama only by one holding title to the debt.  If neither proposition is true, then the defendant could not be a creditor under Section 1641(g), and the plaintiffs' case fails under Part II.  But if (as the Court assumes for argument) either is true, then assignment of the debt to the defendant necessarily was administratively convenient to the defendant in servicing the obligation.

As the plaintiffs admit, conducting foreclosure proceedings is an integral part of the defendant's duties as servicer.  (Doc. 58 at 9; Doc. 76 at 6-7).  As the plaintiffs admit, the defendant was required by its arrangements with Fannie Mae to foreclose in its own name – not in Fannie Mae's name and not in MERS' name.  (Doc. 58 at 9-10; Doc. 76 at 6-7).  As the plaintiffs admit, in order to foreclose in its own name, the defendant was required to be the mortgagee of record, which status required an assignment of the Mortgage to it from MERS.  (*Id*. at 9, 20-21).  As the plaintiffs admit, Fannie Mae requires the defendant to obtain such an assignment.  (*Id*. at 11).

Given the plaintiffs' position that assignment of the debt follows assignment of the mortgage and/or that assignment of the debt is a legal prerequisite to foreclosure, assignment of the debt (if it occurred) made it less difficult for the defendant to fulfill its servicing duty of foreclosing in its own name.  Indeed, under the plaintiffs' theory it would not have been legal or even possible for the defendant to fulfill this duty without

being assigned the debt. Any assignment of the debt to the defendant therefore was administratively convenient within the contemplation of Section 1641(f). [9]

The plaintiffs object that the defendant's Rule 30(b)(6) deponents do not expressly describe the Assignment as being "administratively convenient." (Doc. 76 at 8-9).[10] The uncontroverted facts listed two paragraphs above – all of which have been conceded by the plaintiffs – of themselves establish a complete factual predicate for the conclusion that any assignment of the debt was administratively convenient to the defendant in carrying out its servicing duty of foreclosing in its own name. The Assignment was administratively convenient for the same reasons. It is irrelevant whether the defendant produced witnesses echoing that conclusion.

The plaintiffs next argue that, even if the Assignment was administratively convenient, the defendant offers no evidence that such convenience was the purpose of the Assignment. (Doc. 76 at 8-9, 11-12). This argument is foreclosed by the plaintiffs' admission that "[i]t is undisputed that the purpose of this assignment was to allow Chase to accelerate the debt and conduct a foreclosure on the Reed's home." (*Id*. at 13). The plaintiffs thereby admit that the defendant's purpose in preparing and accepting the Assignment was to allow (that is, make less difficult) its performance of its servicing duty of foreclosing in its own name. Since they contend that assignment of the debt

---

[9] The plaintiffs appear to believe that any act which benefits the servicer's client and/or costs the servicer money (such as the cost of preparing and recording the Assignment) cannot be administratively convenient to the servicer. (Doc. 76 at 11). This is a non sequitur. Every business in America incurs costs in the course of delivering what the client wants and would quickly go out of business if it did not incur those costs or satisfy its clientele. What makes conduct administratively convenient under Section 1641(f) is that the conduct renders it easier for the servicer to perform that which its client requires in servicing the obligation.

[10] Under Section 1641(f), the assignment that matters is assignment of the debt. The plaintiffs, however, focus their arguments on the Assignment of the Mortgage, presumably because, under their theory, assignment of the Mortgage for purposes of foreclosure encompasses or requires assignment of the debt.

follows assignment of the Mortgage and that assignment of the debt is necessary to foreclosure, their admission extends to assignment of the debt.

The plaintiffs stress that Section 1641(f) requires that administrative convenience be the "sole" reason for the assignment. (Doc. 76 at 8-9, 11-12, 23). Their admission as to the "the purpose" of the Assignment sweeps this argument before it, since there is no difference between "the purpose" as the plaintiffs have used it and "the sole purpose."[11]

Finally, the plaintiffs argue there is evidence that the reason for the Assignment was to benefit Fannie Mae, primarily by avoiding or minimizing transfer taxes. (Doc. 76 at 11). Again, the plaintiffs have already admitted that the purpose of the Assignment was to allow the defendant to perform its servicing duty of foreclosing in its own name, and that admission is dispositive. But the plaintiffs are also mistaken on the merits. Section 1641(f) is concerned only with why a servicer takes an assignment, while the plaintiffs' argument addresses not the defendant's motivation in taking the Assignment but the separate (and irrelevant) question of Fannie Mae's motivation in requiring the Assignment.

## CONCLUSION

For the reasons set forth above, the plaintiffs' motion for summary judgment is **denied** and the defendant's motion for summary judgment is **granted**. Judgment shall be entered accordingly by separate order.[12]

---

[11] *See, e.g., In re: Cardelucci*, 285 F.3d 1231, 1234 (9th Cir. 2002) ("The definite article 'the' instead of the indefinite 'a' or 'an' indicates that Congress meant for a single source to be used to calculate post-petition interest."); *American Business Association v. Slater*, 231 F.3d 1, 5 (D.C. Cir. 2000) ("Indeed, it is a rule of law well established that the definite article 'the' particularizes the subject which it precedes. It is a word of limitation ….") (internal quotes omitted).

[12] The following ancillary motions are **denied as moot**, as the Court has not relied on any of the evidence made the subject of the motions: (1) the plaintiffs' motion to strike the declaration of Thomas Reardon, (Doc. 70); (2) the plaintiffs' motion to strike the declaration of Thomas Kowick, (Doc. 71); (3) the defendant's motion for leave to file supplemental (Continued)

DONE and ORDERED this 26th  day of September, 2012.

s/ WILLIAM H. STEELE  
CHIEF UNITED STATES DISTRICT JUDGE

---

declarations of Kowick and Reardon, (Doc. 79); (4) the plaintiffs' restated motion to strike the declarations of Kowick and Reardon, (Doc. 82); and (5) the defendant's addended motion for leave to file supplemental declarations of Kowick and Reardon.  (Doc. 86).